**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS, | ) ) ) | |
| Applicant, | ) ) | Misc. No. 1:16-mc-00621-RMC |
| v. | ) ) | |
| CARL FERRER, 2501 Oak Lawn Avenue Dallas, TX 75219 | ) ) ) ) | |
| Respondent. | ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO APPLICATION OF
SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
TO ENFORCE SUBPOENA DUCES TECUM**

Steven R. Ross
Stanley M. Brand
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue NW
Washington, D.C. 20036
Telephone:  (202) 887-4343

Robert Corn-Revere
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, D.C. 20006
Telephone:  (202) 973-4200

Counsel for Carl Ferrer

DATED:  April 26, 2016.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iv

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

    A.    Freedom of Expression and Online Intermediaries ........................................... 4

    B.    Efforts to Restrain Speech Published By Online Intermediaries ...................... 6

        1.    State and Local Attacks on Online Intermediaries ........................... 7

        2.    Federal Attacks on Backpage.......................................................... 10

    C.    The Subcommittee Investigation..................................................................... 11

        1.    The Subcommittee's July 7, 2015 Document Subpoena ................. 11

        2.    The Subcommittee's October 1, 2015 Document Subpoena ......... 13

        3.    PSI's Hearing and Report ............................................................... 16

        4.    The Subcommittee's Application for Enforcement ......................... 17

    D.    The Subcommittee's Targeting of Individuals and Third Parties ................... 18

    E.    The Subcommittee's Undisclosed Coordination With Law Enforcement .................... 19

ARGUMENT ..................................................................................................................... 21

I.    The Subcommittee's Efforts to Compel Documents from Backpage and Its CEO Violate the First Amendment ........................................................................................... 21

    A.    Backpage Raised Valid First Amendment Objections................................... 22

        1.    The Subcommittee's Demands Impinge on Significant First Amendment Interests..... 22

        2.    This is Not a Commercial Speech Issue ........................................ 28

        3.    The Subpoena Demands Are Overly Broad and Burdensome....................................... 30

    B.    The Subcommittee Lacks a Valid Legislative Purpose to Support Subpoena Enforcement ................................................................................................... 32

    C.    The Subcommittee's Investigation is Part of a Punitive Campaign Targeting Backpage ........................................................................................................... 37

II.   The Subcommittee's Application for Enforcement of the Subpoena Seeks Relief Not
       Provided by 28 U.S.C. § 1365 and Otherwise Denies Backpage Due Process of Law ....... 41

CONCLUSION ........................................................................................................................... 45

## TABLE OF AUTHORITIES

**CASES**

*ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009) .............................................................................................................. 6

*American Booksellers Found. v. Dean*, 342 F.3d 96 (2d Cir. 2003) ........................... 6

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986) ............................................... 29, 30

*Backpage, LLC v. Dart*, 127 F. Supp. 3d 919 (N.D. Ill. 2015).................................. 17

∗ *Backpage.com LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015)........................... 3, 7, 9, 10, 17, 32, 40

*Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013) ................. 6, 8, 22, 29

*Backpage.com, LLC v. Hoffman*, No. 13–cv–03952, 2013 WL 4502097 (D.N.J. Aug. 20, 2013) ...................................................................................... 6, 8, 29

*Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012)................. 6, 8, 29

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)..................................................... 9

*Ben Ezra, Weinstein & Co., Inc. v. AOL, Inc.*, 206 F.3d 980 (10th Cir. 2000)............ 4

*Bigelow v. Virginia*, 421 U.S. 809 (1975)................................................................. 29

∗ *Bursey v. United States*, 466 F.2d 1059 (9th Cir. 1972) .................................. 24, 25, 26, 34

*Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008) ............................................................................. 28

*Clark v. Martinez*, 543 U.S. 371 (2005) ................................................................. 37

*Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009).......................... 5, 7, 28

∗ *Deutch v. United States*, 367 U.S. 456 (1961) ........................................ 24, 33, 36, 43

*Doe v. Backpage.com, LLC*, — F.3d —, 2016 WL 963848 (1st Cir. Mar. 14, 2016)...................................................................................................... 6

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008) ................................................. 5

*Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 638 F.3d 794 (D.C. Cir. 2011).......................................................... 37

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008)........................................................................... 5, 28

*Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539 (1963) .......... 27, 35

*Google, Inc. v. Hood*, — F.3d —, 2016 WL 1397765 (5th Cir. April 8, 2016) ............... 4, 7, 26

*Jones v. Helms*, 454 U.S. 412 (1981) ..................................................................... 27

*NAACP v. Alabama*, 357 U.S. 449 (1958) .............................................................. 27

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973) ................................................................................................................. 28

*RAV v. St. Paul*, 505 U.S. 377 (1992) .................................................................... 23

*Reno v. ACLU*, 521 U.S. 844 (1997) .......................................................... 4, 5, 6, 28

*Russell v. United States*, 369 U.S. 749 (1962) ................................................... 24, 36

*S.E.C. v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118 (3d Cir. 1981) .................. 37

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F. 2d 725 (D.D.C. 1974) ...................................................................................................... 37

*Shelton v. United States*, 327 F.2d 601 (D.C. Cir. 1963) ........................................ 24

*Shelton v. United States*, 404 F.2d 1292 (D.C. Cir. 1968) ...................................... 22

*Sinclair v. United States*, 279 U.S. 263 (1929) ...................................................... 32

*Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011) .................................................. 29

*Stamler v. Willis*, 415 F.2d 1365 (7th Cir. 1969) ................................................... 23

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ................................... 23, 27, 35, 36

*United States v. Ballin*, 144 U.S. 1 (1892) ........................................................... 32

*United States v. Powell*, 379 U.S. 48 (1964) ..................................................... 37, 40

\* *United States v. Rumely*, 345 U.S. 41 (1953) ................................. 23, 27, 33, 34, 36

*United States v. Stevens*, 559 U.S. 460 (2010) ...................................................... 31

\* *Watkins v. United States*, 354 U.S. 178 (1957) ............ 22, 23, 24, 25, 27, 35, 36, 37, 41, 43

*Wilkinson v. United States*, 365 U.S. 399 (1961) .................................................. 32

*Yellin v. United States*, 374 U.S. 109 (1963) ........................................................ 32

*Zeran v. AOL, Inc.*, 129 F.3d 327 (4th Cir. 1997) .................................................... 4

**STATUTES**

18 U.S.C. § 1591 ................................................................................................. 10

28 U.S.C. § 1365(a) ............................................................................ 44

* 28 U.S.C. § 1365(b) ................................................................ 41, 43, 44

Stop Advertising Victims of Exploitation Act of 2015 (the "SAVE Act"), Pub. L.
   No. 114-22, § 118, 129 Stat. 227 (2015) ......................................... 10

**CONGRESSIONAL MATERIALS**

161 Cong. Rec. S1458 (daily ed. Mar. 12, 2015) ..................................... 10

161 Cong. Rec. S1561 (daily ed. Mar. 17, 2016) ..................................... 16

162 Cong. Rec. S1562 (daily ed. Mar. 17, 2016) ................................ 3, 19

H.R. RES. 649, 112th Cong. (2012) ....................................................... 10

*Human Trafficking Investigation Hearing Before the Permanent Subcomm. on
   Investigations of the Committee on Homeland and Governmental Affairs,*
   114th Cong. (2015) ........................................................ 16, 17, 33, 41

S. REP. No. 114-214 (2016) .................................................................. 18

S. REP. No. 95-170 (1977) .................................................................... 44

S. RES. 439, 112th Cong. (2012) ........................................................... 10

STAFF OF  S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON
   RECOMMENDATION TO ENFORCE A SUBPOENA ISSUED TO THE CEO OF
   BACKPAGE.COM (Nov. 19, 2015) ............................................... 11, 40

**MISCELLANEOUS**

*Backpage, LLC v. Dart*, No. 15-3047, Dkt. No. 47 (7th Cir. Nov. 16, 2015) ........... 17

Certificate of Service of Notice, *Backpage, LLC v. Dart,*  No. 15- 3047, Dkt. No.
   49 (Nov. 17, 2015) ....................................................................... 10

*Craigslist, Inc. v. McMaster*, No. 2:09-cv-1308, Order Granting Defs.' Mot. to
   Dismiss (Dkt. No. 43) (D.S.C. Aug. 6, 2010) .................................... 7

Joint Statement of Craigslist, AGs, and the National Center for Missing &
   Exploited Children (undated),
   https://www.azag.gov/sites/default/files/craigslist%20final%20statement.pdf ...... 7

Letter from Reps. Marsha Blackburn and Carolyn Maloney to Larry Page, Chief
   Executive Officer, Google, Inc. (Apr. 3, 2012), *available at*
   http://blackburn.house.gov/uploadedfiles/blackburn_maloney_letter_4-3-
   12.pdf ........................................................................................ 8

Memorandum of Points and Authorities in Support of Application to Enforce
   Subpoena Duces Tecum of Senate Permanent

Subcommittee on Investigations ......... 3, 19, 22, 23, 26, 27, 28, 29, 30, 32, 33, 34, 36, 38, 44

*Modification, Black's Law Dictionary*, (10th ed. 2014) ............................................................ 44

Motion to Strike Plaintiff's Improvidently Filed Summary Judgment Motion,
    *Backpage, LLC v. Dart*, No. 15-cv-06340, Dkt. No. 126. .................................................... 40

\* Cases and authorities chiefly relied upon are denoted with an asterisk.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS, <br><br> Applicant, <br><br> v. <br><br> CARL FERRER, <br><br> Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Misc. No. 1:16-mc-00621-RMC |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO APPLICATION OF
SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS
TO ENFORCE SUBPOENA DUCES TECUM**

Respondent Carl Ferrer, Chief Executive Officer of Backpage.com LLC ("Backpage"), opposes the Application to Enforce Subpoena Duces Tecum ("Application") filed by the Senate Permanent Subcommittee on Investigations (the "Subcommittee") and in response submits as follows.

**INTRODUCTION**

The Subcommittee comes before this Court asking for an order requiring the publisher of "an online forum for classified ads"—an online intermediary for speech of third-party users—to produce documents in response to three paragraphs of a subpoena issued by the Subcommittee on October 1, 2015 ("Subpoena").  The Subcommittee would have this Court believe that this is a simple, almost ministerial, request to invoke the authority of the Judicial Branch in furtherance of the ordinary law-writing duties of the federal legislature.  The Subcommittee describes its enforcement application as a mere effort to obtain a carefully circumscribed cache of information specifically necessary to the proper performance of its legislative drafting functions.  In reality, it is nothing of the kind.

– 1 –

The three paragraphs of the Subpoena now presented to the Court for enforcement strike at the very heart of Backpage's First Amendment rights as an online intermediary publisher.  Far from narrow, the very first of the Subpoena's paragraphs alone illustrates the breadth and constitutionally infirm nature of document demands: "Any documents concerning Backpage's reviewing, blocking, deleting, editing, or modifying advertisements in Adult sections . . . including but not limited to policies, manuals, memoranda and guidelines."  Subpoena to Carl Ferrer from Chairman and Ranking Member of the Subcommittee (Oct. 1, 2015) (hereinafter, "Oct. 1, 2015 Subpoena"), attached hereto as Ex. A.  Compliance with this demand would require the collection, review, and production of a vast array of materials concerning Backpage's editorial processes, including virtually all emails to or from employees who perform the content review function, over a six-year period.  The Subcommittee's characterization of this dragnet Subpoena as a narrowly-tailored effort to obtain information directly relevant to contemplated legislation bears little, if any, resemblance to the facts.

The Subcommittee falsely asserts that Backpage has simply refused to cooperate with its investigation and has asserted only "blanket objections," but the truth is, Backpage sought to comply with the Subcommittee's vacillating demands in good faith, notwithstanding its valid and clearly-stated constitutional reservations.  Although the Congress enjoys a broad ability to conduct inquiries in support of its legislative function, that power is—like all governmental authority—constrained by constitutional limits.  The government cannot require the production of information that impairs the exercise of First Amendment rights, and Backpage spelled out the ways in which the Subcommittee's demands had just such an effect.  Nor may the Subcommittee use its power of inquiry in a governmental effort to attack, impugn, and ultimately eradicate an unpopular publisher of constitutionally-protected speech.  But the Subcommittee's work appears to be connected to a larger effort to close down Backpage through various types of pressure tactics.

In seeking permission of the Senate to invoke the authority of this Court, the Subcommittee's Chairman revealingly described the purpose of the Subcommittee's demand, stating that "[w]e still don't know the full extent of Backpage's [ad] editing practices." 162 Cong. Rec. S1562 (daily ed. Mar. 17, 2016) (statement of Sen. Portman). In speaking to political supporters, he was even more blunt: "The website called backpage essentially sells human beings. It's horrible, and *I'm going after them*." Rob Portman (@robportman), TWITTER, (Mar. 26, 2016, 4:54 PM EST), https://twitter.com/robportman/status/713876894693793792, attached hereto as Ex. B. (emphasis added). This hyperbolic misrepresentation of the facts is linked to others, who have made similar assertions to justify their campaigns to shutter the "Adult" section of Backpage's online forum for classified ads. But as the United States Court of Appeals for the Seventh Circuit recently observed, such assertions cannot justify "squelch[ing] the free speech of private citizens." *Backpage.com LLC v. Dart*, 807 F.3d 229, 235 (7th Cir. 2015).

The process by which a publisher determines what it will or will not publish lies at the core of the First Amendment, regardless of whether speech appears in newsprint or online. The Subcommittee's Application seeks to invoke this Court's authority to breach the constitutional protections afforded to the publisher of an online forum. The fundamental question in this case is whether to permit its own authority to be expropriated for such a purpose. The Court should refuse to be party to such an effort and should decline to enforce the Subpoena.

## BACKGROUND

The Subcommittee seeks to justify enforcement of the Subpoena as an adjunct to an investigation within its general congressional authority to regulate interstate commerce, organized crime, and matters relating to the Internet. *See* Subcommittee's Mem. of Points and Authorities in Supp. ("App. Mem.") at 16–19. To evaluate this claim requires a broader understanding of efforts to regulate the Internet and their impact on freedom of expression; campaigns to hold online intermediaries responsible for speech posted by third parties, including

ongoing campaigns targeting Craigslist, Backpage, and other such platforms; and the relationship between these efforts and the Subcommittee's investigation.

### A.      Freedom of Expression and Online Intermediaries

This case, "like others of late," reinforces "the importance of preserving free speech on the internet, even though the medium serves as a conduit for much that is distasteful or unlawful." *Google, Inc. v. Hood*, — F.3d —, 2016 WL 1397765, at *5 (5th Cir. April 8, 2016). Recognizing the unprecedented global nature of the medium, the Supreme Court extended the highest level of First Amendment protection to the Internet because "regulation of the content of speech is more likely to interfere with the free exchange of ideas than to encourage it." *Reno v. ACLU*, 521 U.S. 844, 885 (1997). An essential feature of this unique medium is the availability of platforms created and managed by online intermediaries that allow individuals to communicate information to vast audiences by posting on forums of various kinds. Because of this vital role of online intermediaries in hosting third-party content, Congress adopted national policies "to maintain the robust nature of Internet communication," *Zeran v. AOL, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997), and "to promote freedom of speech in the 'new and burgeoning Internet medium.'" *Ben Ezra, Weinstein & Co., Inc. v. AOL, Inc.*, 206 F.3d 980, 985 n.3 (10th Cir. 2000) (citation omitted).

Online intermediaries, like Backpage, have been essential for the Internet to become and remain a vital medium of free expression for billions of users who exchange ideas and information all over the world.[1] Platforms provided by these intermediaries take many forms, including search engines, social networks, advertising platforms, and content-hosting sites—all of which offer forums to post and/or access to user-generated content.

---

[1]      *See Shielding the Messengers: Protecting Platforms for Expression and Innovation*, CENTER FOR DEMOCRACY & TECHNOLOGY (2012), https://cdt.org/files/pdfs/CDT-Intermediary-Liability-2012.pdf.

The universal adoption and popularity of the Internet requires online intermediaries to deal with vast amounts of information.  For example, on the classified advertising website Craigslist seven years ago, "users create[d] and post[ed] over thirty million new classified advertisements each month," and "Craigslist's website, which displays the ads, [was] viewed over nine billion times each month."  *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 961 (N.D. Ill. 2009) (internal marks omitted).  Backpage is the second largest online classified advertising website in the U.S.  Backpage users post millions of ads monthly in various categories, including real estate, buy/sell/trade, automotive, jobs, dating and adult.  Backpage users provide all content for ads, while Backpage provides an online platform—its website—for users to disseminate that speech.[2]

One consequence of creating a global medium in which any person with an online connection "can become a town crier with a voice that resonates farther than it could from any soapbox," *Reno*, 521 U.S. at 870, is that speech on the Internet is wide-open and robust, but it may also offend or in some cases even violate the law.  This fact has prompted litigation attempting to impose liability on intermediaries for such speech, as well as demands for regulation.  In order to avoid any constitutionally impermissible prior restraint on Internet speech, Congress adopted Section 230 of the Communications Decency Act, 47 U.S.C. § 230, to preserve freedom of expression online by creating broad immunity for "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online."  *Fair Hous. Council of San Fernando Valley v. Roommates.com*, LLC, 521 F.3d 1157, 1170–71 (9th Cir. 2008) (*en banc*).  This specifically protects "decisions relating to the monitoring, screening, and deletion of content."  *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) (citation and marks omitted).  Various courts have recognized, including most recently the First Circuit, that "websites that display third-party content may have an infinite number of users generating an

---

[2]     Backpage does not dictate or require any content, though it may block and remove content that violates its rules or that may be improper.

enormous amount of potentially harmful content," and there can be no doubt that "holding website operators liable for that content would have an obvious chilling effect in light of the difficulty of screening posts for potential issues." *Doe v. Backpage.com, LLC*, — F.3d —, 2016 WL 963848, at *4 (1st Cir. Mar. 14, 2016) (citation and marks omitted).

The strong First Amendment protections for online expression have prevented most direct efforts to censor online speech. For example, the Supreme Court struck down restrictions on "indecent" expression in the Communications Decency Act, *Reno*, 521 U.S. at 868–79, 885, and the Third Circuit voided its successor statute, the Child Online Protection Act. *See ACLU v. Mukasey*, 534 F.3d 181, 207 (3d Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009). Numerous similar state laws have fallen as well. *See, e.g.*, *American Booksellers Found. v. Dean*, 342 F.3d 96 (2d Cir. 2003). Particularly relevant here, multiple federal courts have invalidated state efforts to target classified ad websites, even where such efforts were adopted for the stated purpose of restricting online sex trafficking, specifically targeting Backpage. *See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1282–83 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 827–40 (M.D. Tenn. 2013); *Backpage.com, LLC v. Hoffman*, No. 13–cv–03952, 2013 WL 4502097, at *4–*12 (D.N.J. Aug. 20, 2013).

### B.  Efforts to Restrain Speech Published By Online Intermediaries

As courts have recognized strong constitutional and statutory protections for online expression, policymakers and other elected officials have sought to employ an assortment of creative means—legal and otherwise—to restrict disfavored speech. The sometimes overlapping efforts have taken the form of unconstitutional threats, harassing investigations, and repeated demands to terminate services. These efforts are frequently coordinated and have been linked to the Subcommittee's investigation of Backpage.

### 1.      State and Local Attacks on Online Intermediaries

In 2008, forty-two state attorneys general ("AGs") issued a joint statement negotiated with Craigslist that included various measures to purportedly help detect and prevent ads for illegal services in the website's "erotic services" section.  Joint Statement of Craigslist, AGs, and the National Center for Missing & Exploited Children (undated), https://www.azag.gov/sites/default/files/craigslist%20final%20statement.pdf.          Although Craigslist took voluntary measures in response, seventeen of the AGs continued to demand that Craigslist remove its adult services section entirely.  *See Craigslist, Inc. v. McMaster*, No. 2:09-cv-1308, Order Granting Defs.' Mot. to Dismiss (Dkt. No. 43), at 4–8 (D.S.C. Aug. 6, 2010).  The following year, the Sheriff of Cook County, Illinois, Thomas J. Dart, filed suit to force Craigslist to eliminate its adult category, claiming it violated criminal laws against prostitution.  The court dismissed the case, holding that having an adult category "is not unlawful in itself nor does it necessarily call for unlawful content," and websites "are not culpable for 'aiding and abetting' their customers who misuse their services."  *Craigslist*, 665 F. Supp. 2d at 967–69.

Various officials persisted in their demands, however, and Craigslist eliminated its adult "category" in September 2010.[3]   Declaration of James Grant ¶ 3 and accompanying exhibit, attached hereto as Ex. C (hereinafter "Grant Decl.").  After Craigslist "closed" its adult category in 2010, the National Association of Attorneys General ("NAAG") demanded that Backpage drop its adult category as well.[4]  *Id.* at ¶ 4 and accompanying exhibit.  This was coupled with a

---

[3]      Still, however, "adult ads can be found elsewhere on [Craigslist's] website." *Dart*, 807 F.3d at 231.

[4]      The selection of Backpage as the designated "villain" after Craigslist closed its adult section seemed to occur at the whim of policymakers.  The same campaign could be waged against almost any large online intermediary, as illustrated by AG Hood's efforts to subpoena Google when it declined to implement changes he demanded.  *Hood*, 2016 WL 1397765, at *2–*4.  In this regard, two members of Congress wrote to Google in 2012 with demands and information requests similar to those waged by NAAG against Backpage.  Letter from Reps. Marsha Blackburn and Carolyn Maloney to Larry Page, CEO, Google, Inc. (Apr. 3, 2012), *available at* http://blackburn.house.gov/uploadedfiles/blackburn_maloney_letter_4-3-12.pdf.

long list of information requests "in lieu of a subpoena" concerning Backpage's posting policies, content screening, cooperation with law enforcement, and other topics (similar to the Subcommittee's Subpoena here).  *Id.*

In 2012, legislatures in Washington, New Jersey, and Tennessee passed laws targeting Backpage, but federal courts enjoined each one as unconstitutional.  *See McKenna*, 881 F. Supp. 2d 1262; *Cooper*, 939 F. Supp. 2d 805; *Hoffman*, 2013 WL 4502097.  The *Cooper* court observed "that legislators openly stated [Tennessee's law] was aimed at Backpage.com," 939 F. Supp. 2d at 819 (quoting *McKenna*, 881 F. Supp. 2d at 1270–71) (internal ellipses omitted), and both *Cooper* and *McKenna* cited public officials' efforts to pressure or shut down Backpage. *See Cooper*, 939 F. Supp. 2d at 819; *McKenna*, 881 F. Supp. 2d at 1270.  The courts rejected arguments that the laws prohibited only ads for illegal transactions and instead found they were overbroad and could not survive First Amendment scrutiny.  *Hoffman*, 2013 WL 4502097, at *8– *9.

Sheriff Dart of Chicago also "focused on Backpage.com as the new battleground" after the demise of the adult "category" on Craigslist, notwithstanding the federal court ruling barring him from bringing suit to close down such websites.  Grant Decl. ¶ 8 and accompanying exhibit. In January 2014, Dart sent Backpage a letter styled as a "Request for Information and Site Modification," that sought detailed information about Backpage's business, finances, personnel, site policies, and moderation practices, and it made demands for how Backpage should operate, including that it should "[r]equire User to pay fees with major credit card."[5]  After that, in 2015, Sheriff Dart "embarked on a campaign intended to crush Backpage's adult section – crush

_See also McKenna_, 881 F. Supp. 2d at 1282–83 (referencing a cited Columbia University study "showing that 83% of prostitutes have a Facebook page and that, by the end of 2011, Facebook would be their number one medium").

[5]     Letter from John Sommerville, Office of the Sheriff, to Samuel Fifer, Counsel for Backpage (Jan. 24, 2014), attached hereto as Ex. D.  The information demand included 159 separate questions, counting various categories of the inquiry and enumerated subcategories.

Backpage, period, it seems – by demanding that firms such as Visa and MasterCard prohibit the use of their credit cards to purchase any ads on Backpage." *Dart*, 807 F.3d at 230.

The campaign resulted from a strategy devised by the Sheriff and his staff "to take down Backpage.com," "legally or otherwise." Grant Decl. ¶ 10 and accompanying exhibit. Implementing this plan, Sheriff Dart sent letters to the CEOs of Visa and MasterCard in June 2015, insisting the companies "immediately cease and desist from allowing your credit cards to be used to place ads on … Backpage.com." *Dart*, 807 F.3d at 231.  The companies quickly acceded to the demand, and the Sheriff's office issued a press release captioned, "Sheriff Dart's Demand to Defund Sex Trafficking Compels Visa and MasterCard to Sever Ties with Backpage.com." *Id*. at 232.  Dart coordinated his efforts with other law enforcement agencies and policymakers—including, as described *infra*, the Subcommittee.

Backpage challenged Dart's actions as imposing an informal prior restraint under *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).  That litigation is ongoing, but the Seventh Circuit held that "a public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." *Dart*, 807 F.3d at 230 (citation omitted).  Judge Richard Posner's opinion for the court explained that the use of "coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or misuse) of the defendant's direct regulatory or decisionmaking authority . . . or in some less-direct form." *Id*. at 230–31 (citation omitted).  Describing the sheriff's actions as "a campaign of suffocation" designed to "crush Backpage," Judge Posner wrote that "[t]he First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands." *Id*. at 231, 238 (citation omitted).[6]

---

[6]     The Seventh Circuit imposed a preliminary injunction, and ordered Sheriff Dart to disclose all those to whom he had sent the Visa and MasterCard letters. *Dart*, 807 F.3d at 239.

## 2.      Federal Attacks on Backpage

Similarly, the Congress has targeted Backpage for years.  In March 2012, nineteen senators wrote Village Voice Media (then Backpage's parent company) demanding that it remove the adult section of Backpage.com.  In October 2012, six senators wrote the company that acquired Village Voice's print operations, threatening to continue to hold it "accountable" until "shutting down Backpage's 'adult entertainment' section … has been achieved."  Letter from Sen. Mark Kirk, et al. to Scott Tobias, former CEO of Voice Media Group, Inc. (Oct. 5, 2012), attached hereto as Ex. E.  House Resolution 649 targeted Backpage and "called on all Internet media providers to immediately eliminate 'adult entertainment' sections and [similar] classified advertising" H.R. RES. 649, 112th Cong. (2012), and Senate Resolution 439 demanded "eliminat[ion] of the 'adult entertainment' section of the classified advertising website Backpage.com."  S. RES. 439, 112th Cong. (2012).

Congress also amended 18 U.S.C. § 1591 in 2015 with the Stop Advertising Victims of Exploitation Act of 2015 (the "SAVE Act"), Pub. L. No. 114-22, § 118, 129 Stat. 227 (2015). Senator Mark Kirk (R-IL), who introduced the measure, explained that "I intended to go after Backpage.com …. We really ought to be able to charge them."  161 Cong. Rec. S1458 (daily ed. Mar. 12, 2015).[7]

---

Pursuant to this order, Dart disclosed his office had sent the letters to 413 recipients, including members of the Subcommittee staff.  *See* Certificate of Service of Notice, *Backpage, LLC v. Dart*, No. 15- 3047, Dkt. No. 49 (Nov. 17, 2015).

[7]      Over the past year, Senator Kirk has publicly pressured the Department of Justice to "aggressively" investigate and prosecute Backpage on at least four separate occasions. *See* Letter from Sen. Mark Kirk et al. to Attorney General Eric Holder, (Jan. 28, 2015); Letter from Sen. Mark Kirk et al. to Attorney General Loretta Lynch (Aug. 7, 2015); Letter from Sen. Mark Kirk to Attorney General Loretta Lynch (Oct. 26, 2015); Letter from Brent Fischer, Adams County Sheriff et al. to Attorney General Loretta Lynch, Deputy Attorney General Sally Yates, and Federal Bureau of Investigations Director James Comey (Feb. 2, 2016), attached hereto as Ex. I. Three of Senator Kirk's calls for prosecution were made since the Subcommittee initiated its investigation against Backpage.

C.      The Subcommittee Investigation

It is in this context of federal and state efforts to halt Backpage's business that the Subcommittee began its investigation in April 2015.  The Subcommittee first contacted Backpage's General Counsel by email on April 15, 2015 "to request an interview to discuss Backpage's business practices."  STAFF OF  S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON RECOMMENDATION TO ENFORCE A SUBPOENA ISSUED TO THE CEO OF BACKPAGE.COM, LLC at 29 (Nov. 19, 2015) (hereinafter, "*PSI Staff Report*"), attached hereto as Ex. F.  Backpage General Counsel Liz McDougall responded on April 17, 2015, offering to travel to D.C. for a meeting with Subcommittee lawyers.  On June 19, 2015, she met voluntarily with Subcommittee staff and provided a more-than-five-hour briefing that covered a broad range of questions.

1.      The Subcommittee's July 7, 2015 Document Subpoena

On July 7, 2015, the Subcommittee, after consulting with Sheriff Dart, issued to Backpage a document subpoena for 41 categories of documents seeking information on all aspects of Backpage's business, terms of use, and editorial policies.  Subpoena to Backpage.com by the Permanent Subcomm. on Investigations (July 7, 2015) (hereinafter, "July 7, 2015 Subpoena"), attached hereto as Ex. G.  Counting the multiple sub-parts for each category, the subpoena sought documents on approximately 120 subjects.  *See id.*

On July 16, 2015, Backpage counsel met with Subcommittee staff to raise concerns about the scope of the document subpoena, the First Amendment issues it posed, and the extent to which the Subcommittee's inquiry appeared to be part of the larger governmental effort targeting Backpage.  Declaration of Steven Ross ¶ 4, attached hereto as Ex. H (hereinafter, "Ross Decl.").  Subcommittee staff denied the requests were connected to other efforts to penalize Backpage or to disrupt its business.  *Id.*  Backpage submitted written objections on August 6, 2015 and requested the subpoena's withdrawal.      *See* Letter from Steven R. Ross, Counsel to

Backpage.com to Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcomm. (Aug. 6, 2015) (hereinafter, Ross Aug. 6, 2015 Letter), attached hereto as Ex. J.

The Subcommittee's reaction was twofold.  First, on August 13, 2015, it began to issue deposition subpoenas to Backpage employees.  *Id.* at ¶ 8.  Then, on August 26, 2015, the Subcommittee responded to certain of Backpage's concerns and claimed that its "objective is to conduct responsible fact-finding in aid of Congress' legislative and oversight responsibilities, not to single out Backpage."  Letter from Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcomm. to Steven R. Ross, Counsel to Backpage.com (Aug. 26, 2015) (hereinafter, "Sens. Portman and McCaskill Aug. 26, 2015 Letter"), attached hereto as Ex. K.  The Subcommittee denied the suggestion that the subpoena might be overly broad or burdensome.  *Id.* at 2–3.

Backpage further objected to the Subcommittee's process in a letter dated August 26, 2015, particularly the subpoenas issued to two of its employees, and it asked, as it had before, that the matter be submitted for judicial consideration pursuant to 28 U.S.C. § 1365.  *See* Letter from Steven R. Ross, Counsel to Backpage.com to Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcomm. (Aug. 26, 2015) (hereinafter, "Ross Aug. 26, 2015 Letter"), attached hereto as Ex. L.  It expressed the concern that "the Senate's inquiry is related to—and indeed connected with—recent explicit efforts by other government actors to halt Backpage.com's legitimate, legal, and First Amendment-protected business operations," citing Sheriff Dart's communications with credit card companies and actions by federal policymakers.  *Id.* at 2–3.

On August 28, 2015, the Subcommittee rejected the request that it withdraw the subpoenas issued to Backpage employees, as well as the claim that the subpoenas raised any First Amendment issues.  Letter from Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcomm. to Steven R. Ross, Counsel to Backpage.com (Aug. 28, 2015) (hereinafter, "Sens. Portman and McCaskill Aug. 28, 2015 Letter"), attached hereto as Ex.

M.  The Subcommittee also objected to what it called "Backpage's unfounded and irresponsible claim that [the] investigation is 'related to—and indeed connected with—recent explicit efforts by other governmental actors to halt Backpage.com's business.  As previously stated to Backpage counsel, that allegation is false." *Id.*

Backpage counsel met again with Subcommittee staff on September 14, 2015, to discuss the serious constitutional concerns raised by the inquiry and to again urge the Subcommittee to initiate the judicial process afforded for such subpoenas.  Ross Decl. ¶ 6.  During this meeting, Subcommittee staff again insisted that the inquiry was unrelated to any other enforcement and harassment efforts against Backpage.[8]

### 2.    The Subcommittee's October 1, 2015 Document Subpoena

On October 1, 2015, the Subcommittee wrote to Backpage and reiterated its position that Backpage's First Amendment concerns were without merit.  *See* Oct. 1, 2015 Subpoena.  It specifically disputed any suggestion that "the Subcommittee's investigation is part of a concerted effort, with other unrelated government actors, to engage in harassment."  *Id.* at 2.  It added: "That suggestion is false; our investigation is our own."  *Id.*  Nevertheless, without conceding the merits of Backpage's privilege claim, the Subcommittee withdrew the July 7 Subpoena and in its place issued the new Subpoena to Mr. Ferrer with eight enumerated requests covering what it called "the core of the Subcommittee's investigation."[9]  The new requests corresponded to the

---

[8]      *Id.*    During this and other meetings, Backpage's counsel informed the Subcommittee of a sealed 2013 federal court order quashing a grand jury subpoena that sought documents from Backpage similar to the Subcommittee's subpoena. Backpage filed a motion to have the order unsealed for the limited purpose of providing it to the Subcommittee.  However, the motion was opposed by the government and ultimately denied. Grant Decl. at ¶ 16.

[9]      The subpoena instructed Backpage to provide all documents from January 1, 2010 to the present relating to: (1) Backpage's reviewing, blocking, deleting, editing, or modifying advertisements in Adult Sections; (2)  posting limitations, including banned terms lists; (3) reviewing, verifying, blocking, deleting, disabling, or flagging user accounts;   (4)  human trafficking, sex trafficking, human smuggling, prostitution, or its facilitation or investigation, including any policies, manuals, memoranda, or guidelines;  (5) Backpage policies related to

general categories the Subcommittee had described as "seven specific topics" that were covered by the 41 requests in the July 7 subpoena.  Sens. Portman and McCaskill Aug. 26, 2015 Letter. Meanwhile, the Subcommittee expanded its investigation further by beginning to issue a series of subpoenas to other entities and individuals that are or were affiliated with Backpage.  *See* Ross Decl. at ¶ 8.

Counsel for Backpage again expressed its concerns regarding the constitutional infirmities of the investigation but agreed to determine what information could be produced without infringing upon Backpage's constitutional rights.  Backpage formally responded to the subpoena on October 23, 2015.  Letter from Steven R. Ross, Counsel for Backpage.com to Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcomm. (Oct. 23, 2015) (hereinafter, "Ross Oct. 23, 2015 Letter"), attached hereto as Ex. N.  It provided a number of documents in response to requests 1–3 and informed the Subcommittee that it was compiling records for production regarding its cooperation with law enforcement agencies in instances of suspected human trafficking in response to request 4.  Backpage identified categories for which it did not maintain information requested by the Subcommittee and set forth objections, where relevant, to each of the requests.  *See id.*  The Subcommittee "overruled" these objections the following week.  *See* Letter from Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcommittee to Carl Ferrer, CEO of Backpage.com (Nov. 3, 2015) (hereinafter "Sens. Portman and McCaskill Nov. 3, 2015 Letter), attached hereto as Ex. O.

On November 13, 2015, Backpage submitted more than 16,000 pages of documents to start what it intended to be a rolling production to the Subcommittee.[10]  Letter from Steven R.

---

hashing of images, data retention, or removal of metadata;  (6) the number of ads posted, by category, for the past three years, and ads reported to law enforcement agencies;  (7) the number of ads for the past three years deleted or blocked at each stage of the reviewing process; and (8) Backpage's annual revenue for each of the past five years, broken down by category.  *See* Subpoena to Backpage.com by the Permanent Subcomm. on Investigations (Oct. 1, 2015), attached hereto as Ex. A.

[10]     Earlier, on November 5, 2015, Backpage indicated its willingness to provide

Ross, Counsel for Backpage.com to Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcomm. (Nov. 13, 2015), attached hereto as Ex. P.  The submission included responses to seven of the eight requests in the document Subpoena.  Specifically, it included complete responses to two of the Subpoena's requests pertaining to detailed advertisement and moderation volumes,[11] and over 10,000 pages of documents specifically responsive to the Subpoena's request regarding human trafficking.  This included, *inter alia*, presentations and guides Backpage created to assist law enforcement officials, correspondence with law enforcement entities regarding potential human trafficking or similar potentially illegal activity, and an initial portion of Backpage's files that it maintains on law enforcement requests for information regarding potential illegal activity like suspected human trafficking. Additionally, Backpage was preparing to submit millions more pages in response to the Subpoena's request regarding human trafficking, the purported topic of the inquiry, but the Subcommittee stated that it did not want that information.[12]

---

documents with the Subcommittee, and provided a software license and hosting agreement with a third-party vendor.  Letter from Steven R. Ross, Counsel for Backpage.com to Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcomm. Letter to Chairman and Ranking Member of the Subcommittee from Steven Ross (Nov. 5, 2015), attached hereto as Ex. Q.

[11]    To respond to these requests, both of which called for data and information not regularly maintained by Backpage, the company compiled data specifically for the Subcommittee and, for one request, used a reporting tool to best estimate the information requested.  Letter from Steven R. Ross, Counsel for Backpage.com to Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcomm. (Nov. 13, 2015), attached hereto as Ex. P.

[12]    Following the initial submission, Backpage's counsel informed Subcommittee staff that it was preparing millions more pages of documents in response to the Subpoena's request regarding human trafficking.  Ross Decl. at ¶ 7.  But the following day, PSI instructed Backpage to cease producing documents.  E-mail from Matt Owen, Chief Counsel, Permanent Subcomm. on Investigations to Steven Ross et al. (Nov. 14, 2015, 11:22 AM), attached hereto as Ex. R.  Senator Portman echoed this directive when he described the submission—which included sensitive confidential data responsive to the document subpoena, as well as other documents Subcommittee staff previously had said they wanted—as "a 16,000-page pile of material and documents that the Subcommittee does not need and is not seeking."  *Human*

Backpage also provided as to its moderation efforts documentation responsive to three of the Subpoena's requests. This included various moderation guidelines Backpage had used and/or considered, a list of terms used by Backpage employees in the moderation process, and other internal documents.[13]  Following the submission, the Subcommittee staff expressed dismay that Backpage had not also turned over its employee moderators' internal emails.[14]  *See* Ross Decl. at ¶ 7.  Of the Subpoena's eight requests, Backpage declined to provide information and documents responsive to only one, pertaining to detailed revenue and profit numbers for various portions of its business for the past five years.  The Subcommittee, in obtaining the support of the full Senate for the instant application, routinely represented that Backpage had refused to cooperate and had simply failed to produce or even "look for" documents in response to the Subpoena. *See, e.g.,* 161 Cong. Rec. S1561 (daily ed. Mar. 17, 2016) (statement of Sen. Portman).

### 3.    PSI's Hearing and Report

On November 19, 2015, the Subcommittee held a public hearing that focused almost exclusively on Backpage. The hearing was not called to gather evidence about the issue of human trafficking, but was convened to bolster the Subcommittee's demand to compel information from Backpage.  *See* Nov. 19 Hearing Rec. at 4 (statement of Sen. Rob Portman, Chairman of Subcomm.); *id.* at 13 (statement of Sen. Claire McCaskill, Ranking Member of

---

*Trafficking Investigation Hearing Before the Permanent Subcomm. on Investigations of the Committee on Homeland and Governmental Affairs,* 114th Cong. 3 (2015) (hereinafter, "Nov. 19 Hearing Rec.") (statement of Sen. Rob Portman, Chairman of Subcomm.).

[13]    Backpage said it would follow-up with additional information, including a second list of terms used in the ad filtering process.   Before it could do so, the Subcommittee instructed Backpage to cease the production of documents. *See supra* note 12.

[14]    Subcommittee staff said that third-party witnesses had already provided "thousands" of these documents.   Subcommittee staff took the position that the subpoena required production of the full email collections of all Backpage employees whose jobs involve moderating ads—a staff that has, at times, included more than 100 employees—if they had anything to do with moderating ads.  Ross Decl. at ¶ 7.

Subcomm.) ("[T]his hearing is not about reaching conclusions about Backpage, about what they have or have not done.  Instead, it is about affirming the legitimacy of this investigation and the legitimacy of the questions that we are asking and that we demand answers to as the U.S. Senate.").  At the hearing, the Subcommittee heard testimony from two witnesses who had filed amicus briefs in separate legal actions against Backpage, and who testified that the Subpoena to Backpage would assist in their other legal efforts.  *See id*. at 10 (testimony of Darwin P. Roberts, Office of Wash. Attorney General); *id*. at 20 (testimony of Yiota G. Souras, Nat'l. Ctr. for Missing and Exploited Children).

The hearing coincided with the release of the *PSI Staff Report*.  As the Report's title suggests, the report was devoted to the single topic of why Backpage should be compelled to provide the information demanded by the Subcommittee.[15]  The hearing also featured the theatrical flourish of setting up an empty chair and "calling" Mr. Ferrer even though the Subcommittee was aware that he was not present and would not be testifying. *See* Nov. 19 Hearing Rec. at 26–27.

### 4.     The Subcommittee's Application for Enforcement

On February 29, 2016, the Subcommittee presented a resolution to the Senate Committee on Homeland Security and Governmental Affairs that directed Senate Legal Counsel to bring a civil action to enforce three of the eight paragraphs in the October 1, 2015

---

[15]     The *PSI Staff Report* relied repeatedly on facts cited by the district court in *Backpage, LLC v. Dart*, 127 F. Supp. 3d 919 (N.D. Ill. 2015), *see id*. at 1, 5, 6, 7—an odd approach for a body supposedly engaged in fact-*finding*.  The Subcommittee did so even though the Seventh Circuit had all but reversed that decision after hearing oral argument, by issuing a stay pending appeal, *Backpage.com, LLC v. Dart*, No. 15-3047, Dkt. No. 47 (7th Cir. Nov. 16, 2015), which the Subcommittee was informed of directly by Sheriff Dart per order of the court. *See supra* note 6.  Backpage also brought the ruling to the Subcommittee's attention, even before the stay ripened into a full-on reversal and order for entry of a preliminary injunction hard on the heels of the *PSI Staff Report*.  Letter from Steven R. Ross, Counsel for Backpage.com to Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcomm.  (Nov. 18, 2015), attached hereto as Ex. S. *See also Dart*, 807 F.3d at 229.

Subpoena (notably excluding the one request for documents regarding human trafficking).  S.

Rᴇᴘ. No. 114-214 (2016).  Specifically, the Subcommittee now asks this Court to enforce the

Subpoena for the following demands:

1. Any documents concerning Backpage's reviewing, blocking, deleting, editing, or modifying advertisements in Adult Sections, either by Backpage personnel or by automated software processes, including but not limited to policies, manuals, memoranda, and guidelines.

2. Any documents concerning advertising posting limitations, including but not limited to the "Banned Terms List," the "Grey List," and error messages, prompts, or other messages conveyed to users during the advertisement drafting or creation process.

3. Any documents concerning reviewing, verifying, blocking, deleting, disabling, or flagging user accounts or user account information, including but not limited to the verification of name, age, phone number, payment information, including but not limited to the verification of name, age, phone number, payment information, email address, photo, and IP address.  *This request does not include the personally identifying information of any Backpage user or account holder.*

Oct. 1, 2015 Subpoena (emphasis in origina).

### D.      The Subcommittee's Targeting of Individuals and Third Parties

While the Subcommittee continued to pressure Backpage, it also demanded information

from entities and individuals that had seemingly *any* connection with Backpage.  To date, the

Subcommittee has issued subpoenas and/or requested information from at least 15 different

entities and/or individuals, including current and former Backpage employees, an accounting

firm,[16] a payroll processor, an Internet service provider, and multiple other corporate and

financial entities that have done business with Backpage.  Ross Decl. at ¶ 8.  The Subcommittee

also subpoenaed documents from a firm that provided moderation services to Backpage. 161

Cᴏɴɢ. Rᴇᴄ. S1562 (daily ed. Mar. 17, 2016).  The Subcommittee indicated that it wanted to

---

[16]      The confidential financial information subpoenaed and received by the Subcommittee from the accounting firm is far more extensive than the information requested in the Subcommittee's subpoena to Backpage.  *See* Ross Decl. at ¶ 10.

question individuals about how they "feel" about working for Backpage, and it has contacted at least three current or former employees through their personal Facebook accounts. Ross Decl. at ¶¶ 9, 11. Even though Backpage employees have submitted to the Subcommittee sworn affidavits of their intent to assert their constitutional rights, the Subcommittee continues to demand that at least three Backpage employees attend depositions in person. *Id.* at ¶ 10.

### E.     The Subcommittee's Undisclosed Coordination With Law Enforcement

In its memorandum to this Court, Senate Counsel labels "Backpage's attempt to link the Subcommittee's investigation as 'connected with'" the "government legal actions, state laws, and private suits adverse to it" as being "wholly unfounded." App. Mem. 36. The Subcommittee likewise had previously assured Backpage's counsel no connection existed. Letters from Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcomm. to Steven R. Ross, Counsel for Backpage.com (August 28, 2015), attached hereto as Ex. M; Letter from Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcomm. to Carl Ferrer, CEO of Backpage.com (Oct. 1, 2015) (hereinafter, "Sens. Portman and McCaskill Oct. 1, 2015 Letter"), attached hereto as Ex. A; Ross Decl. at ¶¶ 4–6. But that is simply not true.

In fact, the Subcommittee had multiple contacts with law enforcement officials who were targeting Backpage at key points in the Subcommittee's investigation. In the very first weeks of the Subcommittee's inquiry, Subcommittee Counsel contacted Sheriff Dart's office regarding the Subcommittee's "inquiry into human trafficking with an eye towards websites that help enable these crimes." E-mail from Andrew Polesovsky, Counsel, Permanent Subcomm. on Investigations, to Benjamin Breit, Cook Cty. Sheriff's Office, (May 13, 2015, 10:11 AM) (hereinafter, "Polesovsky May 13, 2015 E-mail"), attached hereto as Ex. T. Subcommittee Counsel conveyed that "[n]ot unsurprisingly Backpage.com's inner workings are of great interest to us," and noted how the Sheriff "has been on the forefront of this issue." *Id.* In reply, Sheriff

Dart's staff said they "would be happy to support" the Subcommittee's investigation, *id.*, and over at least the next couple of months, the Subcommittee and Cook County staff convened a series of conference calls regarding their respective Backpage strategies.

Later, as the Subcommittee was preparing its document requests to Backpage, it again strategized with Sheriff Dart's office.   On July 1, 2015, Subcommittee Counsel wrote the Sheriff's office regarding the success of their "cease and desist" letters insisting that Visa and MasterCard terminate all dealings with Backpage, exclaiming "What a development!"   E-mail from Andrew Polesovsky, Counsel, Permanent Subcomm. on Investigations, to Benjamin Breit, Cook Cty. Sheriff's Office (July 1, 2015, 3:10 PM) (hereinafter, "Polesovsky July 1, 2015 Email"), attached hereto as Ex. T.   Subcommittee Counsel asked to schedule a call with Sheriff Dart's staff "to get the story about how it all went down." *Id.*   He told the Sheriff that the Subcommittee's investigation "is rapidly progressing down a parallel track."   *Id.*   In reply, Sheriff Dart's staff said they "would be happy to jump on another call," adding they would "love to hear about how your investigation is going and any way we can support it."   *Id.*

Correspondence reveals that Sheriff Dart's team was looking forward to the damage a Senate inquiry could inflict.   Following a conversation with Senator Feinstein's counsel, a member of Sheriff Dart's staff remarked that his "dream scenario is to have [the founders of Backpage] dragged before a Senate committee"—a scenario Sheriff Dart's staff described as "increasingly realistic." E-mail from Benjamin Breit, Cook Cty. Sheriff's Office, to Cara Smith et al., Cook Cty. Sheriff's Office, (July 2, 2015, 11:52 AM) (hereinafter, "Breit July 2, 2015 Email"), attached hereto as Ex. U. Less than a week later, on July 6, 2015, Subcommittee Counsel wrote Sheriff Dart's staff to request copies of the document requests that the Sheriff's office had sent to Backpage.   *See* E-mail from Benjamin Breit, Cook Cty. Sheriff's Office, to Mark Angehr, Senior Counsel, Senate Permanent Subcomm. on Investigations (July 6, 2015, 3:08 PM) (hereinafter, "Breit July 6, 2015 Email"), attached hereto as Ex. V   Once the Sheriff's staff provided those materials, Subcommittee Counsel followed-up with questions regarding how

Backpage had responded to such requests in the past.  *Id.*  With Sheriff Dart's document demands in hand, the Subcommittee issued its initial document subpoena on July 7, 2015, seeking 41 categories of documents.  In particular, the subpoena devoted five detailed demands (items 37–41) for all documents on payment processing, the termination or discontinuation of services by credit card companies, and the intended use of alternatives such as Bitcoin or other credits.  *See* July 7, 2015 Subpoena at 9–10.   These were the same questions Sheriff Dart was pursuing at the same time to perfect his campaign of suffocation.[17]

## ARGUMENT

## I.     The Subcommittee's Efforts to Compel Documents from Backpage and Its CEO Violate the First Amendment

The First Amendment is the Constitution's most clearly stated limitation on Congress' authority to legislate.  A congressional investigation that seeks to deploy the power to compel information, a power that derives from the legislative authority, cannot transgress the limits of the Bill of Rights.  It is well established that, in addition to its proscription on legislation that limits speech, the First Amendment also stands as a bulwark against investigative and other governmental actions that trench upon constitutionally protected rights.   In this case, the Subcommittee has exaggerated (or fabricated, *ex post facto*) a legislative need for the documents it seeks from Backpage, while ignoring or misstating the First Amendment burdens the document demands would impose.  It has not attempted to ensure that enforcement of this Subpoena would not "abridge [ ] liberty of speech, press, religion or assembly" and has instead left that task to this Court.  *Watkins v. United States*, 354 U.S. 178, 199 (1957).

---

[17]     Backpage is aware that following Sheriff Dart's campaign against Backpage, the Subcommittee contacted at least one credit card company; however, documents concerning the contact were produced with a request that they be confidential.  *See* Grant Decl. ¶ 17.  And, of course, all of the foregoing reflects only that which Backpage has been able to learn, raising the question what other, thus far unknown coordination, may have occurred.

### A.     Backpage Raised Valid First Amendment Objections

#### 1.     The Subcommittee's Demands Impinge on Significant First Amendment Interests

From its earliest contacts with the Subcommittee, Backpage explained the First Amendment issues raised by efforts to impose various kinds of restrictions on Internet intermediaries in general, and on Backpage specifically. *See, e.g.*, Ross Aug. 6, 2015 Letter at 3, n.3 ("[S]ignificant First Amendment problems result not just from efforts to regulate content directly . . . but also from governmental measures that place special burdens on Internet intermediaries like Backpage.com"). The correspondence with the Subcommittee cautioned that "[t]he Constitution tells us that – when freedom of speech hangs in the balance – the state may not use a butcher knife on a problem that requires a scalpel to fix." *Id*. at 3 (quoting *Cooper*, 939 F. Supp. 2d at 813). This was not just a general or "blanket" objection; Backpage set forth particular ways the investigation crossed constitutional boundaries.[18]

The Subcommittee argues that there is no First Amendment concern because "[t]he Subcommittee's Subpoena does not prohibit or punish any speech or expression of Mr. Ferrer or Backpage," but "merely seeks information about Backpage's efforts to screen advertisements," App. Mem. at 28. This assumes incorrectly that only prior restraints or laws that directly punish speech may violate the First Amendment. The Supreme Court has long recognized that "[t]he

---

[18]     The Subcommittee mischaracterizes Backpage's constitutional objection to the method and scope of this investigation as a "blanket immunity from inquiry" based on the "mere fact" it "engage[s] in First Amendment activity," App. Mem. at 27, citing *Shelton v. United States*, 404 F.2d 1292 (D.C. Cir. 1968). In *Shelton*, the witness refused to provide documents of any kind in response to a congressional subpoena and raised no First Amendment objections until the matter was on appeal. *Id*. at 1295, 1298. By contrast, Backpage has sought to cooperate with the Subcommittee since first being contacted in mid-April 2015, and it explained its objections to the nature and extent of the inquiry in a series of conversations, email communications, and through the exchange of correspondence. *See* Ross Aug. 6, 2015 Letter; Letter from Steven R. Ross, Counsel for Backpage.com to Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcomm. (Aug. 26, 2015) (hereinafter, "Ross Aug. 26, 2015 Letter"), attached hereto as Exs. J, L.

Bill of Rights is applicable to investigations as to all forms of government action." *Watkins*, 354 U.S. at 188. Indeed, "[t]he Congress has no more right, whether through legislation or investigations conducted under an overbroad enabling Act, to abridge the First Amendment freedoms of the people, than do other branches of government." *Stamler v. Willis*, 415 F.2d 1365, 1370 (7th Cir. 1969).

Investigations alone can violate the First Amendment even where "no legal sanction is involved" and despite the fact that "Congress has imposed no tax, established no board of censors, instituted no licensing system." *United States v. Rumely*, 345 U.S. 41, 57 (1953) (Douglas, J., concurring); *Sweezy v. New Hampshire*, 354 U.S. 234, 245 (1957) (plurality) ("There is no doubt that legislative investigations, whether on a federal or state level, are capable of encroaching upon the constitutional liberties of individuals."). The Supreme Court has stressed that "[i]t is particularly important that the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press, freedom of political association, and freedom of communication of ideas." *Sweezy*, 354 U.S. at 245. Merely "seek[ing] information" (as the Subcommittee puts it) can impose a restriction that is "equally severe" as direct legal sanctions. *Rumely*, 345 U.S. at 57 (Douglas, J., concurring). "Through the harassment of hearings, investigations, reports, and subpoenas government will hold a club over speech and over the press. Congress could not do this by law. The power of investigation is also limited." *Id*. at 58 (Douglas, J., concurring).

The Subcommittee tries to play down any First Amendment concerns. App. Mem. at 26–30. It claims that because it is not seeking the identity of Backpage users, "the central First Amendment evil, the 'official suppression of ideas,'" is not afoot. *Id*. at 30 (quoting *RAV v. St. Paul*, 505 U.S. 377, 390 (1992)). No doubt, demands by congressional committees for such things as political membership lists and compulsion to "name names" represent obvious First Amendment intrusions, as the Subcommittee knows only too well.[19] But as Backpage explained

---

[19]     *See, e.g., Watkins*, 354 U.S. at 187;  *Russell v. United States*, 369 U.S. 749, 758

in its objection to the October 1, 2015 Subpoena, the First Amendment limits on congressional investigations apply more broadly than just to subpoenas seeking disclosure of readers' names or membership lists for political organizations.  *See* Ross Oct. 23, 2015 Letter at 4.  That specific application of the First Amendment does not exhaust the general principles that limit the Subcommittee's authority.

The fact that the Subpoena does not seek "the personally identifying information of any Backpage user or account holder" does not respond to the specific objections Backpage raised with the Subcommittee.  *See* Ross Aug. 6 and 26, 2015 Letters.  Even without asking the names of Backpage users, these demands seek every bit of information generated by Backpage and its employees relating to every editorial decision made during the past six years, including all emails sent between moderators regarding the editorial process.  It also includes all information relating to payment processing.  This is precisely the type of "investigation" that can violate the First Amendment and chill protected speech.  *See infra* pp. 31–32.

The fact that Congress has broad power to conduct investigations changes nothing.  "No governmental door can be closed against the [First] Amendment.  No governmental activity is immune from its force."  *Bursey v. United States*, 466 F.2d 1059, 1082 (9th Cir. 1972).  What is true of laws restricting speech is equally true of investigations that use compulsory process: "When First Amendment interests are at stake, the Government must use a scalpel, not an ax."  *Id*. at 1088.  The court in *Bursey* held that the government must "carr[y] its burden almost question by question before it can compel answers."[20]  *Id*. at 1086.  It refused "to issue a carte

---

(1962); *Deutch v. United States*, 367 U.S. 456 (1961); *Shelton v. United States*, 327 F.2d 601, 605 (D.C. Cir. 1963) (invalidating subpoena to NEW YORK TIMES copy editor).

[20]     The *Bursey* court set forth a three part test whereby the government's burden for compulsory process for editorial materials is not met unless it can show: (1) an immediate, substantial, and subordinating need for the information; (2) a substantial connection between the information sought and an overriding governmental interest; and (3) no less drastic means to obtain the information.  *Bursey*, 466 F.2d at 1083.

blanche to a grand jury to override First Amendment rights simply because the questions . . . might have something vaguely to do with conduct that might have criminal consequences." *See id*. at 1091 (Op. of Hufstedler, J., on den. pet. for reh'g).

*Bursey* involved a grand jury investigation of *The Black Panther* newspaper after it published speeches and articles that included such things as a purported assassination threat directed at President Richard Nixon, a call for violent overthrow of the United States government, instructions on the use of firearms, and a description of how to make a Molotov cocktail. *Id*. at 1065–68.  In limiting a subsequent grand jury investigation of the inner workings of the newspaper, the Ninth Circuit explained that the government's interests undoubtedly were compelling, but that "the existence of these interests does not automatically override First Amendment rights, and their invocation does not alone carry the Government's burden with respect to any question that the grand jury seeks to force a witness to answer over his First Amendment protest." *Id*. at 1086 (citing *Watkins*, 354 U.S. at 198–99).

Although the court was rightly concerned about questions that touched on the compelled disclosure of political affiliations, it was even more focused on the extent to which the subpoena asked about editorial decision-making, and it concluded that "the deepest cuts were into press freedom." *Id*. at 1087.  The constitutional sensitivities applied not only to "the identity of [] persons who worked on the paper" but also to such issues as the job descriptions of individuals and the details of the newspaper's finances. *Id*. at 1088.  With respect to the newspaper's policies, the court explained that "decisions about what should be published initially, how much space should be allocated to the subject, or the placement of a story on the front page or in the obituary section" were the products of editorial judgment, and "[w]ere we to hold that the exercise of editorial judgments of these kinds raised an inference that the persons involved in the judgments had or may have had criminal intent, we would destroy effective First Amendment

protection for all news media." *Id*. at 1087–88.  For the same reasons, the Subcommittee in this case is wrong to brush off Backpage's constitutional concerns as "marginal." [21]

The Subcommittee mischaracterizes *Bursey* as a case where the grand jury was seeking only the identity of persons who belonged to the Black Panther Party and who worked on the party's newspaper.  App. Mem. at 29–30.  To be sure, the grand jury did ask about members of the Black Panther Party, and that issue was analyzed separately by the court.  But it specifically addressed the First Amendment concerns raised by the investigation into the newspaper's operations, held there was no justification for the questions, and concluded the witnesses could not be compelled to answer.  *Bursey*, 466 F.2d at 1088.  It found the First Amendment issues to be of surpassing importance, because if the staff of the *Black Panther* could be compelled to provide information on its internal operations and editorial policies, then "any editor, reporter, typesetter, or cameraman could be compelled to reveal the same information about his paper or television station, if his paper or station carried the story." *Id.*  But the court concluded "[t]he First Amendment forbids that result."[22]

The same concern applies here.  If Backpage can be compelled to provide documents on its editorial policies, so too could any online intermediary.  *See, e.g.*, *Hood*, 2016 WL 1397765,

---

[21]     App. Mem. at 30.  Backpage raised its specific objections with the Subcommittee. *See* Ross Oct. 23, 2015 Letter ("When it comes to the press, any investigation seeking information on an organization's internal operations inherently raises constitutional concerns. *See*, *e.g.*, *Bursey*, 466 F.2d at 1088.").

[22]     *Bursey*, 466 F.2d at 1088.  The Subcommittee also mischaracterizes *Bursey* in a footnote, claiming that the witnesses actually testified about newspaper operations after first raising objections.  App. Mem. at 30 n.23.  This is false.  Although the witnesses gave sufficient testimony to establish their *bona fides* as journalists, they refused to reveal information the government sought about editorial policies. *See*, *e.g.*, *id*. at 1067 ("[T]hey refused to answer any questions concerning its internal operations");  *id*. ("Presley again refused to name specific individuals and to identify the roles each played in the publication and distribution of the same issues of the paper"); *id*. at 1071 ("Bursey declined to describe the details of the publication of the paper").  By the same token, the fact that Backpage attempted to cooperate with PSI and provided a large number of documents does not foreclose its ability to raise constitutional objections where appropriate.

at *5.  *See also Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963) ("[W]hatever affects the rights of the parties here, affects all.").

The Subcommittee tries to distinguish other cases where courts held subpoenas could not be used "to uncover the identity of political dissenters and to suppress unpopular ideas," asserting those decisions "have nothing to do with this case." [23]  But this confuses the particular facts of those cases with the broader constitutional principles involved.  Although certain aspects of the investigations in those cases threatened the right of political association, the decisions turned on more encompassing First Amendment concepts.  *See, e.g.*, *Watkins*, 354 U.S. at 188 ("Nor can the First Amendment freedoms of speech, press, religion, *or* political belief and association be abridged.") (emphasis added); *Gibson*, 372 U.S. at 544 ("The First and Fourteenth Amendment rights of free speech *and free association* are fundamental and highly prized, and 'need breathing space to survive.'") (citation omitted and emphasis added);  *Rumely*, 345 U.S. at 58 (Douglas, J., concurring) ("Through the harassment of hearings, investigations, reports, and subpoenas government will hold a club over speech and over the press.");  *Jones v. Helms*, 454 U.S. 412, 425 (1981) ("[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties") (citation omitted).  *See also Sweezy*, 354 U.S. at 250 ("Merely to summon a witness and compel him, against his will, to disclose the nature of his past expressions and associations is a measure of governmental interference in these matters.").

There is no question that it would violate the First Amendment if a legislative committee subjected the NAACP, the Black Panthers, or any other group to unsupported, excessive, or intrusive document demands even if the government was not seeking members' identities.  Such groups would have solid claims if they had received subpoenas like those issued by the

---

[23]     App. Mem. at 29-30 (discussing *Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539 (1963); *United States v. Rumely*, 345 U.S. 41 (1953); *Watkins v. United States*, 354 U.S. 178, 187 (1957); and *NAACP v. Alabama*, 357 U.S. 449 (1958)).

Subcommittee in this case even if the government demanded no personal information. The Subcommittee's attempt to distinguish the case law based solely on violations of freedom of association is, thus, far too narrow. The Subcommittee simply does not address the overarching First Amendment concepts the Supreme Court articulated and applied in these cases.

### 2.    This is Not a Commercial Speech Issue

The Subcommittee also tries to downplay Backpage's First Amendment interests by incorrectly framing this as a commercial speech case, citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973). App. Mem. at 28–29. But this misconstrues the issues, as Backpage is not an advertiser, but rather is an online intermediary for third-party speech, for whom First Amendment protections are significant. *Reno*, 521 U.S. at 870 ("[O]ur cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium"). *See supra* pp. 4–10. *Pittsburgh Press*, which predates both the commercial speech doctrine and the advent of the Internet, simply does not apply.[24] That case is also distinguishable because no suggestion was made that the ordinance at issue "was passed with any purpose of muzzling or curbing the press," *Pittsburgh Press*, 413 U.S. at 383, whereas the Subcommittee's actions in this case strongly suggest just such a purpose. *See infra* at 37–41.

---

[24]    *Pittsburgh Press* was predicated on the assumption that a newspaper publisher could be held responsible for third-party content, giving as an example, a newspaper that prints a defamatory advertisement. 413 U.S. at 386 ("The newspaper may not defend a libel suit on the ground that the falsely defamatory statements are not its own."). But online freedom of speech depends on the opposite assumption—that intermediaries are not liable for content posted by others. *See*, *e.g.*, *Fair Hous. Council of San Fernando Valley v. Roommates.com*, LLC, 521 F.3d 1157, 1169 (9th Cir. 2008) (*en banc*); *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008); *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 561, 565-68 (N.D. Ill. 2009). As numerous cases have held, immunity from liability for third party content is essential for the viability of online intermediaries, whereas in *Pittsburgh Press*, the Court explained it was not dealing with a law that "arguably disables the press by undermining its institutional viability." 413 U.S. at 382.

Cases decided after the Supreme Court developed the commercial speech doctrine make clear that the fact that a medium carries advertising does not dictate a lower level of First Amendment scrutiny.[25]  In fact, in one of its first decisions to clarify protections for commercial speech, the Supreme Court held the First Amendment protected a publisher in Virginia that ran an advertisement for an abortion clinic in New York even though abortions were illegal in Virginia at that time.  *Bigelow v. Virginia*, 421 U.S. 809 (1975).  The Court held that if the publisher were held responsible for the potentially illegal conduct, "[t]he burdens thereby imposed on publications would impair, perhaps severely, their proper functioning."  *Id*. at 829.  So too, here. Backpage's constitutional interest arises from its role as a platform for speech, and cases invalidating state laws targeting Backpage have thus rejected application of the commercial speech doctrine.  *See McKenna*, 881 F. Supp. 2d at 1281–82; *Cooper*, 939 F. Supp. 2d at 833; *Hoffman*, 2013 WL 4502097, at *9.

For the same reason, the Subcommittee's citation of *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986) cannot justify its disregard of the First Amendment issues raised by its inquiry. App. Mem. at 29.  In that case, the Supreme Court upheld a state court order closing an adult bookstore because of sexual activities that occurred on the premises.  *Id.* at 700.  The Court held that the closure order concerned "absolutely no element of protected expression" and "had nothing to do with any expressive conduct at all."  *Id.* at 705, n.2.  *Arcara* thus provides no support for an investigation into editorial decision making.  *Cooper*, 939 F. Supp. 2d at 830 ("[T]he statute at issue here does not criminalize prostitution—it criminalizes the sale or potential sale of advertisements.").  Additionally, *Arcara* does not support the misuse of compulsory process as part of an investigative witch hunt. As Justice O'Connor said in concurrence, if a government official "were to use a nuisance statute as a pretext for closing

---

[25]    *See, e.g.*, *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571–73 (2011) (reiterating that heightened scrutiny applies when burdens on speech are based on the content of the speech or the identity of the speaker, even in the commercial context).

down a bookstore because it sold indecent books . . . the case would clearly implicate First Amendment concerns and require analysis under First Amendment standards of review." *Arcara*, 478 U.S. at 708 (O'Connor, J., concurring).[26]  The same principle applies here.

### 3.      The Subpoena Demands Are Overly Broad and Burdensome

The Subcommittee asserts that the Subpoena demands are not overbroad and were not part of any effort to harass or damage Backpage.  App. Mem. at 34–35.  These are two distinct issues, and the issue of the Subcommittee's illegitimate purpose is addressed below.  But with respect to the burdens, the Subcommittee fails to come to grips with the way in which probing the editorial functions of a publisher imposes an excessive burden, grossly understates the volume of materials it is demanding, and is less than forthcoming with this Court about its multiple efforts to target Backpage, its employees, and other entities that do business with the company.  The Subcommittee's claim that it "already narrowed the documents it sought from Backpage" and that it now is seeking "only a subset of the document requests in the subpoena" is deceptive.  If anything, the Subcommittee has expanded and accelerated its efforts to hound Backpage.[27]

The Subcommittee's claim that it narrowed its document request in the October 1 Subpoena is disingenuous.  Although it reduced the number of categories, it simultaneously asked broader, more general questions that covered essentially the same subject areas.  The Subcommittee has demanded the email correspondence from and between all those employed to provide moderation services for the past six years.  It also is seeking all documents concerning

---

[26]      The majority likewise acknowledged the First Amendment interests would be heightened if the prosecution was brought as "a pretext for the suppression of First Amendment protected material."  *Arcara*, 478 U.S. at 707 n.4.

[27]      The Subcommittee issued new subpoenas to three Backpage employees on April 20, 2016, after it filed the instant application for enforcement of the October 1, 2015 subpoena to Carl Ferrer. *See* Ross Decl. at ¶ 9.

the review, verification, editorial decision, and payment information for all transactions for the same six year period.  Even without any personally identifying information on users, this would require production of massive amounts of information, with no explanation of how it relates to the purported topic of the investigation.  The demand for information on payments processing for the same period likewise would require the production of documents in an area that dovetails with Sheriff Dart's efforts to foreclose all payments options.

Such an overly broad demand for documents would be bad enough if just focused on Backpage.  But it is not.  The Subcommittee has issued subpoenas and/or requested information from at least 15 different entities and/or individuals, including current and former Backpage employees, an accounting firm, a payroll processor, an Internet service provider, and multiple other corporate and financial entities that have done business with Backpage. *See* Steve Ross Decl. at ¶ 9. The Subcommittee has sought to question individuals about how they "feel" about working for Backpage, and it has contacted at least three current or former employees through their personal Facebook accounts.  *Id*.  Far from being narrow, the Subcommittee's investigation of Backpage is expansive, open-ended, and growing.

The Subcommittee's argument that its Subpoena imposes no First Amendment burdens boils down to the claims that it is not seeking personally identifying information about Backpage users and that this demand is not targeting political dissidents.  Neither claim addresses the First Amendment burdens imposed by the Subcommittee's document demands.  If, for example, an investigating committee told the NAACP that it could keep its membership lists, but only wanted to see six years of documents reflecting internal policies and employee communications, stalked its employees at home, and subpoenaed its vendors and accountants, it would not be plausible to suggest that this would not impose a substantial burden on freedom of expression.  This is true whether or not the entity under scrutiny may be classified as a political dissident, for the First Amendment imposes no such requirement.  *United States v. Stevens*, 559 U.S. 460, 479 (2010) ("*Most* of what we say to one another lacks 'religious, political, scientific, educational,

journalistic, historical, or artistic value' (let alone serious value), but it is still sheltered from government regulation.") (emphasis in original).  If the Subcommittee is permitted to make such demands simply because its targets do not fall into the same political categories of some of its Cold War victims, then this Court would be approving "a formula for permitting unauthorized, unregulated, foolproof, lawless government coercion."  *Dart*, 807 F.3d at 237.

### B.    The Subcommittee Lacks a Valid Legislative Purpose to Support Subpoena Enforcement

The authority of the Congress to investigate is broad, but it is not unbounded.  The Senate's authority to investigate extends no further than its authority to legislate, as courts have consistently held that a congressional inquiry must be conducted further to a "valid legislative purpose." *See Wilkinson v. United States*, 365 U.S. 399, 408–09 (1961).  Even the presence of a valid purpose does not afford committees carte blanche to undertake all manner of oversight activities—investigatory actions must be reasonably related to the subject matter under investigation.  *See Sinclair v. United States*, 279 U.S. 263, 299 (1929).  Where a congressional inquiry threatens the constitutional rights of a party under investigation, courts have also required that committees act with a higher degree of explicitness and clarity.  *See, e.g.*, Y*ellin v. United States*, 374 U.S. 109, 143, 144 (1963); *United States v. Ballin*, 144 U.S. 1, 5 (1892).

The Subcommittee asserts that its investigation is authorized because Congress is generally empowered to legislate on matters involving the Internet and sex trafficking and Senate Resolution 73 authorizes the Subcommittee "to investigate matters related to organized criminal activity that operates in or utilizes the facilities of interstate commerce." App. Mem. at 17–19. Under such an expansive mandate, there is no information that could not be sought and no documents beyond the Senate's compulsory process.  The Subcommittee's Subpoena cannot be enforced based an unlimited legislative mandate, simply because Congress is empowered to legislate about anything involving either organized crime or the Internet.  *See, e.g.*, *Deutch v.*

*United States,* 367 U.S. 456, 468–69 (1961), ("The resolution creating the subcommittee revealed nothing.  It was merely a general resolution authorizing the creation of a subcommittee to act for the Committee.").

The Subcommittee's brief features an extended discussion of how the three categories of documents demanded in the Subpoena could be relevant to congressional deliberations about whether, or how, to amend Section 230 of the Communications Decency Act.  App. Mem. at 19–26.  The problem is, that subject is mentioned nowhere in the Subcommittee's authorizing resolution, it is not addressed in the Subpoena or its cover letter, and was never broached in the voluminous correspondence between Backpage and Subcommittee staff.[28]  Nor was it the subject of the November 19, 2015 hearing, which Senator McCaskill described as being "about affirming the legitimacy of this investigation"—meaning the Subcommittee is seeking to support its rationale for the Subpoena because it conducted a hearing about its enforcement.  *See* Nov. 19 Hearing Rec. at 13 (statement of Sen. McCaskill, Ranking Member, S. Comm. on Homeland Sec. and Governmental Affairs).  Neither the Subcommittee's chairman nor its ranking member mentioned any potential or pending legislation as the goal of its investigation.[29]  On this record, the Subcommittee cannot retroactively articulate its purpose though lawyers' arguments made to this Court.  *E.g.*, *Deutch*, 367 U.S. at 467–68 ("[T]he pertinency of the interrogation to the topic under the congressional committee's inquiry must be brought home to witness at the time the questions are put to him").  The Subcommittee's efforts to now develop its legislative record is precisely the type of *post litem motam* prohibited by *Rumely* (the respondent's "duty to answer

---

[28]     When the Subcommittee issued its various subpoenas to Backpage and its employees, it described the inquiry as one of "issues related to human trafficking." *See* Oct. 1, 2015 Subpoena.  At its November 19, 2015 hearing, the Subcommittee described its inquiry as an investigation "into how sex traffickers increasingly use the Internet to advance their trade and to evade detection." Nov. 19 Hearing Rec. at 1 (statement of Sen. Portman, Chairman of the Subcomm.).

[29]     *See generally* Nov. 19 Hearing Rec.  To the contrary, Subcommittee Chairman Portman pointed out that the Senate had already legislated on the topic. *See id.* at 26.

must be judged as of the time of his refusal. The scope of the resolution defining that duty is therefore to be ascertained as of that time and cannot be enlarged by subsequent action of Congress."). *See Rumely*, 345 U.S. at 48.

This is particularly important where, as here, the documents that the Subcommittee is demanding impinge on First Amendment freedoms. The Supreme Court thus limited a committee's investigative power in *Rumely*, when it held that the Committee for Constitutional Government could not be compelled by subpoena to produce information on the buyers of its books and financial records, including information on receipts from the sale of books, pamphlets, and other literature. The Court held that a congressional resolution authorizing the Select Committee on Lobbying Activities to study and investigate (1) all lobbying activities intended to influence, encourage, promote, or retard legislation; and (2) all activities of agencies of the Federal Government intended to influence, encourage, promote, or retard legislation did not empower it to "inquire into all efforts of private individuals to influence public opinion through books and periodicals." *Rumely*, 345 U.S. at 46.

In order to accommodate "contending principles – the one underlying the power of Congress to investigate, the other at the basis of the limitation imposed by the First Amendment," the Court interpreted the mandate to investigate "lobbying activities" narrowly to include only "representations made directly to the Congress, its members, or its committees."[30] In this case, the Subcommittee argues that the special House committee in *Rumely* had special jurisdiction that raised obvious constitutional problems (investigating lobbying activities), while asserting that this case raises no such concerns. App. Mem. at 31. It claims to be free from any

---

[30]     *Rumely*, 345 U.S. at 44, 47. In addition to names of individuals who purchased books, the committee sought "pertinent financial records" to determine whether lobbying laws were being circumvented, but the Court held that the First Amendment did not permit the investigatory mandate to be read so expansively. *Rumely*, 345 U.S. at 52. When it comes to the press, any investigation seeking information of an organization's internal operations inherently raises constitutional concerns. *See, e.g.*, *Bursey*, 466 F.2d at 1088.

such First Amendment conundrums because it is empowered to investigate "a broad swath of activity, both in the government and in society generally," and that there is no possible narrowing construction of its authority that would fix the problem. *Id*. at 32.

This is nonsense that runs headlong into the rule of *Watkins*: the broader the mandate the greater the obligation to identify the source of authority and its link to the purpose of the investigation. "It is the responsibility of Congress . . . to insure that the compulsory process is used only in furtherance of a legislative purpose. This requires that the instructions to an investigating committee spell out that group's jurisdiction and purpose with sufficient particularity. Those instructions are embodied in the authorizing resolution." *Watkins*, 354 U.S. at 201. A broad delegation obviously encompasses "many facts which the legislature might find useful," but without a specific mandate there is no way to tell the particular investigation was authorized (as well as the specific questions asked), nor would it be possible to prevent inquiries that exceed what a committee may "validly acquire because of the effect upon the constitutional rights of individual citizens." *Sweezy*, 354 U.S. at 253–54.

Under the Subcommittee's theory, a non-specific grant of authority to regulate the world generally would justify ***any*** investigation without the need to demonstrate pertinence of the Subpoena demands. But this is not the law. "Validation of the broad subject matter under investigation does not necessarily carry with it automatic and wholesale validation of all individual questions, subpoenas, and documentary demands." *Gibson*, 372 U.S. at 545 (citations omitted). To the contrary, "[i]t is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge on such highly sensitive areas as freedom of speech or press, freedom of political association, and freedom of communication of ideas. . . ." *Sweezy*, 354 U.S. at 245. This places a constitutional obligation on Congress to specify the purpose and authority for its investigations because "[t]his safeguard can be nullified when a committee is invested with a broad and ill-defined jurisdiction." *Id*. This makes the authorizing resolution "especially significant in that it

reveals the amount of discretion that has been conferred upon the committee." *Id*.  "The more vague the committee's charter is, the greater becomes the possibility that the committee's specific actions are not in conformity with the will of the parent House of Congress." *Watkins*, 354 U.S. at 201.

The Subcommittee loses sight of the fact that well-defined authorizing resolutions are essential not just to define and circumscribe the legislative purposes, but also to protect witnesses. *Russell*, 369 U.S. at 767–68.  Compelling information from witnesses without a clear and specific mandate—particularly when the information implicates First Amendment freedoms—is a violation of due process. *Sweezy*, 354 U.S. at 254–55;  *Rumely*, 345 U.S. at 46 (Congress must demonstrate "its full awareness of what is at stake by unequivocally authorizing an inquiry of dubious limits.").  *See infra* pp. 41–43.  This is because under an expansive and non-specific delegation of authority, "[n]o one could reasonably deduce . . . the kind of investigation that the Committee was directed to make"; in these circumstances, reviewing courts will not defer to a committee's interpretation of its mandate because "such deference cannot yield to an unnecessary and unreasonable dissipation of constitutional freedoms." *Watkins*, 354 U.S. at 204.  These considerations are particularly important in contempt proceedings. *See Deutch*, 367 U.S. at 467–69; *Russell*, 369 U.S. at 767–68.

At base, the Subcommittee's analysis is marred by the same limited view of the First Amendment rights at issue in this case, assuming that freedom of expression is threatened only by demands that a witness "name names" or disclose membership lists.  App. Mem. at 31–32.  And while such practices may reflect some of this Subcommittee's darkest hours, they by no means exhaust the ways in which a targeted investigation may burden or destroy a disfavored speaker or intermediary publisher.  Through a broad and undefined mandate and with unlimited discretion, an investigating committee can target and harass an unpopular publisher or speaker in myriad ways—and the Subcommittee has done so here. [31]

---

[31]      The cases the Subcommittee cites on the doctrine of constitutional avoidance are

**C.** **The Subcommittee's Investigation is Part of a Punitive Campaign Targeting Backpage**

The Subcommittee's subpoena also lacks a valid legislative purpose because its goal is more prosecutorial than legislative and because it is part of a sustained, coordinated, and targeted campaign to take down Backpage. Congress is not a "law enforcement or trial agency," *Watkins*, 354 U.S. at 187, and there is "a clear difference between Congress' legislative tasks and the responsibility of a grand jury, or any institution engaged in like functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F. 2d 725, 732 (D.D.C. 1974). Moreover, a court "may not permit its process to be abused" in enforcing administrative subpoenas "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *United States v. Powell*, 379 U.S. 48, 58 (1964).[32] Ultimately, "no inquiry is an end in itself," and congressional investigations conducted "solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Watkins*, 354 U.S. at 187.

The Subcommittee seeks to assure this Court that the investigation is not intended to harass or damage Backpage and that any claims to the contrary are nothing but "conclusory

---

inapplicable. *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 638 F.3d 794, 801 (D.C. Cir. 2011); *Clark v. Martinez*, 543 U.S. 371, 381 (2005). Neither case involves pertinence or First Amendment rights (and *Empresa Cubana* does not even involve any fundamental right), and each merely states boilerplate principles of constitutional avoidance.

[32] Such circumstances can raise still greater concerns if an executive process is tainted by congressional intervention. *Cf. S.E.C. v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 129-30 (3d Cir. 1981). In light of these factors and the Subcommittee's clear coordination with Sheriff Dart's unconstitutional attacks on Backpage, this Court must reject the abuse of its process by declining to enforce the Subcommittee's subpoena.

assertions." It calls "wholly unfounded" any efforts to link the investigation to various other government legal actions, state laws, or private suits.[33] The facts show otherwise.

From the earliest days of its inquiry, the Subcommittee partnered with Sheriff Dart and his team dedicated to attacking Backpage.[34] The first contact came just as Dart was devising a strategy to "disrupt Backpage.com" "legally or otherwise." Grant Decl. at ¶ 9 and accompanying exhibit. Subcommittee staff scheduled a call with Sheriff Dart's office "to discuss the next few steps of our investigation." Polesovsky May 13, 2015 E-mail. Dart's staff responded enthusiastically that they would be "happy to support [the Subcommittee's] investigation," and the respective staffs conducted a series of telephonic coordination meetings. E-mail from Benjamin Breit, Cook Cty. Sheriff's Office to Andrew Polesovsky, Counsel, Permanent Subcomm. on Investigations (May 13, 2015, 11:37 AM) (hereinafter, "Breit May 13, 2015 Email"), attached hereto as Ex. T. When Sheriff Dart's unconstitutional plan to suffocate

---

[33]   App. Mem. at 36. The Subcommittee's brief in this regard merely echoes the Subcommittee's repeated denials, in both face-to-face meetings and in correspondence, that its efforts were coordinated with other initiatives to take down Backpage. *See, e.g.*, Ross Aff. ¶ 4 ("Subcommittee counsel strongly denied any connection between the Subcommittee's inquiry and the actions of Sheriff Dart."); *id.* at ¶ 6 (At a September 14, 2015 meeting "Subcommittee staff again represented that its inquiry was unrelated to Sheriff Dart's and other legal actions against Backpage.com."). *See also* Letter from Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcomm. to Steven R. Ross, Counsel for Backpage.com (Aug. 28, 2015), attached hereto as Ex. M (describing as "false" Backpage's "unfounded and irresponsible claim that [the] investigation is 'related to – and indeed connected with – recent explicit efforts by other governmental actors to halt Backpage.com's business'"); Letter from Sens. Rob Portman and Claire McCaskill, Chairman and Ranking Member of the Subcomm. to Carl Ferrer, CEO of Backpage.com (Oct. 1, 2015), attached hereto as Ex. A (denying as "false" an allegation that the investigation is part of a "concerted effort, with other unrelated governmental actors, to engage in harassment").

[34]   In early 2015, as part of an ongoing campaign being waged against Backpage by the Illinois team of Senator Kirk and Sheriff Dart, a Senate staffer told Sheriff Dart's staff that "[p]rosecuting Backpage is always at the top of my list." E-mail from Gregory Tosi, Legislative Counsel, Office of Sen. Mark Kirk, to Benjamin Breit, Cook Cty. Sheriff's Office (Mar. 3, 2015, 3:12 PM EST), attached hereto as Ex. W. Within weeks, that same Senate staffer connected Sheriff Dart's staff with the Subcommittee, at the very time the Senate was launching an investigation into "human trafficking."

Backpage met with quick success, Subcommittee staff reached out to express their admiration (in their words, "[w]hat a development!") and to "set up a quick call here at the subcommittee to get the story about how it all went down."  Polesovsky July 1, 2015 Email.  The Subcommittee added that its investigation was "rapidly progressing on a parallel track." *Id*.

Sheriff Dart's team responded with equal enthusiasm and quickly set up a call to brief the Subcommittee and offer assistance, and a joint strategy session occurred the following day.  At the same time, a member of Sheriff Dart's staff (the same individual who coordinated the conference calls with the Subcommittee) contacted Senator Kirk's office to say that his "dream scenario would be to have [the founders of Backpage.com] dragged before a Senate Committee" and that "[b]ased on calls this morning, that's looking increasingly realistic."  Breit July 2, 2015 Email.  Subcommittee Counsel then obtained copies of Sheriff Dart's previous document requests and potentially incorporated Dart's requests into the Subcommittee's Subpoena. *See* Breit July 6, 2015 Email.  That subpoena also sought information about actions by the credit card companies at the same time Sheriff Dart was seeking to choke off all remaining sources of revenue for Backpage.  *See* Subpoena to Backpage.com by the Permanent Subcomm. on Investigations (July 7, 2015), attached hereto as Ex. G.

The Subcommittee ultimately withdrew the July 7 Subpoena and these specific questions but replaced its more particularized demands with very general ones in the October 1 Subpoena, including a demand for the following:

> Any documents concerning reviewing, verifying, blocking, deleting, disabling, or flagging user accounts or user account information, including but not limited to the verification of name, age, phone number, payment information, including but not limited to the verification of name, age, phone number, payment information, email address, photo, and IP address.

*See* Oct. 1, 2015 Subpoena.  This demand may seem narrower than the five detailed questions it replaced, but this impression is deceptive.  It seeks all documents used in reviewing and verifying user accounts including all payment information for a six year period.  The Subpoena's

instructions state that the document demands are to be construed broadly (as further evidenced by the Subcommittee's broad demand for moderators' emails).  And the category for payment information is one of those for which the Subcommittee still seeks enforcement.

This is precisely the type of information that is relevant to the Subcommittee's collusion with Sheriff Dart.  The Seventh Circuit found that Dart had organized a "boycott," and was pursuing a "campaign of suffocation" in violation of the First Amendment.  *Dart*, 807 F.3d at 231, 238.  This included both initial contacts with the credit card companies, as well as follow-up to make sure the lost revenue would not be replaced.  The Court quoted the lower court's finding that "Dart admitted in the preliminary injunction hearing [that] his department often coordinates with other local law enforcement agencies and sometimes with other states and the federal government."  *Id*. at 236–37. The information demanded by the Subcommittee undoubtedly would quickly be put to use.[35]

The *PSI Staff Report* did not disclose its contacts with Dart's office but merely noted the litigation, observing, less than candidly, that "[t]he Subcommittee has no position on this dispute."  PSI Staff Rep. at 9.  It also issued findings that tracked Dart's efforts to close off sources of replacement revenue.  *Id*. at 28 ("The Subcommittee's investigation has revealed steps taken by Backpage to circumvent restrictions on its access to credit card networks.").  In this way, one regulatory hand was washing the other:  Dart's office fed questions to the Subcommittee to add to its subpoena and the Subcommittee looked for ways to assist Dart in his unconstitutional scheme to close off sources of revenue.  This Court should not lend its authority to such abusive tactics.  *Powell*, 379 U.S. at 58.

---

[35]     As the *Dart* litigation has resumed, the Sheriff has made frequent use of the Subcommittee's report, falsely claiming it proves Backpage had participated in illegal behavior.  *See, e.g.*, Motion to Strike Plaintiff's Improvidently Filed Summary Judgment Motion, *Backpage, LLC v. Dart*, No. 15-cv-06340, Dkt. No. 126.

Even if the Subcommittee's investigation were not tainted by harassment and abuse, the prosecutorial thrust of the Subpoena deprives it of legitimacy. *Watkins*, 354 U.S. at 187. This was made clear in the November 19 hearing, the purpose of which was to target Backpage and to set up enforcement of the Subpoena rather than to gather evidence. The transcript is replete with references to how the Subcommittee's investigation would dovetail with other efforts against Backpage,[36] and it contained multiple calls to action by law enforcement.[37] This Court should not legitimize this exercise in political theater by granting the application for enforcement.[38] There is "no congressional power to expose for the sake of exposure." *Watkins*, 354 U.S. at 200.

## II.     The Subcommittee's Application for Enforcement of the Subpoena Seeks Relief Not Provided by 28 U.S.C. § 1365 and Otherwise Denies Backpage Due Process of Law

The Subcommittee has denied Backpage due process of law by failing to define the scope of its inquiry and the relevance of its requests, while depriving the company of the opportunity to consider and address the Subcommittee's ostensibly flexible and evolving objectives, and its application for partial enforcement violates the terms of 28 U.S.C. § 1365(b). Of the eight

---

[36]     *See*, *e.g*., Nov. 19 Hearing Rec. at 10 (expressing interest in the information sought in the subpoena); *id*. at 13-14 (expressing interest in information for use in ongoing litigation against Backpage); *id*. at 14 (Sen. McCaskill tying information sought by the Subpoena to prior document requests by NAAG); *id.* at 20 (Sen. Ayotte suggesting that information coming out of the hearing will be "an area that many attorneys and prosecutors will be focusing on").

[37]     *See*, *e.g*., Nov. 19 Hearing Rec. at 15 (Sen. McCain suggesting results of hearing might lead to prosecutions); *id*. at 19 (Sen. Lankford suggesting U.S. Attorney and Department of Justice should step in "with full force");   *id.* at 23 (Sen. McCaskill suggesting laying a foundation for a RICO prosecution).

[38]     Not only has the Subcommittee focused the full weight of its investigative efforts against Backpage and seemingly any individual or entity ever affiliated with the company, it has used these efforts to enlist political support and raise campaign funds. *See, e.g.*, *Deirdre Shesgreen, Portman Threatens Criminal Action against CEO of Sex-Ad Website*, Cincinnati Enquirer, Nov. 19, 2015, http://www.robportman.com/portman_threatens_criminal_action_against_ceo_of_sex_ad_websit e; Sen. McCaskill Campaign Solicitation, *Tell the Senate: Do Right by Victims and Survivors. Hold Backpage in Contempt of Congress*, attached hereto as Ex. X.

requests for documents and information set forth in the October 1, 2015 Subpoena, the Subcommittee now seeks enforcement of only requests one through three. *See* Oct. 1, 2015 Subpoena.   At no time prior to this enforcement action did the Subcommittee indicate to Backpage that it intended to further limit its Subpoena, and Backpage relied upon this understanding in determining and executing its response to the Subpoena.

This Court must carefully examine whether the Senate Subcommittee has fully observed the rules and precedents governing the invocation of the Senate's power to compel information. Failure to do so is not simply, as the Senate might suggest, a mere foot-fault. *See* Sens. Portman and McCaskill Nov. 3, 2015 Letter.   Instead, for both the summoned witness and the Court, a clear and obvious adherence to those precepts is required.   Any witness determining how to respond to a Senate subpoena must be able to rely on a clearly enunciated and properly communicated explanation of precisely what is being demanded and how that information is pertinent to the proper legislative business of the Senate.   In the absence of a clear statement of legislative necessity at the time compliance is demanded, of pertinence to a constitutionally authorized legislative purpose, and of a definitive and timely description of what documents are required to satisfy the subpoena, the Court should not permit its authority to be seconded to the legislative branch.   In this case, no such purpose was set forth to support the Subpoena, and counsel cannot cure that defect by concocting a rationale in its application for enforcement.

The Subcommittee's shifting demands violate due process.   Based on the Subcommittee's broad representations of its own authority, Backpage was faced with a decision regarding how and whether to respond to the Subcommittee's Subpoena.   This decision has required the company to evaluate the compulsory requests laid before it in their entirety and to balance the potential consequences of declining to fully comply with the Subpoena's requests against the significance of preserving its rights under the First Amendment.   Such a delicate balance is precisely why courts have recognized that it is "investigations that are conducted by use of compulsory process that give rise to a need to protect the rights of individuals against illegal

encroachment," *Watkins*, 354 U.S. at 215, and that a "person compelled to make this choice is entitled to have knowledge of the subject to which the interrogation is deemed pertinent. That knowledge must be available with the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense." *Id*. at 208–09.

Courts have sought to safeguard witnesses from the coercive and deceptive impact of constantly shifting goal posts—protecting their right to understand the nature and scope of the topic under investigation and the pertinency of related requests. *See, e.g.*, *Deutch*, 367 U.S. at 46768 ("[T]he pertinency of the interrogation to the topic under the congressional committee's inquiry must be brought home to witness at the time the questions are put to him"). By constantly shifting its requests and objectives, including through its present application for limited enforcement of the Subpoena, the Subcommittee has left Backpage with little basis to determine the Committee's current objectives and the relevance of the remaining requests to these ends. This issue has only been exacerbated by the reality that the Subcommittee continues to refine and redefine the nature of the information it seeks, including through its most recent request to this Court to limit enforcement of the Subpoena to its first three requests.

Just as Congress' oversight authority is limited by the constitutional rights of those investigated, so too can Congress' power of inquiry be limited by the laws that the body, itself, creates. In this sense, in defining the scope of the statutory enforcement procedure now sought by the Subcommittee, Congress placed concrete limits on the nature of the relief available to the Senate and to the parties against whom enforcement is sought. The civil enforcement mechanism affords this Court sufficient jurisdiction to safeguard the Constitutional rights of parties facing compulsory process, while not impinging Congress' power of inquiry. *See* 28 U.S.C. § 1365(b) (stating that "[n]othing in [§ 1365] shall confer upon such court jurisdiction to…modify…any such subpena [sic] or order.") The Subcommittee now petitions this Court to ignore such limits on account of the Subcommittee's failure to appropriately modify its Subpoena and timely apprise Backpage of the evolving focus of its inquiry.

In seeking only partial enforcement of its Subpoena, the Subcommittee has also requested a remedy which is unavailable through this enforcement action, as such relief is outside of the jurisdiction conferred upon this Court by section 705 of the Ethics in Government Act of 1978, 28 U.S.C. § 1365.  The Subcommittee has applied "for judicial assistance in obtaining [certain] subpoenaed documents … pursuant to 28 U.S.C. § 1365(a), which confers jurisdiction upon this Court over civil actions to enforce subpoenas of Senate committees and subcommittees." App. Mem. at 2.   However, this Court's jurisdiction in such matters, as defined by 28 U.S.C. § 1365(b), does not empower it to "review, modify, suspend, terminate, or set aside any such subpena [sic] or order." *Id*.  Congress has expressly limited such jurisdiction solely to determining, based on the interests involved, "whether or not to aid Congress in enforcing the subpoena or order." S. REP. No. 95-170, at 94 (1977).  This statutory restriction forecloses the Court's customary authority to modify a subpoena brought before it, even if the Court "finds that [the subpoena] does not meet the applicable legal standards for enforcement." *Id.*   In such circumstances, Congress has provided that the Court may only decline to order compliance with the subpoena.[39]

It does not matter that the Subcommittee in this matter has, on its own initiative, requested modification of the Subpoena, seeking to limit it to only three requests.  The nature of the Subcommittee's application for enforcement does not alter this Court's jurisdiction under § 1365.  If the Subcommittee has determined that components of its Subpoena are unenforceable or no longer germane to its inquiry, the Subcommittee is best positioned to rectify this problem by issuing a new subpoena.  Indeed, the Subcommittee has already taken such action in this

---

[39]      Partial enforcement of the Subcommittee's Subpoena, setting aside requests four through eight, would reflect a "change," "alteration," and "limitation" of the subpoena—a modification, by any reasonable definition, of the document as it was issued by the Subcommittee. *See Modification, Black's Law Dictionary*, (10th ed. 2014).  Yet, under the plain text of § 1365, this Court lacks the jurisdiction to order the modification requested by the Subcommittee, and—consistent with these jurisdictional limitations—this Court has never partially enforced a subpoena in this context.

matter, withdrawing its original July 7, 2015 subpoena (requesting 41 categories of documents), and issuing its October 1, 2015 Subpoena with eight requests.

Having initiated this proceeding without modifying its Subpoena in a timely and appropriate manner, the Subcommittee now seeks relief outside of this Court's jurisdiction. Because the Subcommittee has sought enforcement of the Subpoena in a manner—following modification—which is expressly forbidden under § 1365, such enforcement is not warranted and should not be granted.

## CONCLUSION

Based on the foregoing, this Court should deny the Subcommittee's Application to partially enforce its October 1, 2015 Subpoena to Mr. Ferrer.

Respectfully submitted,

Steven R. Ross, Bar #244863
Stanley M. Brand, Bar #213082
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue NW
Washington, D.C. 20036
Telephone:  (202) 887-4343

Robert Corn-Revere, Bar #375415
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, D.C. 20006
Telephone:  (202) 973-4200

Counsel for Carl Ferrer

## EXHIBITS LIST

Exhibit A       Subpoena to Carl Ferrer from Chairman and Ranking Member of the
                Subcommittee, Oct. 1, 2015

Exhibit B       Rob Portman (@robportman) TWITTER, Mar. 26, 2016

Exhibit C       Declaration of James Grant and accompanying exhibits

Exhibit D       Letter from John Sommerville, Cook County Sheriff's Office, to Samuel Fifer,
                Counsel for Backpage, Jan. 24, 2014

Exhibit E       Letter from Sen. Mark Kirk, et al. to Scott Tobias, former CEO of Voice Media
                Group, Inc., Oct. 5, 2012

Exhibit F       STAFF OF  S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON
                RECOMMENDATION TO ENFORCE A SUBPOENA ISSUED TO THE CEO
                OF BACKPAGE.COM, LLC, Nov. 19, 2015

Exhibit G       Subpoena to Backpage.com by the Permanent Subcomm. on Investigations, Jul. 7,
                2015

Exhibit H       Declaration of Steven R. Ross

Exhibit I       Letters from Sen. Mark Kirk et al. to Attorney General et al., Jan. 28, 2015; Aug.
                7, 2015; Oct. 26, 2015; Feb. 2, 2016

Exhibit J       Letter from Steven R. Ross, Counsel to Backpage.com to Sens. Rob Portman and
                Claire McCaskill, Chairman and Ranking Member of the Subcomm., Aug. 6,
                2015

Exhibit K       Letter from Sens. Rob Portman and Claire McCaskill, Chairman and Ranking
                Member of the Subcomm. to Steven R. Ross, Counsel to Backpage.com, Aug. 26,
                2015

Exhibit L       Letter from Steven R. Ross, Counsel to Backpage.com to Sens. Rob Portman and
                Claire McCaskill, Chairman and Ranking Member of the Subcomm., Aug. 26,
                2015

Exhibit M       Letter from Sens. Rob Portman and Claire McCaskill, Chairman and Ranking
                Member of the Subcomm. to Steven R. Ross, Counsel to Backpage.com, Aug. 28,
                2015

Exhibit N       Letter from Steven R. Ross, Counsel for Backpage.com to Sens. Rob Portman and
                Claire McCaskill, Chairman and Ranking Member of the Subcomm., Oct. 23,
                2015

Exhibit O       Letter from Sens. Rob Portman and Claire McCaskill, Chairman and Ranking
                Member of the Subcomm. to Carl Ferrer, CEO of Backpage.com, Nov. 3, 2015

Exhibit P       Letter from Steven R. Ross, Counsel for Backpage.com to Sens. Rob Portman and
                Claire McCaskill, Chairman and Ranking Member of the Subcomm., Nov. 13,
                2015

Exhibit Q       Letter to Chairman and Ranking Member of the Subcommittee from Steven Ross,
                Nov. 5, 2015

Exhibit R       E-mail from Matt Owen, Chief Counsel, Permanent Subcomm. on Investigations
                to Steven Ross et al., Nov. 14, 2015

Exhibit S       Letter from Steven R. Ross, Counsel for Backpage.com to Sens. Rob Portman and
                Claire McCaskill, Chairman and Ranking Member of the Subcomm., Nov. 18,
                2015

Exhibit T       E-mails Between Andrew Polesovsky, Counsel, Permanent Subcomm. on
                Investigations, and Benjamin Breit, Cook Cty. Sheriff's Office, May 13, 2015

Exhibit U       E-mail from Benjamin Breit, Cook Cty. Sheriff's Office, to Cara Smith et al.,
                Cook Cty. Sheriff's Office, July 2, 2015

Exhibit V       E-mail from Benjamin Breit, Cook Cty. Sheriff's Office, to Mark Angehr, Senior
                Counsel, Senate Permanent Subcomm. on Investigations, July 6, 2015

Exhibit W       E-mail from Gregory Tosi, Legislative Counsel, Office of Sen. Mark Kirk, to
                Benjamin Breit, Cook Cty. Sheriff's Office, Mar. 3, 2015

Exhibit X       Sen. McCaskill Campaign Solicitation

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2016, copies of the foregoing

1.     Memorandum of Points and Authorities in Opposition to Application of Senate Permanent Subcommittee on Investigations to Enforce Subpoena Duces Tecum;
2.     Proposed Order Denying Application;
3.     Exhibits Attached to Memorandum of Points and Authorities in Opposition;
4.     Motion for Oral Hearing; and
5.     Proposed Order Granting Oral Hearing

were served by electronic mail and United Parcel Service overnight delivery on counsel to

Applicant Permanent Subcommittee on Investigations at the following address:

     Patricia Mack Bryan
     Morgan J. Frankel
     Thomas E. Caballero
     Office of Senate Legal Counsel
     642 Hart Senate Office Building
     Washington, D.C. 20510-7250
     Thomas_Caballero@legal.senate.gov

     Counsel for Applicant Permanent Subcommittee on Investigations

                                   Steven R. Ross