MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO APPLICATION OF SENATE PERMANENT SUBCOMMITTEE
ON INVESTIGATIONS TO ENFORCE SUBPOENA DUCES TECUM

# Exhibit J



**Akin Gump**
STRAUSS HAUER & FELD LLP

STEVEN R. ROSS
202.887.4343/fax: 202.887.4288
sross@akingump.com

August 6, 2015

**VIA HAND DELIVERY**

The Honorable Rob Portman, Chairman
The Honorable Claire McCaskill, Ranking Member
Permanent Subcommittee on Investigations
Committee on Homeland Security & Governmental Affairs
United States Senate
Russell Senate Office Building, SR-199
Washington, DC 20510

  *Re: July 7, 2015 Subpoena Issued to Backpage.com*

Dear Chairman Portman and Ranking Member McCaskill:

  On behalf of Backpage.com, LLC ("Backpage.com"), we write regarding the subpoena issued by the Permanent Subcommittee on Investigations (the "Subcommittee") on July 7, 2015 (the "Subpoena").

  As the Subcommittee is aware, Backpage.com operates the second-largest online classified advertising service, located at www.backpage.com. The service began in 2004. Users of Backpage.com may post and review ads in a number of categories (e.g., local places, community, buy/sell/trade, automotive, musician, rentals, real estate, jobs, dating, adult and services) and subcategories. Users post over six million ads every month. Users provide all the content for ads they post on Backpage.com using an automated interface. Backpage.com does not dictate or require any content, although it does block and remove user-supplied content pursuant to its moderation standards and policies. Users may post individual ads for free in most categories, although until recently, Backpage.com charged for certain ads and services.[1]

---

[1] For example, Backpage.com charged $5–$17 for users to post in the adult category and $1 for dating ads. These charges discouraged abusive posting and provided data to help track users engaged in illegal activities. Indeed, law enforcement officials have urged that classified ad websites such as Backpage.com should require payment by credit cards because of the user information this provides.


August 6, 2015
Page 2

Backpage.com prohibits illegal content and activity on its website and takes extensive steps to prevent such misuse, especially to guard against any form of human trafficking or child exploitation. For example, Backpage.com's Terms of Use prohibit any ads for illegal services or posting "any material ... that exploits minors in any way." http://www.backpage.com/classifieds/TermsOfUse. Before users can post or view ads in the adult category, they must affirm they are at least eighteen years old and accept the site's Posting Rules, which mirror the prohibitions of the Terms of Use and also state that any suspected child exploitation will be reported for law enforcement investigation. In addition, every ad on the website contains a link for users to report if they believe the ad may be improper, emphasizing that concerns about any possible threat to a child should also be reported to abuse@backpage.com. Links are also provided at many places on the site to the CyberTipline of the National Center for Missing and Exploited Children ("NCMEC") and a User Safety page addressing the issue of human trafficking. In addition, Backpage.com prominently features an ad from a national support and rescue organization, Children of the Night ("Want Out? National Free Help 24/7: 1-800-551-1300. Tired of Turning Tricks? Pimps Don't Care. We Do!").

Backpage.com also developed and had implemented extensive measures to police user posts. The multi-tiered system created by Backpage.com includes automated filtering and two levels of manual review by over 100 personnel. The filter scans for more than 100,000 terms, phrases, URLs, and email and IP addresses. The system also includes two levels of manual review. Prior to the recent actions by Cook County Sheriff Thomas J. Dart, discussed below, the first manual review assessed ads in the adult and dating categories before they were allowed to appear on the site, and the second level examined nearly every such ad after posting, as a double-check for potentially improper content.[2] Through its review processes, Backpage.com blocks or removes over a million ads per month and immediately reports any ad that may concern child exploitation to NCMEC (approximately 300 to 400 per month). Backpage.com regularly works with local, state and federal law enforcement officials in connection with investigations and prosecutions, including responding to subpoenas and other information requests (most within 24 hours), providing training to law enforcement officials, and removing and blocking posts at their request. In some instances, Backpage.com personnel conduct additional Internet research to provide law enforcement further information to assist in rescuing victims and arresting and prosecuting criminals. Law enforcement officials often commend Backpage.com for its support and cooperation.

---

[2] Based upon the major credit card companies' response to Sherriff Dart's demands to stop processing payments to Backpage.com, Backpage.com has needed to impose some limitations on certain moderation measures.


**Akin Gump**
STRAUSS HAUER & FELD LLP

August 6, 2015
Page 3

In recent years, under the guise of fighting human trafficking and/or child exploitation, various government actors have attempted to silence the user-provided information posted on Backpage.com. Indeed, legislatures in three states—Washington, Tennessee, and New Jersey—passed criminal laws targeting Backpage. In each instance, federal courts enjoined the laws, finding them unconstitutional under the First Amendment—which affords rights equally applicable in the context of congressional and other federal oversight—and preempted by Section 230 of the Communications Decency Act ("CDA"). *See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097 (D.N.J. Aug. 23, 2013). Noting that escort ads have long been permitted (and escort services are licensed and regulated in many states), these cases held that the states' efforts to regulate or effectively block such ads "would likely chill protected speech." *McKenna*, 881 F. Supp. 2d at 1282. The courts rejected arguments that the laws only prohibited advertisements for illegal transactions and instead found that they were overbroad and could not survive strict scrutiny. *See Hoffman*, 2013 WL 1249063, at *8. Further, the laws violated CDA Section 230 because they sought to impose liability on websites for publishing third-party content, they "would encourage websites either to restrict speech or to relax their current self-policing," and Section 230 preempts all state civil and criminal laws. *McKenna*, 881 F. Supp. 2d at 1273–75; *Cooper*, 939 F. Supp. 2d at 825. As the Tennessee court summarized:

> Child sexual exploitation is an evil that states have an undisputed interest in dispelling. However despicable this evil, though, the Constitution stands as a shield against broad assaults by states on the rights of their citizens. The Constitution tells us that—when freedom of speech hangs in the balance—the state may not use a butcher knife on a problem that requires a scalpel to fix.

*Cooper*, 939 F. Supp. 2d at 813. In all three cases, the courts ultimately entered permanent injunctions and awarded Backpage.com attorneys' fees. *See, e.g., Backpage.com, LLC v. Cooper*, 2013 WL 1249063 (M.D. Tenn. Mar. 27, 2013).[3]

---

[3] Of course, significant First Amendment problems result not just from efforts to regulate content directly, as in the case of the three state laws just described, but also from governmental measures that place special burdens on Internet intermediaries like Backpage.com. Congress provided broad immunity for online intermediaries specifically to support First Amendment protection for Internet communication. 47 U.S.C. § 230(a)(4). This "Good Samaritan provision" furthers the goal of encouraging intermediaries to self-police their sites for objectionable material, as Backpage.com does, free from fear of legal repercussions. Congress enacted this measure to "encourage the unfettered and unregulated development of free speech on the Internet." *Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th Cir. 2003); *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997) ("Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive



August 6, 2015
Page 4

The Supreme Court has long recognized that "[t]he Bill of Rights is applicable to investigations as to all forms of government action." *Watkins v. United States*, 354 U.S. 178, 187 (1957). In this sense, it has found that burdensome demands for information can have a serious impact on First Amendment rights. *See id.* at 188. Accordingly, even where the general subject matter of an inquiry is uncontroversial, particular requests for information may be excessive where they threaten to impair the exercise of constitutional rights. *See, e.g., Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 549 (1963). Consequently, the Supreme Court has cautioned that "[i]t is particularly important that the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press, freedom of political association, and freedom of communication of ideas." *Sweezy v. New Hampshire*, 354 U.S. 234, 245 (1957) (plurality op.).

In the face of these important principles, and despite clear rulings from a growing number of courts, governmental attacks on Backpage.com and its First Amendment rights continue. Indeed, just last month, Cook County Sheriff Thomas J. Dart mounted a campaign to pressure the major credit card companies—Visa and MasterCard—to cut off use of their cards for purchases on Backpage.com, with the aim of eliminating the website's ability to do business altogether. Though the matter is in active litigation, another federal court issued a temporary restraining order against Sherriff Dart on July 24, 2015, halting his effort to use the power of his office to damage Backpage.com's legal business.

Thus, it is in the context of these various attempts by the government—legislative and executive branch attacks at both the state and federal levels—to seemingly press every angle to shut the company down that Backpage.com received the Subcommittee's Subpoena.

Your staff has indicated that the Subcommittee is conducting a far-ranging inquiry into issues relating to human trafficking. To be clear, Backpage.com respects these efforts, and it has been pleased to voluntarily assist the Subcommittee in this regard. For example, Backpage.com's General Counsel spent nearly an entire day with Subcommittee staff, and in doing so described Backpage.com's many processes and mechanisms by which it seeks to

---

effect."). The interest of free expression would likewise be undermined if Internet intermediaries were saddled with special, or particularly burdensome, investigative demands because they serve as the platforms for millions of messages posted by others.



**Akin Gump**
STRAUSS HAUER & FELD LLP

August 6, 2015
Page 5

prevent and report any advertisements that may involve instances of human trafficking or child exploitation. During that briefing, Backpage.com's General Counsel also outlined how Backpage.com regularly works with various law enforcement agencies to combat human trafficking and child exploitation.

However, just as other recent governmental efforts to harass and damage Backpage.com went beyond the proper limits on the government's authority to restrict speech, the Subpoena reveals that the Subcommittee's interest in fact extends far beyond issues of human trafficking. Rather, the 41 enumerated requests (many of which contain multiple sub-requests) in Schedule A of the Subpoena show that the Subcommittee is seeking a stunning breadth of information about Backpage.com and its operations, much of which is wholly unrelated to issues of human trafficking and which questions the activities of Backpage.com itself, rather the conduct of individual users. Indeed, the Subpoena appears to call for each and every piece of paper within Backpage.com's possession for the past five years. It reads far more like an examination of and collateral attack on Backpage.com's business than it does an exploration of potential legislation related to human trafficking.

In this sense, we believe that the Subpoena is so expansive that it imposes an unreasonable burden on Backpage.com. Its expansive requests necessarily infringe the First Amendment rights of Backpage.com and its users to such an extent that even attempting to revise the subpoena in its current form would be a fruitless endeavor. Accordingly, we respectfully request that the Subcommittee withdraw the Subpoena in its entirety. While Congress possesses a great power of inquiry, that power is bounded by the Constitution's limits on the powers of the government. There is, perhaps, no area where caution in exercising that power is more essential than in those instances where a Committee or Subcommittee seeks to use the compulsory power of a subpoena to overcome a constitutionally-based claim. History has taught, and in particular the history of this Subcommittee has provided vivid evidence, that Congress should not relegate unto itself the clearly judicial function of determining the extent of the protections afforded to all Americans under the Bill of Rights.

Alternatively, we request that the Subcommittee defer the Subpoena to permit Backpage.com the opportunity to seek a modification of an existing judicial order that placed under seal a specific federal judicial opinion that provides an informed discussion of the First Amendment limitations on a similar attempt to subpoena comparable information from the company. We would propose to then submit to the Subcommittee for its consideration this recent federal opinion and a more fulsome discussion of the constitutional infirmities and concerns regarding the Subcommittee's Subpoena. Given the well-defined law that has been established by the judicial branch over the decades regarding the constitutional limits on governmental action, including investigatory activity, this is an area that calls for a cautious


**Akin Gump**
STRAUSS HAUER & FELD LLP

August 6, 2015
Page 6

approach by the Subcommittee. Similarly, in the event that the Subcommittee would take steps to enforce a subpoena over constitutional objections, it should avail itself of the civil judicial review mechanism the Senate enacted into law.

In conclusion, various elements within the government have sought to use the full panoply of governmental authority to attack Backpage.com—elected officials have sought to legislate, investigate, and to indirectly interfere with the operation of a legal business by Backpage.com. In each and every instance, these efforts to attack and harass Backpage.com have been halted by various courts that, in measuring the government's actions against the Constitution's limits on the government, have found these efforts to violate the Constitution. With respect to the Subcommittee's inquiry, we look forward to discussing a way to proceed that ensures that the Subcommittee—like all other governmental entities that have sought to challenge Backpage.com's operations—not encroach on Backpage.com's well settled constitutional and statutory protections.

Sincerely,

Steven R. Ross
Stanley M. Brand
Akin Gump Strauss Hauer & Feld
Counsel for Backpage.com, LLC

Robert Corn-Revere
Davis Wright Tremaine, LLP
Counsel for Backpage.com, LLC