MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO APPLICATION OF SENATE PERMANENT SUBCOMMITTEE
ON INVESTIGATIONS TO ENFORCE SUBPOENA DUCES TECUM

# Exhibit K

RON JOHNSON, WISCONSIN, CHAIRMAN

| | |
|---|---|
| JOHN McCAIN, ARIZONA | THOMAS R. CARPER, DELAWARE |
| ROB PORTMAN, OHIO | CLAIRE McCASKILL, MISSOURI |
| RAND PAUL, KENTUCKY | JON TESTER, MONTANA |
| JAMES LANKFORD, OKLAHOMA | TAMMY BALDWIN, WISCONSIN |
| MICHAEL B. ENZI, WYOMING | HEIDI HEITKAMP, NORTH DAKOTA |
| KELLY AYOTTE, NEW HAMPSHIRE | CORY A. BOOKER, NEW JERSEY |
| JONI ERNST, IOWA | GARY C. PETERS, MICHIGAN |
| BEN SASSE, NEBRASKA | |

KEITH B. ASHDOWN, STAFF DIRECTOR
GABRIELLE A. BATKIN, MINORITY STAFF DIRECTOR

# United States Senate

COMMITTEE ON
HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS
WASHINGTON, DC 20510–6250

August 26, 2015

**VIA ELECTRONIC MAIL**

Mr. Steven R. Ross
Akin, Gump, Strauss, Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036

Dear Mr. Ross:

We write in response to Backage.com's failure to comply with the subpoena issued by the Permanent Subcommittee on Investigations on July 7, 2015.

In a letter dated August 6, 2015, the day before the subpoena's return date, Backpage claims that the subpoena "imposes an unreasonable burden" on Backpage and "necessarily infringes the First Amendment rights" of Backpage and its users. The letter does not, however, point to any particular document request in the subpoena. Instead, Backpage asserts a blanket First Amendment privilege over all of its records and refuses to provide a single page of responsive material. Backpage also contends that the subpoena "reveals that the Subcommittee's interest in fact extends far beyond issues of human trafficking" and potential legislation related to trafficking — an apparent challenge to the Subcommittee's authority. On these grounds, Backpage requests that the Subcommittee "withdraw the Subpoena in its entirety" or, in the alternative, "defer" the subpoena. After due consideration, the Subcommittee declines at this time to withdraw or defer the subpoena and directs Backpage to submit an appropriate response.

The contention that the Subcommittee's subpoena somehow exceeds its legitimate investigative authority is meritless. To the contrary, the Subcommittee is engaged in a carefully structured inquiry into a complex problem of significant legislative interest — the use of the Internet as a marketplace for interstate sex trafficking, including trafficking in children. The purpose of this long-term investigation is to produce a Subcommittee report addressing the problem and reform options that have received considerable legislative and scholarly attention. The Subcommittee's fact-finding will inform the Senate regarding these issues and assist in its consideration of any potential legislation relating to, *inter alia*, interstate and international human trafficking and sex trafficking; interstate cyberstalking; federal law enforcement policies and resources to combat trafficking; the federal anti-money laundering regime as it concerns illegal trafficking proceeds; and federal telecommunications policy.

1

Nor is there any merit to your assertion that the Subcommittee's investigation is designed to "harass and damage" Backpage.[1] Our objective is to conduct responsible fact-finding in aid of Congress's legislative and oversight responsibilities, not to single out Backpage. As part of this investigation, the Subcommittee has met with dozens of stakeholders, including non-profit organizations, advocacy groups, federal law enforcement agencies and officials, federal regulatory authorities, social media and technology companies, and companies that operate websites advertising "adult" services. Of course, the business practices of Backpage are an area of significant interest, given the company's large reported market share and the widespread, credible reporting that many children have been advertised for sex services on your site in the United States.[2] Businesses similar to Backpage have voluntarily provided information and documents detailing corporate structure, finances, and policies and procedures for preventing trafficking of minors.

As part of its fact-finding endeavor, the Subcommittee issued a duly authorized subpoena to Backpage on July 7, 2015. The subpoena requires the production of documents related to seven specific topics: (1) review of adult advertisements for illegal activity; (2) interaction and compliance with law enforcement; (3) reporting of suspicious advertisements to the National Center for Missing and Exploited Children; (4) payment processing; (5) anti-trafficking policies and provisions; (6) data retention policies and website data; and (7) corporate information, including ownership, revenue, employee headcount, and other websites under Backpage's control. These categories of documents fall within the Subcommittee's broad fact-finding mandate to build a record for potential legislation. The requested documents will afford the Subcommittee a better understanding of the practices of a major business that disseminates and profits from advertisements for commercial sex work, the abuse of such businesses by individuals engaged in unlawful sex trafficking, and the efficacy of screening measures to prevent such abuses.

With regard to the scope of the subpoena, the corporate information that we seek is necessary to conduct an effective investigation. The information sought in the subpoena is necessary to evaluate, among other things, Backpage's claims about the effectiveness of its monitoring; the proportion of company resources devoted to combating sex trafficking; and the potential migration of online escort advertising to foreign countries outside the reach of U.S. law

---

[1] As evidence of alleged "governmental attacks" on its business, Backpage cites to ongoing litigation concerning public letters written by Cook County Sheriff Thomas J. Dart to three major credit card companies detailing the sheriff's experiences with Backpage. Backpage sued Sheriff Dart on the theory that his letters constituted an informal prior restraint in violation of the First Amendment. On August 21, 2015, a federal judge denied Backpage's motion for a preliminary injunction and allowed a previously-entered temporary restraining order to expire, finding that the sheriff's actions did not amount to informal or improper censorship. *See Backpage.com, LLC v. Dart*, No. 15-cv-06340, slip op. at 24 (N.D. Ill. Aug. 24, 2015).

[2] Indeed, at least two federal district courts have recognized this fact—in cases Backpage cited in its own letter to the Subcommittee. *See Dart*, No. 15-cv-06340, slip op. at 3 ("Backpage's adult services section overwhelmingly contains advertisements for prostitution, including the prostitution of minors."); *id.* ("Backpage.com's adult section is the leading forum for unlawful sexual commerce on the Internet and . . . the majority of the advertisements there are for sex."); *Backpage.com LLC v. McKenna*, 881 F.Supp.2d 1262, 1267 (W.D. Wash. 2012) ("Many child prostitutes are advertised through online escort advertisements displayed on Backpage.com and similar websites."); *see also* Nicholas Kristof, *Where Pimps Peddle Their Goods*, N.Y. TIMES, Mar. 17, 2012, available at http://www.nytimes.com/2012/03/18/opinion/sunday/kristof-where-pimps-peddle-their-goods.html.

enforcement.[3] In light of Backpage's unwillingness to provide basic corporate information such as its ownership structure and the websites it controls, the Subcommittee had no choice but to resort to a subpoena.

Your August 6 letter contends that the subpoena "appears to call for each and every piece of paper within [its] possession." That assertion is unhelpful hyperbole. Indeed, that suggestion is belied by your own August 6 letter, which describes Backpage as "the second-largest online classified advertising service," where users "may post and review ads in a number of categories (e.g., local places, community, buy/sell/trade, automotive, musician, rentals, real estate, jobs, dating, adult and services) and subcategories." The subpoena seeks targeted information concerning only one of those eleven categories. If Backpage has concerns regarding the burden of specific requests in the subpoena, the Subcommittee remains willing to discuss options for minimizing that burden (e.g., through selecting search terms and covered custodians).

\* \* \*

In the face of the Subcommittee's targeted requests for information, Backpage also makes a blanket assertion of First Amendment privilege with respect to the entire subpoena. The rhetoric of the company's August 6 letter does not, however, come close to supporting that novel and sweeping claim. Backpage begins by citing cases that stand for the uncontroversial proposition that the First Amendment applies in the context of congressional investigations. *See, e.g., Watkins v. United States*, 354 U.S. 178, 187 (1957). We heartily agree. That is why, from the outset, the Subcommittee has been scrupulously mindful of any potential First Amendment issues in this investigation and crafted its subpoena accordingly.

Backpage next relies on cases in which courts have enjoined certain state-law bans on the advertisement of minors for sex, on federal preemption and First Amendment grounds. *See, e.g., Backpage.com LLC v. McKenna*, 881 F. Supp. 2d 1262, 1267 (W.D. Wash. 2012) (enjoining Washington statute criminalizing advertisement of minors for commercial sexual abuse); *Backpage.com LLC v. Cooper, Jr.*, 939 F. Supp. 2d 805, 807 (M.D. Tenn. 2013) (enjoining Tennessee statute criminalizing the sale of advertisements for the purpose of engaging in a commercial sex act with a minor). The holding of these cases is unavailing here for an obvious reason: The Subcommittee merely *seeks information* regarding Backpage's business practices. The subpoena does not regulate, much less criminalize, any speech. Indeed, to the extent these cases are relevant, they only underscore the need for *better-informed* legislation to avoid unconstitutionally overbroad or vague enactments in this area of acute public concern. *Cf. Cooper*, 939 F. Supp. 2d at 832-33 (holding that overly expansive definition of "commercial sex

---

[3] As Backpage is doubtless aware, media reports of the company's sale to an undisclosed entity in the Netherlands have led to speculation about Backpage's continued compliance with U.S. law enforcement. Korri Kezar, *Backpage.com Sold to Dutch Company for Undisclosed Amount*, DALLAS BUS. J. (Dec 30, 2014), available at http://www.bizjournals.com/dallas/news/2014/12/30/backpage-com-sold-to-dutch-company-for-undisclosed.html. In fact, Backpage has repeatedly stated that efforts to drive it and similar websites out of business would have the perverse effect of weakening anti-trafficking efforts by forcing websites overseas and outside the reach of U.S. law. Yet, in a Subcommittee staff interview on June 19, 2015, Backpage's General Counsel was unable to answer basic questions about Backpage's ownership and overseas restructuring.

act" rendered statute overbroad); *McKenna*, 881 F. Supp. 2d. at 1280 (recognizing that the challenged statute "might find itself on better constitutional footing if the statute included [more clear] definitions"). That is one of the principal reasons Congress engages in fact-finding of the kind the Subcommittee has undertaken — to enable it to write statutes that do *not* run afoul of the First Amendment.

Backpage also points to cases that bar investigative demands seeking information concerning participation in protected First Amendment activity, such as membership lists of political organizations. *See Watkins*, 354 U.S. at 214-16 (witness could not be compelled to disclose whether his associates were members of the Communist Party); *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 554-58 (1963) (witness could not be compelled to produce membership list of NAACP for state legislative committee to determine whether those individuals were Communists); *see also Sweezy v. New Hampshire*, 354 U.S. 234, 254 (1957) (college professor could not be compelled to reveal, among other things, opinions about Communism to state attorney general). But Backpage does not even attempt to argue that the subpoena seeks any information of that kind. Quite the contrary, the Subcommittee has on its own volition taken great care to avoid any plausible First Amendment concerns. For that reason, in an abundance of caution, the Subcommittee avoided seeking *any* documents that identify Backpage users. Indeed, the subpoena explicitly stated "Backpage may redact where appropriate the personally identifying information of users."

In short, Backpage has not explained the legal rationale for its categorical assertion of privilege. To the extent Backpage wishes to assert privilege over particular documents or categories of documents, the Subcommittee will consider those objections in accordance with its procedure. As Subcommittee staff advised you, Backpage has failed to comply with the Subcommittee's procedure for asserting privilege. With no lawful excuse, Backpage has rebuffed the Subcommittee's repeated requests to produce a privilege log, as the subpoena instructions and longstanding Subcommittee custom require. A privilege log is necessary in order for the Subcommittee to evaluate the basis for withholding specific documents or categories of information. In addition, please provide a detailed update—including dates and specific actions taken—regarding any efforts to unseal the "recent federal opinion" described in your August 6 correspondence. Please note that Backpage is not relieved of any obligation to begin producing responsive documents for which it has no claim of privilege.

Thank you for your attention to this matter.

Sincerely,

Rob Portman  
Chairman  
Permanent Subcommittee on Investigations

Claire McCaskill  
Ranking Member  
Permanent Subcommittee on Investigations