UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
SENATE PERMANENT SUBCOMMITTEE ON      )
INVESTIGATIONS,                                       )
                                                      )
                    Applicant,                        )
                                                      )          Misc. No. 1:16-mc-00621-RMC
          v.                                          )
                                                      )
CARL FERRER,                                          )
                                                      )
                    Respondent.                       )
_____)


**REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF APPLICATION TO ENFORCE SUBPOENA DUCES TECUM OF
SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**


Patricia Mack Bryan, Bar #335463
Senate Legal Counsel

Morgan J. Frankel, Bar #342022
Deputy Senate Legal Counsel

Grant R. Vinik, Bar #459848
Assistant Senate Legal Counsel

Thomas E. Caballero
Assistant Senate Legal Counsel

Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, D.C. 20510-7250

(202) 224-4435 (tel)
(202) 224-3391 (fax)

Dated: May 17, 2016                    Counsel for Senate Permanent Subcommittee
                                       on Investigations

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.      The Subcommittee's Investigation Is Within Its Jurisdiction and Has a
        Valid Legislative Purpose, and Requests 1, 2, and 3 of the Subpoena
        Are Directly Pertinent to That Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      This investigation is within the Subcommittee's jurisdiction . . . . . . . . . . . . . . . 5

        B.      The Subcommittee's investigation pursues a legitimate legislative
                purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        C.      Requests 1, 2, and 3 are directly pertinent to the Subcommittee's
                investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.     Subpoena Requests 1, 2, and 3 Do Not Violate Mr. Ferrer's First
        Amendment Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.      The Subcommittee's subpoena does not intrude into protected
                First Amendment activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.      The Subcommittee's subpoena is not an illegitimate attempt to
                punish Backpage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        C.      Subpoena requests 1, 2, and 3 are not overly broad and do not
                impose an undue burden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III.    The Court Has Jurisdiction Under Section 1365 to Grant the Application to
        Enforce Three of the Subpoena's Documentary Requests and Doing So
        Does Not Violate the Due Process Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## CASES

*Almendarez-Torres v. United States,* 523 U.S. 224 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Associated Press v. N.L.R.B.*, 301 U.S. 103 (1937). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

\* *Barenblatt v. United States*, 360 U.S. 109 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 8, 11, 20

*Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989). . . . . . . . . . . . . . . . . . . . 17

*Bursey v. United States*, 466 F.2d 1059 (9th Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Flytenow, Inc. v. F.A.A.*, 808 F.3d 882 (D.C. Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*F.T.C. v. Texaco, Inc.*, 555 F.2d 862 (D.C. Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Application of U.S. Senate Permanent Subcomm. on Investigations (Cammisano)*,
     655 F.2d 1232 (D.C. Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-17

*In re Chapman*, 166 U.S. 661 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Subpoena Duces Tecum Issued to C.F.T.C.*, 439 F.3d 740 (D.C. Cir. 2006). . . . . . . . . . . . 13

*Latif v. Obama*, 677 F.3d 1175 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

\* *McGrain v. Daugherty*, 273 U.S. 135 (1927). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

*Senate Permanent Subcomm. on Investigations v. Accardo*, Misc. No. 84-53
     (D.D.C. Mar. 29, 1984 amended Mar. 30, 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Senate Select Committee on Ethics v. Packwood*, 845 F. Supp. 17 (D.D.C.),
     *stay denied*, 510 U.S. 1319 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Sinclair v. United States*, 279 U.S. 263 (1929). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9

*Spirit Airlines v. U.S. Dept. of Transportation*, 687 F.3d 403 (D.C. Cir. 2012). . . . . . . . . . . . . 17

*United States v. Edge Broadcasting Co.*, 509 U.S. 418 (1993). . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Fort*, 443 F.2d 670 (D.C. Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Rumely*, 345 U.S. 41 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16

*United States v. Shelton*, 404 F.2d 1292 (D.C. Cir. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Williams*, 553 U.S. 285 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Watkins v. United States*, 354 U.S. 178 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 16, 20

*Wilkinson v. United States*, 365 U.S. 399 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20

*Zauderer v. Office of Disciplinary Counsel of the Supreme Ct. of Ohio*,
    471 U.S. 626 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17


**CONSTITUTION AND STATUTES**

U.S. Const. art. I, § 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 U.S.C. § 1365. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24


**CONGRESSIONAL MATERIAL**

S. Res. 73, 114th Cong., § 12(e)(1) (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Documents Related to the Investigation of Senator Robert Packwood*,
    S. Prt. No. 104-30, vol. 9 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Human Trafficking Investigation: Hearing Before the Permanent Subcomm. on
    Investigations of the Senate Comm. on Homeland Security and Governmental
    Affairs*, S. Hrg. No. 114-179, 114th Cong. (2015), *available at*
    https://www.gpo.gov/fdsys/pkg/CHRG-114shrg98445/pdf/CHRG-
    114shrg98445.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 19

    Items reprinted therein:

    Recommendation to Enforce Subpoena Issued to the CEO of
    Backpage.com, LLC, Staff Report to the Permanent Subcommittee
    on Investigations, Nov. 19, 2015 [PSI Staff Report]. . . . . . . . . . . . . . . 13, 14, 18, 19

*Public Officials Integrity Act of 1977*, S. Rep. No. 95-170 (1977). . . . . . . . . . . . . . . . . . . . . 23

Stop Advertising Victims of Exploitation Act of 2015, Pub. L. No. 114-22, § 118
    129 Stat. 227 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**MISCELLANEOUS**

Sheriff Dart's Motion for Leave to Amend Affirmative Defenses, filed Apr. 21, 2016,
ECF No. 155, *Backpage.com v. Dart*, No. 1:15-cv-06340 (N.D. Ill.). . . . . . . . . . . . . . . . 15

Backpage's Opposition to Motion to Dismiss, filed Mar. 28, 2016, ECF No. 12,
*Backpage.com, LLC v. Lynch*, No. 1:15-cv-02155-RBW (D.D.). . . . . . . . . . . . . . . . . . 3

---

<sup>*</sup> Cases and authorities chiefly relied upon are denoted with an asterisk.

# INTRODUCTION

Mr. Ferrer devotes much of his opposition to matters irrelevant to the legal issues before the Court.  His opposition is permeated with baseless allegations of collusion by the Subcommittee against Backpage, paeans to Internet freedom, lengthy discussions of government actions unconnected to the Subcommittee's investigation, and mischaracterizations of the scope of the Subcommittee's subpoena and of Backpage's "cooperation" with the Subcommittee.  None of that is relevant.  The issue in this case is whether Mr. Ferrer, the CEO of an online commercial marketplace, has a legitimate ground for not complying with three specific document requests from a validly issued subpoena of a Senate subcommittee.  That subpoena seeks information, as part of the Subcommittee's investigation of sex trafficking on the Internet, about how that company screens for illegal activity on its website.

To re-focus on the central question in this action, it is important first to explain what this action is *not* about.  This action does not involve "efforts to censor online speech."  Mem. of Pt.'s & Auth.'s in Opposition to Application of Senate Permanent Subcomm. on Investigations to Enforce Subpoena Duces Tecum [hereinafter "Opp."] at 6.  The subpoena seeks information from Backpage; it neither prohibits, censors, or otherwise regulates any conduct of Backpage.  Nor is this action about whether law enforcement agencies or private entities are or should be investigating or taking legal action against Backpage.  *Id.* at 6-10.  The actions of other entities do not limit the Senate's constitutional authority to seek information from Mr. Ferrer that bears on potential legislation.  Equally irrelevant is whether information gathered by the Subcommittee and reported to the Senate may be of use to law enforcement or private entities adverse to Backpage.  *Id.* at 40-41.  A congressional committee's "authority . . . to require pertinent disclosures  . . . is not abridged because the information sought to be elicited may also be of use" in other legal actions.  *Sinclair v. United States*, 279 U.S. 263, 295 (1929).

Nor does the Senate's subpoena power somehow recede because some Members of

Congress, including the Subcommittee Chairman, have expressed outrage over the significant and growing problem of sex trafficking and traffickers' use of Backpage as their online marketplace of choice.  Opp. at 10.  The Subcommittee has articulated an obvious and legitimate legislative purpose supporting its investigation, and the statements by Members of Congress (or other public officials) condemning Backpage do not abrogate that purpose nor limit the Subcommittee's authority to obtain the materials it seeks.  *See Watkins v. United States*, 354 U.S. 178, 200 (1957) ("[T]esting the motives of committee members" to determine if there is a legislative purpose "is not [the Court's] function.  Their motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served."); *Wilkinson v. United States*, 365 U.S. 399, 412 (1961).  Likewise, the Subcommittee's power to subpoena materials from Mr. Ferrer is not limited because the Subcommittee is also seeking information from other sources.  Opp. at 18-19.

Instead, whether Mr. Ferrer should be ordered to comply with the Subcommittee's subpoena depends on two questions: (1) whether the Subcommittee's subpoena seeks information pertinent to an investigation that is within its jurisdiction and has a legitimate legislative purpose, and (2) whether Mr. Ferrer has a valid First Amendment basis for refusing to produce the materials responsive to that subpoena.

As discussed in its opening memorandum[1], the Subcommittee issued this subpoena in support of its investigation into sex trafficking on the Internet, a subject well within the Subcommittee's jurisdiction.  The purpose of this investigation, as the Subcommittee has explained, is to acquire information about Internet sex trafficking (in particular, the trafficking of children) to aid the Senate's consideration of potential legislation combating that terrible problem.

---

[1]  Mem. of Pt.'s & Auth.'s in Support of Application to Enforce Subpoena Duces Tecum of Senate Permanent Subcomm. on Investigations [hereinafter "Subcomm. Mem."] at 17-26.  In this reply, exhibits accompanying the Subcommittee's opening memorandum are referred to as "Subcomm. Ex.", and exhibits accompanying Mr. Ferrer's opposition as "Opp. Ex."

Requests 1, 2, and 3 of the subpoena – which the Subcommittee seeks to enforce – concern information directly pertinent to the investigation, particularly Backpage's practices for screening for sex trafficking advertisements and the actions it takes to prevent sex traffickers from using its website. Mr. Ferrer fails to offer any argument undermining either the Subcommittee's authority to conduct this investigation, its power to issue this subpoena, the legislative purpose of the investigation, or the pertinency to its investigation of the documents sought.

Nor does Mr. Ferrer establish any First Amendment basis for his failure to comply with the Subcommittee's subpoena. His opposition fails to show how subpoena requests 1, 2, and 3, which relate to Backpage's practices for screening illegal activity on its online commercial marketplace, infringe on any specific First Amendment right of his, Backpage's, or Backpage's users. Indeed, Mr. Ferrer provides no authority whatsoever to justify either his blanket objection to the subpoena's requests or his refusal even to *search* for responsive documents and produce a privilege log detailing the basis for withholding particular documents. Instead, Mr. Ferrer continues to assert that Backpage's mere status as an online commercial marketplace for advertisements – predominantly advertisements for adult services – supplies blanket immunity from congressional scrutiny of its practices for dealing with sex trafficking activity on its website.

Yet, the importance of Internet speech is precisely why thorough congressional fact-finding is needed to assist Congress in drafting legislation in a manner that *respects* First Amendment sensitivities. Indeed, even as Mr. Ferrer seeks to evade a duly authorized Senate subpoena in this case, Backpage is asking this Court in another case to invalidate the Stop Advertising Victims of Exploitation Act of 2015, Pub. L. No. 114-22, § 118, 129 Stat. 227 (2015), on the ground that Congress failed to legislate with "narrow specificity" and "precision" in banning the advertisement of children and coerced adults for sex.[2] But to write with precision, Congress first needs

---

[2] Backpage's Opposition to Motion to Dismiss at 10, 20-22, filed Mar. 28, 2016, ECF No. 12, *Backpage.com, LLC v. Lynch*, No. 1:15-cv-02155-RBW (D.D.C.).

information about the conduct it seeks to regulate.  The First Amendment surely does not require Congress to legislate with a "scalpel," Opp. at 22, while rendering it blind.

The consequence of Mr. Ferrer's blanket First Amendment argument would be that Congress cannot obtain any information, no matter how focused, regarding Backpage's activities because it serves as an online marketplace for advertisements – in other words, that Backpage's activities would be outside the constitutional jurisdiction of Congress.  Yet, a business is not excused from responding to congressional subpoenas merely because it engages in commercial speech.  *Cf. Associated Press v. N.L.R.B.*, 301 U.S. 103, 132-33 (1937) ("The business of the Associated Press is not immune from regulation because it is an agency of the press.  The publisher of a newspaper has no special immunity from the application of general laws.").  "It is the[] unremitting obligation [of all citizens] to respond to [congressional] subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation."  *Watkins*, 354 U.S. at 187-88.  The Court should require Mr. Ferrer to fulfill that duty.[3]

_____

[3]  While Mr. Ferrer asserts that he and Backpage have tried to cooperate "in good faith" with the Subcommittee's investigation, Opp. at 2, that characterization is belied by the record.  Mr. Ferrer asserted a blanket objection to the subpoena and, in response to requests 1, 2, and 3, produced 21 pages of *publicly* available documents.  Letter to Chair and Ranking Member of PSI from Steven R. Ross, Esq., Oct. 23, 2015 [Subcomm. Ex. H].  Only after the Subcommittee overruled his objections and ordered him to produce responsive documents did Mr. Ferrer produce any non-public documents responsive to requests 1, 2, and 3, and then only 44 additional pages.

Mr. Ferrer asserts that Backpage produced over 10,000 pages and "was preparing to submit millions more pages in response to the Subpoena's request regarding human trafficking . . . but the Subcommittee stated that it did not want that information."  Opp. at 15.  As explained in the opening memorandum, Subcomm. Mem. at 14 n.11, Mr. Ferrer produced over 16,000 pages in response to subpoena request 4, consisting largely of Backpage's responses to law enforcement subpoenas, with each response containing numerous repetitive pages of advertisements and photos.  When Mr. Ferrer's counsel explained that the company had over five million additional pages of this material, Subcommittee staff informed Mr. Ferrer that Backpage need not collect and submit those pages as the Subcommittee needed no further material of that nature in response to request 4.  The Subcommittee has *never* declined to receive, nor instructed Mr. Ferrer or Backpage not to produce, any materials responsive to requests 1, 2, and 3.

**ARGUMENT**

I.     **The Subcommittee's Investigation Is Within Its Jurisdiction and Has a Valid Legislative Purpose, and Requests 1, 2, and 3 of the Subpoena Are Directly Pertinent to That Investigation**

   A.     **This investigation is within the Subcommittee's jurisdiction.**

   As explained in the opening memorandum, the Senate has authorized the Subcommittee to investigate, *inter alia*, matters related to organized criminal activity that operates in or utilizes the facilities of interstate commerce; all aspects of crime and lawlessness that have an impact upon or affect the national health, welfare, and safety; and the efficiency of Federal regulatory policies and programs.  S. Res. 73, 114th Cong., § 12(e)(1) (2015).  Sex trafficking on the Internet falls within those grants of authority.  Internet sex trafficking constitutes potential organized criminal activity using facilities of interstate commerce, represents crime and lawlessness that impacts national health, safety, and welfare, and involves questions of the efficiency of the many federal agency programs and operations that combat such activity.  *See* Subcomm. Mem. at 17-19.

   Mr. Ferrer does not argue that the subject matter of this investigation is beyond the Senate's power of inquiry or outside the scope of the Subcommittee's authorizing resolution.  Instead, he takes issue with the breadth of that resolution, Opp. at 32 (referring to Subcommittee's "unlimited legislative mandate"), without pointing to any authority limiting the investigative jurisdiction the Senate may delegate to a committee or subcommittee.  The Senate, as a House of Congress, has expansive legislative authority, *see* U.S. Const. art. I, § 8, and the Supreme Court has explained that "the scope of [Congress's] power of inquiry . . . is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution."  *Barenblatt v. United States*, 360 U.S. 109, 111 (1959).  The Senate's decision to grant broad jurisdiction to the Permanent Subcommittee on Investigations to conduct investigations across a range of legislative subjects does not impair the legitimacy of this investigation.  *See id.* at 122-23 (finding that "broad scope of" House rule authorizing

committee's investigation "cannot be said to be constitutionally infirm on the score of vagueness" and committee's authority to conduct inquiry was "unassailable").[4]

Mr. Ferrer invokes *United States v. Rumely,* 345 U.S. 41 (1953), to argue that the doctrine of constitutional avoidance requires interpreting the language of the Subcommittee's authorizing resolution not to cover this investigation. Opp. at 33-34. That argument betrays a fundamental misunderstanding of the constitutional avoidance doctrine, which allows courts to interpret ambiguous statutory phrases to avoid serious constitutional questions – if the text is "genuinely susceptible to two constructions." *Almendarez-Torres v. United States,* 523 U.S. 224, 238 (1998). *Rumely* addressed subpoenas from a temporary House committee seeking the identity of those purchasing disfavored books. Far from creating a general requirement that courts must read authorizing resolutions narrowly whenever a First Amendment argument is raised, Opp. at 34-35, *Rumely* narrowly interpreted the phrase "lobbying activities" in the committee's authorizing resolution according to its "commonly-accepted" meaning of only direct representations to Congress. 345 U.S. at 47. Here, there is simply no plausible reading of the Senate resolution establishing the Subcommittee's broad jurisdiction, *see* S. Res. 73, 114th Cong., § 12(e)(1); Subcomm. Mem. at 4-5, that would not cover this investigation into Internet sex trafficking.

**B.     The Subcommittee's investigation pursues a legitimate legislative purpose.**

Mr. Ferrer argues that the Subcommittee failed to articulate a valid legislative purpose underlying its investigation – at least until it filed the Application to enforce its subpoena. *See* Opp. at 32-33. Specifically, Mr. Ferrer complains that the Subcommittee never mentioned that

---

[4] Mr. Ferrer suggests that the breadth of the Subcommittee's jurisdiction increases "the possibility that the committee's specific actions are not in conformity with the will of the parent House of Congress." Opp. at 36 (quoting *Watkins*, 354 U.S. at 201). Here, the Senate voted 96-0 to authorize the Subcommittee to seek to enforce this subpoena, confirming that the Subcommittee's investigation and this subpoena are in "conformity with the will" of the Senate.

its investigation and the information it seeks could be relevant to congressional deliberations regarding CDA section 230 or any other "potential or pending legislation," *id.* at 33, and thus it never connected its investigation to a valid legislative purpose.  This argument is both legally meritless and factually incorrect.

As a legal matter, Congress's investigatory power does not depend on the existence of particular pending or even contemplated legislation.  Congress has authority to investigate any subject about which it *may* legislate if it "would be materially aided by the information which the investigation was calculated to elicit."  *McGrain v. Daugherty*, 273 U.S. 135, 177 (1927).  As the Supreme Court explained: "The power of inquiry has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or *decide upon due investigation not to legislate. . . ."  *Barenblatt*, 360 U.S. at 111 (emphasis added); *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 509 (1975) ("Nor is the legitimacy of a congressional inquiry to be defined by what it produces. The very nature of the investigative function – like any research – is that it takes the searchers up some 'blind alleys' and into non-productive enterprises. To be a valid legislative inquiry there need be no predictable end result.").

Accordingly, a congressional committee need not identify any particular legislation the consideration of which its investigation is meant to enlighten.  *See In re Chapman*, 166 U.S. 661, 670 (1897) ("[I]t was certainly not necessary that the resolutions [establishing the special Senate investigating committee] should declare in advance what the [S]enate meditated doing when the investigation was concluded"); *McGrain*, 273 U.S. at 177-78 (even though not stated in Senate authorizing resolution, fact that matter being investigated was subject to legislation supported presumption that "object of the investigation . . . was to obtain information for legislative purposes").  All that is required is that the subject matter of the investigation fall within the jurisdiction of the committee or subcommittee conducting the investigation, that Congress has constitutional authority to legislate in the area of inquiry, and that the witness subpoenaed be

sufficiently apprised of "the topic under inquiry." *Barenblatt*, 360 U.S. at 124 (quoting *Watkins*, 345 U.S. at 215). These elements have been established here.

In any event, as a factual matter, the record reflects that the Subcommittee, on multiple occasions, *did* articulate the investigation's legislative purpose – namely, to acquire information to aid the Senate in its consideration of legislation addressing Internet sex trafficking. As early as its August 26, 2015 letter to Backpage's counsel, the Subcommittee explained that:

> [T]he Subcommittee is engaged in a carefully structured inquiry into a complex problem of significant legislative interest – the use of the Internet as a marketplace for interstate sex trafficking, including trafficking in children. The purpose of this long-term investigation is to produce a Subcommittee report addressing the problem and reform options that have received considerable legislative and scholarly attention. *The Subcommittee's fact-finding will inform the Senate regarding these issues and assist in its consideration of any potential legislation* relating to, *inter alia,* interstate and international human trafficking and sex trafficking; interstate cyberstalking; federal law enforcement policies and resources to combat trafficking; the federal anti-money laundering regime as it concerns illegal trafficking proceeds; and federal telecommunications policy.

Subcomm. Ex. D at 1 (emphasis added). In the October 1, 2015 letter accompanying the subpoena to Mr. Ferrer, the Subcommittee again explained that "gaining a complete understanding of Backpage's anti-trafficking measures, including its screening and verification procedures for advertisements posted in its 'adult' section, will aid Congress as it *considers additional legislation . . . that combats human trafficking.*" Subcomm. Ex. F at 2 (emphasis added).[5]

In its November 3 Letter Ruling on Mr. Ferrer's objections, the Subcommittee once more articulated that its investigation was focused on "the problem of human trafficking on the Internet" and the information obtained "will assist Congress in its *consideration of potential legislation in a number of legitimate areas of legislative interest*, including interstate and international human trafficking and the federal law enforcement policies and resources devoted

---

[5] Indeed, Mr. Ferrer's counsel's correspondence indicates that he understood that the Subcommittee's inquiry "concern[s] potential legislation regarding human trafficking." Letter to Chairman and Ranking Member of PSI from Steven R. Ross, Esq., Nov. 16, 2015 [Subcomm. Ex. L] at 2.

to combatting it."  Subcomm. Ex. I at 10 (emphasis added).  The Letter Ruling also *specifically* referenced section 230 of the Communications Decency Act (CDA), noting that "this information will enable Congress to assess how effectively it has encouraged service providers to self-regulate as Congress intended in the CDA."  *Id.* at 17 (quotation marks omitted).[6]

Finally, Mr. Ferrer argues that the "prosecutorial thrust" of the Subcommittee's subpoena "deprives it of legitimacy."  Opp. at 41; *see also id.* at 37 (asserting that subpoena's "goal is more prosecutorial than legislative").  As support, he points to references by witnesses and Subcommittee Members at the November 19, 2015 hearing to possible law enforcement interest in the information that may be uncovered in this investigation and, particularly, by the subpoena to Mr. Ferrer.  *Id.* at 41 nn.37, 38.  These statements do not undermine the investigation's valid legislative purpose.  Congressional investigations often uncover information relevant to legal actions, including criminal prosecutions, and the fact that information obtained in this investigation may be relevant to law enforcement efforts or in other legal actions adverse to Backpage in no way negates the legitimate legislative purpose of the Subcommittee's investigation, nor diminishes its constitutional power to compel information in aid of that purpose.  "[T]he authority of [Congress], directly or through its committees, to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in such suits."  *Sinclair*, 279 U.S. at 295; *see also McGrain*, 273 U.S. at 179-80 ("Nor do we think it a valid objection to the [Senate committee's] investigation that it might possibly disclose crime or wrongdoing . . . .").[7]

---

[6]  The CDA's application to websites such as Backpage, and whether modifications to that law might be needed, were also specifically addressed at the Subcommittee's hearing.  S. Hrg. No. 114-179, at 20-21 (2015) (questions of Sen. Ayotte).

[7]  This Court has previously enforced two subpoenas of this Subcommittee under 28 U.S.C. § 1365, both of which arose in Subcommittee investigations of organized crime syndicates.  *See In re Application of U.S. Senate Permanent Subcomm. on Investigations*

(continued...)

### C.   Requests 1, 2, and 3 are directly pertinent to the Subcommittee's investigation.

Requests 1, 2, and 3 of the subpoena seek documents concerning Backpage's "reviewing, blocking, deleting, editing, or modifying advertisements in Adult Sections," its "advertising posting limitations," including banned terms lists, error messages, and prompts conveyed to users when posting advertisements, and its practices in "reviewing, verifying, blocking, deleting, disabling, or flagging user accounts or user account information."  Subpoena to Carl Ferrer, Oct. 1, 2015 [Subcomm. Ex. F].

Mr. Ferrer offers no substantive argument that the information sought by subpoena requests 1, 2, and 3 is not pertinent to the investigation.  Nor could he.  As explained in the opening memorandum, Subcomm. Mem. at 19-26, as part of its inquiry into Internet sex trafficking, the Subcommittee seeks to understand how traffickers use online commercial marketplaces to facilitate illegal sex transactions with victims and how such websites, particularly Backpage as the dominant online marketplace in commercial sex transactions, conduct sex trafficking screening and the effectiveness of such screening.[8]  Information about

---

[7](...continued)
*(Cammisano)*, 655 F.2d 1232 (D.C. Cir. 1981); *Senate Permanent Subcomm. on Investigations v. Accardo*, Misc. No. 84-53 (D.D.C. Mar. 29, 1984 amended Mar. 30, 1984).  Certainly the testimony this Court compelled in those matters would have been useful to law enforcement, and yet that did not prevent this Court from enforcing those subpoenas.

[8]  As explained in the opening memorandum, Subcomm. Mem. at 20 n.17, the Subcommittee is seeking to understand website screening measures for sex trafficking, including: whether and to what extent Backpage captures the user's IP address when an advertisement is created; whether Backpage employs any technology that links advertisements that have been blocked to any other existing advertisements based on similar content or on the identity of the user posting the advertisement; whether and for how long Backpage retains relevant data from advertisements that could be helpful to law enforcement should a particular user or advertisement become the subject of investigation; when Backpage rejects an advertisement for including a prohibited term, whether it blocks the user from re-posting the advertisement with the term changed or deleted; and what steps Backpage takes when it receives a complaint of possible child sex trafficking in an advertisement or by a poster of advertisements.

Backpage's screening procedures is relevant to the Senate's understanding of online sex trafficking and to its consideration of potential legislation to address this serious problem, including whether to amend the safe harbor provided in federal law (section 230 of the CDA) that is meant to encourage web-sites to self-monitor. Here, as in *Barenblatt*, the "pertinency" of the information sought "was made to appear with undisputable clarity." 360 U.S. at 124 (internal quotation marks and citation omitted); *cf. also United States v. Fort*, 443 F.2d 670, 682-84 (D.C. Cir. 1970) (rejecting challenge to conviction for contempt of Congress based on lack of pertinency of committee questions).

## II.      Subpoena Requests 1, 2, and 3 Do Not Violate Mr. Ferrer's First Amendment Rights

In its opening memorandum, the Subcommittee demonstrated that subpoena requests 1, 2, and 3 do not infringe on any potential First Amendment rights of Mr. Ferrer, Backpage, or Backpage's users. The Subcommittee's subpoena seeks only information regarding Backpage's screening for illegal sex-trafficking advertisements and its efforts to prevent sex trafficking on its website – it does not prohibit, punish, or censor any expression of Mr. Ferrer or Backpage. The three subpoena requests focus on specific, discrete categories of documents. They do not directly implicate any expressive activity of Mr. Ferrer or his company, and they do not seek any personally identifying information of Backpage users – indeed, the subpoena expressly provides for redaction of any such information. *See* Oct. 1, 2015 Letter at 2 and Subpoena, schedule A [Subcomm. Ex. F].

In response, Mr. Ferrer identifies no particular documents or class of documents the production of which would implicate, much less violate, his First Amendment rights. Instead, he claims that the First Amendment provides blanket protection[9] from having to produce *any*

_____

[9] Mr. Ferrer takes issue with the Subcommittee's referring to his First Amendment claim as a "blanket objection[]." Opp. at 2. Yet, he has asserted, and continues to assert, an objection applicable to *all* possible, responsive documents to the subpoena – "possible" because Mr. Ferrer has not done a complete search sufficient to know even what documents his objection
(continued...)

documents responsive to subpoena requests 1, 2, and 3.  He further claims that the First

Amendment immunizes him against having even to search for responsive documents and assert

privileges on a document-by-document basis.[10]  But the First Amendment offers no such

categorical immunity from government inquiry.  The mere fact that a business engages in First

Amendment activity does not shield it from government actions that do not infringe on that First

Amendment activity or from the basic duty of responding to a duly authorized subpoena.  *Cf.*

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986) ("Bookselling in an establishment used

for prostitution does not confer First Amendment coverage to defeat a valid statute aimed at

penalizing and terminating illegal uses of premises.").

Mr. Ferrer offers three arguments in support of his claim that the subpoena violates his

First Amendment rights.  He asserts that: (1) the subpoena intrudes into Backpage's protected

"editorial decision[s]," Opp. at 24; (2) the "Subcommittee's investigation is part of a punitive

campaign targeting Backpage" and, thus, pursues an illegitimate purpose, *id.* at 37; and (3) the

subpoena's demands "are overly broad and burdensome."  *Id.* at 30.  None of these arguments

has merit.

### A.     The Subcommittee's subpoena does not intrude into protected First Amendment activity.

Mr. Ferrer has not established that information about Backpage's screening for sex

trafficking advertisements or its verifying users and blocking questionable user accounts is

---

[9](...continued)
covers.  Letter to PSI Chairman and Ranking Member from Steven R. Ross, Esq., Nov. 16, 2015
at 2 [Subcomm. Ex. L] ("As counsel for Backpage.com, we have not represented, and do not now
represent, that the company's submission of information and documents to date constitute [] the
fruits of a complete search . . . .").  Such a claim is properly termed a "blanket objection."

[10]  The Subcommittee's subpoena required Mr. Ferrer to provide a privilege log
identifying any documents he is withholding and the legal basis for such withholding.  Mr. Ferrer
has never produced such a privilege log, nor engaged in any legal analysis showing how the
content of any particular responsive document is covered by the First Amendment.

shielded from disclosure by the First Amendment.  According to Backpage, it established

screening procedures "especially to guard against any form of human trafficking or child

exploitation."  Letter to PSI Chaiman and Ranking Member from Steven R. Ross, Esq., Aug. 6,

2015 at 2 (Subcomm. Ex. B).  Those screening mechanisms, Backpage explained, involve

automated searches for words – apparently such as "schoolgirl," "teen," and "yung," PSI Staff

Report appendix 116 (S. Hrg. No. 114-179, at 205) – or images that may indicate illegal sex

trafficking in a proposed advertisement, followed by manual screening.  Aug. 6, 2015 letter at 2

(Subcomm. Ex. B).  While advertising in general may constitute "commercial speech" that

receives First Amendment protection (albeit less extensive than other speech), advertisements

"that propose[] an illegal transaction" are not protected.  *Zauderer v. Office of Disciplinary*

*Counsel of the Supreme Ct. of Ohio*, 471 U.S. 626, 638 (1985).

     Mr. Ferrer offers no reason why information about the screening or editing of

advertisements for illegal activity should be shielded from disclosure by the First Amendment,

any more than the publication of such advertising is shielded from regulation.  *See United States*

*v. Williams*, 553 U.S. 285, 297 (2008) ("Offers to engage in illegal transactions are categorically

excluded from First Amendment protection.") (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n*

*on Human Relations*, 413 U.S. 376, 388 (1973)); *Flytenow, Inc. v. F.A.A.*, 808 F.3d 882, 894

(D.C. Cir. 2015) ("[T]he advertising of illegal activity has never been protected speech.") (citing

*Pittsburgh Press Co.*, 413 U.S. at 388-89).  Nor does he attempt to show that disclosure of any

particular document about those topics would infringe his First Amendment rights.  Instead, he

asserts that *every* document responsive to the subpoena (even though he has not searched for or

collected them) contains First Amendment-protected material that no governmental need could

overcome.  That is insufficient to justify Mr. Ferrer's objection.  *Cf. In re Subpoena Duces*

*Tecum Issued to C.F.T.C.*, 439 F.3d 740, 750-51 (D.C. Cir. 2006) ("The basis of a privilege must

be adequately established in the record through evidence sufficient to establish the privilege with

reasonable certainty.") (internal quotation marks and citations omitted).

Mr. Ferrer asserts that subpoena requests 1, 2, and 3 infringe on his First Amendment rights because they "seek every bit of information generated by Backpage and its employees relating to every editorial decision made during the past six years." Opp. at 24. While Mr. Ferrer now terms Backpage's screening process "editorial decisions," he provides no details whatsoever about those "decisions" and why they are constitutionally protected. Nor does he identify any specific, responsive document containing constitutionally protected information on which the subpoena purportedly infringes. Merely asserting that the subpoena's requests encompass "editorial decisions" is insufficient to meet his burden to establish a violation of his First Amendment rights.[11]

Moreover, evidence regarding Backpage's screening procedures obtained from third parties refutes Mr. Ferrer's assertion that production of documents on these topics would infringe on protected First Amendment activity. In one e-mail, for example, Mr. Ferrer instructed outside screeners how to delete content from advertisements that offer services using time increments that are standard in the illegal sex trade: "Removing bad pics and removing bad text like 15 min ½ hour is critical. I think you will be busy." PSI Staff Report appendix 92 (S. Hrg. No. 114-179, at 181). Similarly, Backpage's Operations Manager informed outside screeners of "new rules" such as "no pricing for services less than an hour." *Id.* appendix 103 (S. Hrg. No. 114-179, at 192).[12] Mr. Ferrer fails to explain how producing e-mails relating to such "editorial decisions" infringes his First Amendment rights.

---

[11] Mr. Ferrer also argues that the requests "include[] all information relating to payment processing," and that seeking such information can also "chill protected speech." Opp. at 24. Given that the subpoena calls for redaction of information revealing the identity of Backpage's users, it is unclear how information on payment processing could be protected by the First Amendment.

[12] *See generally* PSI Staff Report appendix 80-92, 102-06 (S. Hrg. No. 114-179, at 169-81, 191-95) (e-mails between Backpage and outside contractor regarding screening).

Further undercutting Mr. Ferrer's First Amendment claim of protected "editorial" judgments, a recent public filing in Backpage's suit against Cook County Sheriff Tom Dart[13] revealed that when law enforcement submitted a fictitious advertisement appearing to be a child offering sexual services, Backpage removed the key words revealing she was underage before posting the advertisement. As submitted, the advertisement read:

> Red Beauty *14-18*
> Hello gentlemen, I'm Tracy *I just graduated grade school* & I'm a
> lil lonely and bored. I like to play and I'm very talented & you
> won't be disappointed. E-mail me today.

Sheriff Dart's Mot. for Leave to Amend Affirmative Defenses at 6 (emphasis added), ECF No. 155, *Backpage.com v. Dart*, No. 1:15-cv-06340 (N.D. Ill.). According to the Sheriff's filing, instead of rejecting that advertisement, Backpage's "screening" removed the text indicating that a minor was involved and then posted the advertisement as sanitized:

> Red Beauty – *18*
> Hello gentlemen, I'm Tracy *I just graduated* & I'm a lil lonely and
> bored. I like to play and I'm very talented & you won't be
> disappointed. E-mail me today.

*Id.* (emphasis added). Such "editorial decisions" – removing text indicating that the person being advertised for sex services is a child – serve only to conceal illegal activity and enjoy no First Amendment protection.[14] The Senate has a manifest interest in understanding such website screening practices to inform its consideration of legislation on sex trafficking, particularly in considering whether such "self-monitoring" by websites merits the immunity provided by CDA section 230.

---

[13]  *See* Sheriff Dart's Motion for Leave to Amend Affirmative Defenses, filed Apr. 21, 2016, ECF No. 155, *Backpage.com v. Dart*, No. 1:15-cv-06340 (N.D. Ill.).

[14]  In order to gather further information on Backpage's screening, the Subcommittee plans to subpoena materials from Sheriff Dart related to his office's effort to post this advertisement on Backpage's website.

The Ninth Circuit's decision in *Bursey v. United States*, 466 F.2d 1059 (9th Cir. 1972), does not excuse Mr. Ferrer's refusal to comply with the Subcommittee's subpoena. In *Bursey*, two journalists objected to grand jury questions asking them to identify members of the Black Panther Party who worked at the party's newspaper, invoking the First Amendment "freedoms of press and associational privacy." *Id.* at 1081. Unlike Mr. Ferrer, the witnesses did not assert a blanket objection to the grand jury's subpoena, but instead objected to specific questions on the record, enabling the Ninth Circuit to evaluate the First Amendment interests implicated by each question. The court of appeals found that many, but not all, questions violated the journalists' First Amendment rights, "infring[ing] both associational privacy and press freedom." *Id.* at 1087. In particular, "[i]nquiries about the identity of persons with whom the witnesses were associated on the newspaper and in the Black Panther Party . . . infringed the right of associational privacy." *Id.* at 1085. *Bursey* is inapposite here. Mr. Ferrer is not being asked to identify any of Backpage's users or reveal other information intruding on "associational privacy." Nor is there any infringement here of "press freedom." Unlike the government's inquiry in *Bursey* into the core political speech and identity of disfavored speakers, the Subcommittee's subpoena seeks information about Backpage's efforts to screen out illegal sex trafficking from the commercial advertisements for adult services on its website.

Even if Mr. Ferrer could demonstrate a First Amendment interest implicated here, that would not in itself preclude enforcement of the subpoena; rather, the Court would then be obliged to balance his asserted interest against the Subcommittee's interest in the information in each particular document. *See Watkins*, 354 U.S. at 198; *Rumely*, 345 U.S. at 44; *see also Bursey*, 466 F.2d at 1083 (explaining that court balances witnesses' First Amendment rights against government's interest in the information).[15] Mr. Ferrer's opposition, however, engages in

---

[15] In *Bursey*, the court found that the governmental interest prevailed for some of the questions propounded by the government. 466 F.2d at 1086 n.20.

*no* balancing and makes *no* attempt to demonstrate that any purported burden on his First Amendment rights outweighs the Subcommittee's need for the subpoenaed information about the serious problem of sex trafficking on the Internet.

In any event, any balancing of interests here would weigh decisively in the Subcommittee's favor. As an initial matter, the Supreme Court has explained that speech that "proposes a commercial transaction," such as Backpage's advertisements for adult services, is commercial speech, *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989); *see also Zauderer*, 471 U.S. at 637; *Spirit Airlines, Inc. v. U.S. Dept. of Transportation*, 687 F.3d 403, 412 (D.C. Cir. 2012), to which the Constitution "affords a lesser protection . . . than to other constitutionally guaranteed expression." *United States v. Edge Broadcasting Co.*, 509 U.S. 418, 426 (1993). The Subcommittee's significant legislative interest in the information it seeks outweighs any limited protection that Backpage might assert.

Even if Backpage's screening and other anti-sex trafficking efforts received stronger protection than mere commercial speech, the balance would still fall in the Subcommittee's favor. The Subcommittee's need for information to assist the Senate's consideration of potential legislative measures to combat the scourge of human trafficking is substantial and outweighs whatever indirect intrusion on Mr. Ferrer's First Amendment interests may be occasioned by the three targeted subpoena requests at issue here.

**B.      The Subcommittee's subpoena is not an illegitimate attempt to punish Backpage.**

Mr. Ferrer also claims that the Subcommittee's subpoena is an illegitimate attempt to punish Backpage as part of a "sustained, coordinated, and targeted campaign," Opp. at 37, by government officials against the company because of its First Amendment activities. That allegation is groundless, both as a matter of law and on the factual record.

Backpage points to no authority for the proposition that a congressional committee's

17

investigation can be tainted by association with some other government initiative over which it

has no control.  This Court need only decide whether the Subcommittee's subpoena to Mr. Ferrer

accords with the Senate's and the Subcommittee's rules, and serves a valid legislative purpose.

Under such circumstances, the Subcommittee's duly authorized subpoena is presumptively

legitimate and a valid exercise of its authority.  *Cf. Latif v. Obama*, 677 F.3d 1175, 1178 (D.C.

Cir. 2011) ("The presumption of regularity supports the official acts of public officers and, in the

absence of *clear* evidence to the contrary, courts presume that they have properly discharged their

official duties.") (emphasis added) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106,

1117 (D.C. Cir. 2007)).  That other governmental entities have taken actions adverse to

Backpage has no bearing on the legitimacy of the Subcommittee's investigation and does not

limit the Subcommittee's constitutional authority to investigate Backpage or to obtain

information from Mr. Ferrer.

    In addition to being legally meritless, Mr. Ferrer's claim that the Subcommittee's

investigation pursues an illegitimate purpose because it "is part of a sustained, coordinated, and

targeted campaign to take down Backpage," Opp. at 37, is belied by the factual record.  As noted

in the PSI Staff Report, as part of its investigation, the Subcommittee has consulted "many

relevant parties, including victim's rights groups, nonprofit organizations, technology companies,

financial institutions, academic researchers, federal, state, and local law enforcement officials,

and several other advertising websites similar to Backpage" to collect relevant information and

draw on outside expertise.  PSI Staff Report at 10 (S. Hrg. No. 114-167, at 65).  Such broad

information-gathering is a standard and sound practice of congressional investigations.  And

while Mr. Ferrer recites various actions by government officials and agencies against Backpage,

*see* Opp. at 7-10, there is no evidence of any "coordination" by the Subcommittee in the actions

of these other governmental entities.

    Mr. Ferrer points specifically to Subcommittee staff contacts with Cook County Sheriff

Tom Dart's office, *id.* at 19, 37-40, and claims that the Subcommittee "partnered" with Sheriff Dart, *id.* at 38, and "looked for ways to assist [Sheriff] Dart" in his efforts to convince credit card companies not to process payments for placing advertisements on Backpage.  *Id.* at 40.  None of these accusations has any factual basis.  Indeed, the two sets of e-mail exchanges between Subcommittee staff and Sheriff Dart's staff that Mr. Ferrer cites (and the two telephone calls that followed those exchanges) do not evidence "coordination" or "partner[ing]" between the Subcommittee and Sheriff Dart, but rather only the Subcommittee's unsurprising effort to draw on that office's law enforcement expertise in Internet sex trafficking to gather information relevant to its investigation.[16]

Mr. Ferrer's assertion that the Subcommittee colluded with Sheriff Dart in his effort to pressure credit card companies to stop processing payments for Backpage is similarly baseless.  Nothing from the record suggests that the Subcommittee had anything to do with that effort.  As the e-mails themselves show, Subcommittee staff first learned of the Sheriff's letters to the credit card companies *after-the-fact from press accounts*, Opp. Ex. T (July 1, 2015 e-mail from PSI counsel to Benjamin Breit of the Sheriff's staff) ("I just came across the Visa and Mastercard articles."), and only received copies of the letters thereafter.  *See* Opp. Ex. V (July 6, 2015 e-mail from Benjamin Breit to PSI senior counsel (forwarding letters)).  Put simply, the information-gathering contacts with Sheriff Dart's office cannot be characterized reasonably as "coordination" or "partnering" with the Sheriff, and are certainly insufficient to overcome the

---

[16]  Mr. Ferrer attempts to make these contacts appear nefarious by claiming that the Subcommittee did not "disclose" its communications with Sheriff Dart.  Opp. at 40.  That allegation is both irrelevant and specious.  There is nothing unusual or problematic for an investigating body not to disclose to one witness the identities of other persons or entities from which it seeks information.  Moreover, the Subcommittee's Staff Report clearly stated that the Subcommittee conducted interviews and briefings with numerous entities with information relevant to its investigation, including "federal, state, and local law enforcement officials," PSI Staff Report at 10 (S. Hrg. No. 114-179, at 65), and three law enforcement offices provided written or oral testimony at the Subcommittee's November 19 hearing.  S. Hrg. No. 114-179.

presumption of regularity that attaches to the Subcommittee's investigation.[17]

Similarly irrelevant are the statements by Senators that Mr. Ferrer cites. The fact that some Members of Congress, including the Subcommittee Chairman, have expressed outrage over the growing problem of Internet sex trafficking and the persistence of such trafficking on Backpage's website, in no way undermines the constitutional authority of the Subcommittee to conduct this investigation and to subpoena relevant materials from Mr. Ferrer. The Supreme Court in *Watkins* made clear that "testing the motives of committee members" to determine if there is a legislative purpose "is not [the Court's] function. Their motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served." 354 U.S. at 200; *see also Wilkinson*, 365 U.S. at 412 ("[I]t is not for us to speculate as to the motivations that may have prompted the decision of individual members of the subcommittee to summon the petitioner."). And, "[s]o long as Congress acts in pursuance of its constitutional power," as it has here, "the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt*, 360 U.S. at 132-133. Surely Congress is not limited to investigating only companies and individuals whose activities Members support.

C.    **Subpoena requests 1, 2, and 3 are not overly broad and do not impose an undue burden.**

Finally, Mr. Ferrer claims that the subpoena is overbroad and places an undue burden on Backpage in violation of the First Amendment. Opp. at 30-31. Putting aside the lack of legal authority, Mr. Ferrer fails to show how the three targeted subpoena requests here are overly broad; nor does he make any concrete showing that searching for and producing documents

---

[17] Mr. Ferrer's suggestion that Sheriff Dart's citation of the PSI Staff Report in litigation demonstrates that the Subcommittee is using its investigation for the inappropriate purpose of supporting Sheriff Dart's efforts is baseless. Opp. at 40 n.35. That report is a public document available for anyone's use.

responsive to requests 1, 2, and 3 imposes any undue burden on the company.  *Cf. F.T.C. v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977)  ("The burden of showing that the request is unreasonable is on the subpoenaed party.  Further, that burden is not easily met where, as here, the agency inquiry is pursuant to a lawful purpose and the requested documents are relevant to that purpose.").  As explained in the opening memorandum, the Subcommittee narrowed its document requests by withdrawing the original subpoena to Backpage and issuing a more targeted subpoena to Mr. Ferrer.[18]  Further, the Subcommittee seeks to enforce only three requests from that second subpoena, which focus on Backpage's screening processes for preventing illegal sex trafficking advertisements on its website.  Mr. Ferrer fails to meet his burden to demonstrate how producing responsive documents to those requests would pose an undue burden on him or Backpage.

Mr. Ferrer argues that the subpoena's overbreadth is demonstrated by the fact that the Subcommittee is "demand[ing] the e-mail correspondence from and between all those employed to provide moderation service for the past six years."  Opp. at 30.  But that is simply incorrect.  The Subcommittee, as Mr. Ferrer's counsel recognizes, is not seeking *all* e-mails of those employees, just the e-mails relating to Backpage's anti-sex trafficking screening practices.[19]  Whenever a subpoena requests documents on a particular topic, a respondent must search all

---

[18]  Mr. Ferrer terms the Subcommittee "disingenuous" in claiming that the October 1 subpoena was narrower than the first subpoena of July 7.  Opp. at 30.  A comparison of the two, Subcomm. Ex. A (July 7, 2015 subpoena) and Subcomm. Ex. F (Oct. 1, 2015 subpoena), reveals that the second makes narrower, more targeted requests than the first subpoena, and omits a number of topics included in the first subpoena.  Indeed, Mr. Ferrer's counsel admitted as much.  *See* Letter to Chair and Ranking Member of PSI from Steve Ross, Esq., Oct. 23, 2015 at 1 [Subcomm. Ex. H] (referring to Oct. 1 subpoena's categories as "more targeted requests").

[19]  Declaration of Steven Ross ¶ 7 (Opp. Ex. H at 3) ("When asked if the Subcommittee understood its subpoena to call for the full email collections of all Backpage employees whose jobs involve moderating ads – a staff that has, at times, included more than 100 employees – the staff indicated that yes, all of those emails, *if they had anything at all to do with moderating ads*, were called for by the subpoena." (emphasis added)).

21

reasonable places where responsive documents might be found, including searching through all e-mail accounts (whether by electronic search or otherwise) that might have e-mails covered by the subpoena.  There is nothing unusual, overly broad, or unduly burdensome about this.  Nor, having failed to complete a search for responsive documents, has Mr. Ferrer made any effort to quantify the amount of materials responsive to requests 1, 2, and 3 that would even permit consideration of the supposed burden of the subpoena's requests.[20]

Finally, contrary to Mr. Ferrer's assertion, the subpoena is not overly broad because the Subcommittee has "issued subpoenas and/or requested information from at least 15 different entities and/or individuals" in some way connected to Backpage.  Opp. at 31.  Mr. Ferrer neither explains why the Subcommittee's legitimate attempt to gather relevant information from other sources is pertinent to whether the subpoena *to him* is overly broad, nor does he cite a single case supporting this argument.  The Subcommittee's requests for information from other individuals or entities regarding Backpage – the dominant website in this area – are simply not relevant to whether the subpoena to Mr. Ferrer is unduly burdensome or overly broad.

### III.    The Court Has Jurisdiction Under Section 1365 to Grant the Application to Enforce Three of the Subpoena's Documentary Requests and Doing So Does Not Violate the Due Process Clause

Mr. Ferrer's final contention merits little discussion.  He argues that, because the Subcommittee is seeking this Court's assistance in enforcing the demand for only three of the eight documentary specifications in its subpoena, the Application seeks relief outside the Court's jurisdiction under 28 U.S.C. § 1365 and denies Mr. Ferrer due process of law.  Neither the terms of section 1365 nor the Due Process Clause prevents the Court from granting the Subcommittee's

---

[20]   In addition, Mr. Ferrer has made no attempt to engage the Subcommittee in its offer to discuss ways of minimizing any burden the subpoena may present – such as by agreeing upon electronic search terms or focusing on particular document custodians or employees.  *See* Letter to Steven R. Ross, Esq. from Chairman and Ranking Member of PSI, Aug. 26, 2016 [Subcomm. Ex. D].

request to order production of a subset of its initial documentary demands.

Mr. Ferrer argues that the Court lacks statutory jurisdiction to grant the Subcommittee's Application because it seeks relief not permitted by 28 U.S.C. § 1365. Specifically, Mr. Ferrer asserts that by seeking to enforce only three of the subpoena's eight requests, the Application calls on the Court to "modify" the subpoena contrary to the Court's authority under 28 U.S.C. § 1365(b), which states:

> Nothing in this section shall confer upon such court jurisdiction to affect by injunction or otherwise the issuance or effect of any subpoena or order of the Senate or any committee or subcommittee of the Senate or to review, *modify*, suspend, terminate, or set aside any such subpoena or order.

28 U.S.C. § 1365(b) (emphasis added). But the Subcommittee is not asking the Court to *modify* its subpoena; rather, the Subcommittee is applying to the Court to enforce three requests in that subpoena that are most pressing to its investigation at this time. By granting the Application, the Court would not be *modifying* the subpoena in any way, but merely enforcing the parts of the subpoena brought before it. Nothing in section 1365 mandates that the Subcommittee ask the Court to enforce all the requests of a subpoena.

The legislative history of section 1365 confirms that its terms in no way restrict the Court's jurisdiction to grant the relief requested by the Subcommittee. The purpose of the reservation in section 1365 that Mr. Ferrer cites is to make clear that "[w]hen Congress petitions the court in a subpoena enforcement action, . . . the court's jurisdiction is limited to *the matter Congress brings before it*, that is whether or not to aid Congress in enforcing the subpoena or order." S. Rep. No. 95-170, at 94 (1977) (emphasis added). In creating this subpoena enforcement mechanism, Congress was careful not to "waive its immunity from court interference with its exercise of its constitutional powers," *id.*, or to invite judicial management of congressional investigations. Hence, section 1365 provided courts jurisdiction only to decide whether to enforce the subpoena demands brought before them, while ensuring that courts would

not "affect by injunction or otherwise the issuance or effect of any [Senate] subpoena or order." 28 U.S.C. § 1365(b). That provision was not intended to prohibit Senate committees from enforcing only a subset of a subpoena's documentary requests.[21]

Similarly without merit is Mr. Ferrer's claim that, by seeking to enforce only three of the eight requests, "[t]he Subcommittee's shifting demands violate due process." Opp. at 42. Seeking to compel production of a *broader* set of documents than called for in the subpoena could understandably draw such an objection. But the idea that *narrowing* the documentary demands when seeking the Court's assistance has "coercive and deceptive impact," *id.* at 43, in violation of Mr. Ferrer's constitutional rights is novel and unsupportable. In fact, by narrowing its effort to enforce its subpoena, the Subcommittee is, to use Mr. Ferrer's phrase, "shifting goal posts," *id.*, but *towards* Mr. Ferrer, which hardly violates his right to due process. Not surprisingly, Mr. Ferrer cites not a single case supporting his claim that it violates due process for the Subcommittee to ask the Court to compel him to comply with a subset of documentary demands in the Subcommittee's subpoena.[22]

---

[21] Nor is it accurate, as Mr. Ferrer asserts, that "this Court has never partially enforced a subpoena in this context." Opp. at 44 n. 39. Indeed, in the only prior action to enforce a documentary subpoena under 28 U.S.C. § 1365, *Senate Select Committee on Ethics v. Packwood*, 845 F. Supp. 17 (D.D.C.), *stay denied*, 510 U.S. 1319 (1994) (Rehnquist, C.J., in chambers), the Senate Ethics Committee sought and obtained from this Court an order enforcing a subpoena for then-Senator Bob Packwood's diaries on terms narrowing the documentary specification in the subpoena. *Compare Documents Related to the Investigation of Senator Robert Packwood*, S. Prt. No. 104-30, vol. 9, at 343-44 (1995) (reprinting subpoena) *with id.* at 662-68 (reprinting Order, *Senate Select Committee on Ethics v. Packwood*, Misc. No. 93-362 (D.D.C. Feb. 7, 1994).

[22] *Cf. United States v. Shelton*, 404 F.2d 1292, 1295 & n.10 (D.C. Cir. 1968) (affirming conviction for contempt of Congress for failure to comply with four of five requests in documentary subpoena, even though witness had refused to produce documents in response to all five requests, House had cited witness for contempt only on first four requests, and no contention was made with respect to fifth subpoena specification).

## CONCLUSION

For the foregoing reasons, and the reasons stated in the Subcommittee's opening memorandum, the Court should grant the Application of the Senate Permanent Subcommittee on Investigations, and order Carl Ferrer to comply with requests 1, 2, and 3 of the Subcommittee's subpoena forthwith and produce all documents responsive to those requests.[23]

Respectfully submitted,

/s/ Patricia Mack Bryan
Patricia Mack Bryan, Bar #335463
Senate Legal Counsel

Morgan J. Frankel, Bar #342022
Deputy Senate Legal Counsel

Grant R. Vinik, Bar #459848
Assistant Senate Legal Counsel

Thomas E. Caballero
Assistant Senate Legal Counsel

Office of Senate Legal Counsel
642 Hart Senate Office Building
Washington, D.C. 20510-7250

(202) 224-4435 (tel)
(202) 224-3391 (fax)

Dated: May 17, 2016                    Counsel for Senate Permanent Subcommittee
                                       on Investigations

---

[23]  As stated in the Application, ¶ 17, the Subcommittee requested expedited consideration of this Application as it seeks to complete its investigation of sex trafficking on the Internet, which it began over a year ago.  The delay created by the failure of Mr. Ferrer to comply with the Subcommittee's subpoena has frustrated the Subcommittee's ability to finish its inquiry into this matter and to provide the Senate with the results of its investigation.