**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SENATE PERMANENT SUBCOMMITTEE,** ) | |
| **ON INVESTIGATIONS,** ) | |
| ) | |
| **Applicant,** ) | |
| ) | |
| **v.** ) | **Misc. Action No. 16-mc-621 (RMC)** |
| ) | |
| **CARL FERRER,** ) | |
| ) | |
| **Respondent.** ) | |

**OPINION**

The Senate Permanent Subcommittee on Investigations applies to this Court for an order requiring Carl Ferrer, Chief Executive Officer of Backpage.com, LLC, an online website for classified ads, to produce certain documents in response to three requests of a subpoena issued on October 1, 2015. The subpoena is part of the Subcommittee's investigation into the use of the Internet for illegal sex trafficking. Mr. Ferrer refuses to comply fully with the October 1, 2015 subpoena. He has failed to conduct a full search for responsive materials and has not provided a privilege log to the Subcommittee.

On March 29, 2016, the Subcommittee filed its Application to enforce three document requests in the subpoena. Mr. Ferrer opposes. He argues that the Court lacks subject matter jurisdiction over the Application and that the subpoena falls outside the Subcommittee's jurisdiction. He also contends that the subpoena lacks a valid legislative purpose and is overly broad and unduly burdensome. Finally, he contends that the subpoena violates the First Amendment and the Due Process Clause of the Constitution. The Subcommittee replies that Mr. Ferrer's objections lack merit and that he has not articulated a valid legal basis for failing to

1

comply.  The matter is fully briefed and ripe for resolution.[1]  For the reasons that follow, the

Court will grant the Subcommittee's Application to Enforce Subpoena *Duces Tecum*.

## I.  FACTS

The Subcommittee on Permanent Investigations is the chief investigative

subcommittee of the Committee on Homeland Security and Governmental Affairs, which is one

of the standing committees of the Senate and was established in Rule XXV.1(k)(1) of the

Standing Rules of the Senate and Senate Resolution 445, 108th Congress (2004), *reprinted in* S.

Doc. 114-6, at 131-34 (2015).  The Subcommittee, in turn, was established in Rule 7(A) of the

Rules of Procedure of the Committee.  *See* 161 Cong. Rec. S413 (daily ed. Jan. 22, 2015),

*reprinted in* S. Doc. 114-6, at 131, 146 (2015).

Pursuant to the Senate's authorization, the Subcommittee is conducting an

investigation into human trafficking, particularly sex trafficking, on the Internet.  Sex trafficking

is defined in federal law as the unlawful practice of selling the sexual services of minors or

adults who have been coerced into participating in the commercial trade.  *See* 18 U.S.C. § 1591.

The Internet is an attractive medium for sex traffickers to advertise the exploited victims because

it is inexpensive and easily accessible.  According to the general counsel for the National Center

for Missing and Exploited Children (NCMEC), "most child sex trafficking today is facilitated by

online classified advertising websites."  Statement of Yiota G. Souras, Sr. V.P. and Gen. Counsel

for NCMEC, S. Hrg. No. 114-79, at 39.

---

[1] The parties have filed the following briefs on this matter: Application to Enforce Subpoena
[Dkt. 1] (Mot.); Opp'n [Dkt. 8]; Reply [Dkt. 11]; Surreply [Dkt. 15]; and Response to Surreply
[Dkt. 16].

The Subcommittee commenced its investigation into Internet sex trafficking in April 2015.  Since then, the Subcommittee has conducted multiple interviews and briefings with various groups, particularly online commercial marketplaces, to learn more about the magnitude of the problem and the measures being taken to prevent sex trafficking.  One of those interviewed as part of the investigation was Backpage.  Backpage is "an online forum for classified ads" that self-identifies as "an online intermediary for speech of third-party users." Opp'n at 1.  It is the "second largest classified advertising website in the U.S." and "users post millions of ads monthly in various categories, including real estate, buy/sell/trade, automotive, jobs, data and adult." *Id.* at 5.  "Backpage does not dictate or require any content, though it may block and remove content that violates its rules or that may be improper." *Id.* at 5 n.2.

Backpage contains an "adult section," which "is subdivided into escorts, body rubs, strippers and strip clubs, dom[ination] and fetish, ts (transsexual escorts), male escorts, phone [sex], and adult jobs (jobs related to services offered in other adult categories, whether or not the jobs are sexual — not every employee of a brothel is a sex worker)." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015), *petition for cert. filed* (Apr. 28, 2016) (No. 15-1321).  A "majority of the advertisements [in Backpage's adult section] are for sex — but a majority is not all, and not all advertisements for sex are advertisements for illegal sex." *Id.* at 234 (internal quotation marks omitted).  Moreover, "[t]here is no estimate of how many ads in Backpage's adult section promote illegal activity." *Id.*

The Subcommittee states that "Backpage is a dominant presence in the online market for commercial sex and that numerous instances of child sex trafficking have occurred through its website."  Mot. at 8 (citing PSI Staff Report at 6-7 (S. Hrg. No. 114-179, at 61-62)).  As a result, the Subcommittee is interested in learning more about the effectiveness of

Backpage's "moderation" procedures, that is, the practices of screening and reviewing advertisements to avoid posting illegal ads, such as ads for sex trafficking.

On April 15, 2015, the Subcommittee first contacted Backpage to request an interview. On June 19, 2015, members of the Subcommittee staff interviewed Backpage's general counsel, Elizabeth McDougall. They reported afterwards that Ms. McDougall could not or did not answer several critical questions concerning Backpage's moderation activities, the statistics reflecting Backpage's reporting of suspected sex trafficking to law enforcement and NCMEC, and Backpage's corporate structure and ownership. *See* Letter to Carl Ferrer, CEO of Backpage.com, LLC from Chairman and Ranking Member of PSI, Nov. 3, 2015 [Dkt. 1-10] (Nov. 3, 2015 Ruling on Mr. Ferrer's Objections) at 2-3. On June 22, 2015, the Subcommittee sent Backpage follow-up questions and requests for information, which Backpage did not answer. *See id*.

On July 7, 2015, the Subcommittee issued a documentary subpoena to Backpage requesting materials concerning its moderation procedures, interaction with law enforcement, terms of use, data retention policies, and basic corporate structure. July 7, 2015 Subpoena [Dkt. 1-2]. While the subpoena sought information for 41 categories of documents, it did not request any materials concerning the identity of Backpage users. *See id*. On July 16, 2015, Backpage counsel met with Subcommittee staff to raise First Amendment concerns regarding the scope of the July 7 subpoena, as well as concerns regarding a possible connection between the subpoena and the efforts of Cook County, Illinois Sheriff Thomas Dart to close down Backpage. Opp'n, Decl. of Steven Ross at ¶ 4 [Dkt. 8-13] (Ross Decl.). On August 6, 2015, Backpage submitted written objections to the subpoena, asserting that it was overbroad, unduly burdensome, and violated the First Amendment. *See* Letter to Chairman and Ranking Member of PSI from Steven

R. Ross, Esq., Aug. 6, 2015 [Dkt. 1-3] (Aug. 6, 2015 Letter).  Backpage asked that the subpoena

be withdrawn or a response to it to be deferred until Backpage could present "a more fulsome

discussion of the constitutional infirmities and concerns regarding the Subcommittee's

subpoena." *Id.* at 5.

On August 13, 2015, the Subcommittee began to issue deposition subpoenas to

Backpage employees.  Ross Decl. at ¶ 8.  On August 26, the Subcommittee wrote to Backpage

asking it to submit further legal authority in support of its First Amendment objection.  *See*

Letter to Steven R. Ross, Esq. from Chairman and Ranking Member of PSI, Aug. 26, 2015 [Dkt.

1-5] (Aug. 26, 2015 Letter to Backpage).  The Subcommittee expressed its intention to minimize

any resource burden and explained that "its objective is to conduct responsible fact-finding in aid

of Congress' legislative and oversight responsibilities, not to single out Backpage." *Id.*

Backpage counsel wrote back on the same day, reiterating his objections, opposing the

subpoenas issued to two employees, and asking the Subcommittee to submit the dispute to

federal court pursuant to 28 U.S.C. § 1365.  *See* Letter to Chairman and Ranking Member of PSI

from Steven R. Ross, Esq., Aug. 26, 2015 [Dkt. 8-17].  In both letters, that of August 6 and

August 26, 2015, Backpage "asked that [the] subpoena be withdrawn or that, in the alternative,

[they] discuss another way in which to proceed" that "fall[s] within the bounds of the

Subcommittee's constitutional authority and [does] not infringe upon Backpage.com's

constitutional rights." *Id.* at 5.

On August 28, 2015, the Subcommittee refused to withdraw the subpoenas issued

to Backpage employees and rejected Backpage's objections.  *See* Letter to Steven R. Ross, Esq.

from Chairman and Ranking Member of PSI, Aug. 28, 2015 [Dkt. 8-18].  The Subcommittee

again denied that its subpoena was part of a larger governmental effort targeting Backpage.  *See*

*id*.  On September 14, 2015, counsel for both sides met to discuss the constitutional objections to the July 7 subpoena.  At that meeting, Backpage was clear that it objected to the entire subpoena on First Amendment grounds because of its "breadth" and the "context" in which it was received — namely, "the fact that governmental actors have recently taken an interest in Backpage." Nov. 3, 2015 Ruling on Mr. Ferrer's Objections at 4-5.  At the Subcommittee's exhortation, Backpage counsel agreed to provide in writing legal authorities in support of the company's First Amendment objection, but failed to do so.  *Id*. at 5.

On October 1, 2015, the Subcommittee withdrew the July 7 subpoena and issued a new subpoena to Mr. Ferrer, part of which is before the Court.  The new subpoena requested eight categories of documents and focused on the core of the Subcommittee's investigation of Internet sex trafficking.  In an accompanying letter, the Subcommittee reiterated its rejection of Backpage's objections as meritless and said that, "in the hope of overcoming the current impasse," it was "seeking a narrower subset of documents."  Letter and Subpoena to Carl Ferrer from Chairman and Ranking Member of PSI, Oct. 1, 2015 [Ex. 1-7] at 2 (Oct. 1, 2015 Letter and Subpoena).  The Subpoena instructed Mr. Ferrer to produce responsive documents, or else to appear personally, on October 23, 2015.  The eight categories of documents requested by the October 1, 2015 in the Subpoena concerned:  (1) Backpage's reviewing, blocking, deleting, editing, or modifying of advertisements in Adult Sections; (2) advertising posting limitations; (3) reviewing, verifying, blocking, deleting, disabling, or flagging user accounts; (4) human and sex trafficking, human smuggling, prostitution, or its facilitation or investigation, and policies, manuals, memoranda, and guidelines; (5) policies related to hashing of images in Adult sections, data retention, and removal of metadata; (6) number of ads posted, by category, for each month in the past three years and ads reported by Backpage to law enforcement agencies; (7) number of

ads, by category, for the past three years that were deleted or blocked at each stage of the reviewing process; and (8) Backpage's annual revenue and profit for each of the past five years by category. *See id.* The subpoena stated that information responsive to categories 6, 7, and 8 could be submitted with numbers and without underlying documentation.

The subpoena did not seek any information concerning Backpage users and the Letter directed that such information be redacted. The Letter also directed Mr. Ferrer to "assert any claim of privilege or other right to withhold documents from the Subcommittee by October 23, 2015, the return date of the subpoena, along with a complete explanation of the basis of the privilege or other right to withhold documents" in a privilege log. *Id.* at 3.

Thereafter, Mr. Ferrer only "produced a limited number of publicly available documents in response to requests 1, 2, and 3 in the subpoena but objected to producing any other documents." Mot. at 12. Mr. Ferrer also indicated that "Backpage would compile certain records . . . responsive to request 4 of the subpoena, and would investigate and seek to compile statistical information responsive to requests 6 and 7 . . . ." *Id.* at 12-13 n.10. No production was made as to requests 5 or 8. Mr. Ferrer objected to the subpoena because it: (1) exceeded the Subcommittee's investigative authority; (2) infringed on First Amendment rights; and (3) did not seek information pertinent to the investigation. Letter to Chairman and Ranking Member of PSI from Steven R. Ross, Esq., Oct. 23, 2015 [Dkt. 1-9] (October 23, 2015 Letter).

On November 3, 2015, the Subcommittee issued a comprehensive ruling overruling Mr. Ferrer's objections to the subpoena. It ordered Mr. Ferrer to produce responsive documents by November 12, 2015 and to appear personally at a hearing on November 19, 2015. On November 13, one day after the production deadline, Backpage produced over 16,800 pages of documents, most of which were responsive to request 4; 16,300 of those pages involved

Backpage's responses to law enforcement subpoenas, "each response containing numerous repetitive pages of advertisements and photos . . . relating to a single Backpage user." Mot. at 14 n.11. Backpage intended to "prepar[e] millions more pages of documents" responsive to request 4, *see* Opp'n at 15 n.12 (citing Ross Decl. at ¶ 7), but the Subcommittee instructed Backpage to suspend the production of documents responsive to request 4 because it did not need more documents of that nature. *See* E-mail to Steven R. Ross, Esq. from Chief Counsel of PSI, Nov. 14, 2015 [Dkt. 8-23] ("Finally, as we discussed, please hold off on processing or producing what you described as more than five million pages of *law enforcement subpoena related material*.") (emphasis added). Backpage erroneously interpreted this communication, limited in its focus, as a direction to cease submitting any documents or responses. *See id.* (stating that the Subcommittee "instructed Backpage to cease producing documents"); *see also* Letter to Chairman and Ranking Member of PSI from Steven R. Ross, Esq., Nov. 18, 2015 [Dkt. 1-14] at 2. There is simply no support in the record for the proposition that the Subcommittee "declined to receive, []or instructed Mr. Ferrer or Backpage not to produce, any materials responsive to requests 1, 2, and 3." Reply at 4 n.3.

In a November 16, 2015 letter responding to various follow-up inquiries, Backpage counsel told the Subcommittee that "the company's submissions of information and documents to date [did not] constitute either the fruits of a complete search of every bit of data possessed by Backpage.com or by all of its employees over the full (nearly six year) time period covered by the Subpoena." Letter to Chairman and Ranking Member of PSI from Steven R. Ross, Esq., Nov. 16, 2015 [Dkt. 1-13] (Nov. 16, 2015 Letter) at 2. Backpage asserted that such a full and complete search would be by itself unconstitutional due to the Subpoena's "overbreadth and First Amendment infirmities." *Id.* Backpage never explained the extent or nature of its

8

limited search, did not provide a privilege log, did not object to the production of specified documents, and did not identify any documents being withheld.

Backpage counsel asked that Mr. Ferrer's personal appearance at the November 19 hearing be waived because Mr. Ferrer would not answer any questions as he intended to assert his Fifth Amended privilege against self-incrimination and invoke his First Amendment rights. *See id.*; Letter to Chairman and Ranking Member of PSI from Steven R. Ross, Esq., Nov. 16, 2015 [Dkt. 1-14] at 1-2. Counsel added that Mr. Ferrer was on international business travel. The Subcommittee rejected Backpage's last minute effort to excuse Mr. Ferrer's appearance. Nonetheless, Mr. Ferrer did not appear before the Subcommittee on November 19, 2015. During that hearing, the Subcommittee received the testimony on Internet sex trafficking from four witnesses, three law enforcement officials, and NCMEC's general counsel. On the same day, the Subcommittee also issued a Staff Report, which was titled, "Recommendation to Enforce Subpoena Issued to the CEO of Backpage.com, LLC, Staff Report to the Permanent Subcommittee on Investigations" (PSI Staff Report).

On February 29, 2016, the Subcommittee presented a resolution to the Senate Committee on Homeland Security and Governmental Affairs authorizing and directing the Senate Legal Counsel to bring a civil action under 28 U.S.C. § 1365 to enforce the first three requests of the October 1, 2015 subpoena. *See* S. Rep. No. 114-214 (2016). On March 17, 2016, the Senate adopted said resolution by a vote of 96-0. *See* 162 Cong. Rec. S1561 (daily ed. Mar. 17, 2016). The Subcommittee asks the Court to enforce the following parts of the subpoena:

> 1. Any documents concerning Backpage's reviewing, blocking, deleting, editing, or modifying advertisements in Adult Sections, either by Backpage personnel or by automated software processes, including but not limited to policies, manuals, memoranda, and guidelines.

2.   Any documents concerning advertising posting limitations, including but not limited to the "Banned Terms List," the "Grey List," and error messages, prompts, or other messages conveyed to users during the advertisement drafting or creation process.

3.   Any documents concerning reviewing, verifying, blocking, deleting, disabling, or flagging user accounts or user account information, including but not limited to the verification of name, age, phone number, payment information, email address, photo, and IP address.  *This request does not include the personally identifying information of any Backpage user or account holder.*

Oct. 1, 2015 Letter and Subpoena (emphasis in original).  The Subcommittee points out that Backpage has only produced a total of 65 pages of documents responsive to these requests — "21 pages of which were publicly available documents: the website's Terms of Use, Posting Rules, and User Agreement, and testimony by Backpage's general counsel before the New York City Council in 2012."  Mot. at 14 n.12 (citing October 23, 2015 Letter at 6-7; PSI Staff Report at 30-31 (S. Hrg. No. 114-179, at 85-86)).  As a result, the Subcommittee filed the instant Application under 28 U.S.C. § 1365 to enforce its subpoena.

## II.  ANALYSIS

The Subcommittee moves to enforce the first three requests of its October 1, 2015 subpoena.  Mr. Ferrer opposes the Subcommittee's Application on four different grounds: (1) lack of subject matter jurisdiction; (2) lack of a valid legislative purpose that falls within the scope of the Subcommittee's authority; (3) violation of the First Amendment because the subpoena intrudes into protected speech, seeks to single out and punish Backpage, and is

overbroad and unduly burdensome; and (4) violation of the Due Process Clause.[2]  For the

reasons that follow, the Court finds Mr. Ferrer's objections to be without merit.  The Court will

address each argument in turn.

### A.  Subject Matter Jurisdiction over the Subcommittee's Application

The Subcommittee filed the instant civil action to enforce its subpoena pursuant to

28 U.S.C. § 1365.  The statute provides in relevant part:

> (a)  The United States District Court for the District of Columbia shall have original jurisdiction, without regard to the amount in controversy, over any civil action brought by the Senate or any authorized committee or subcommittee of the Senate to enforce, to secure a declaratory judgment concerning the validity of, or to prevent a threatened refusal or failure to comply with, any subpena or order issued by the Senate or committee or subcommittee of the Senate to . . . any natural person to secure the production of documents or other materials of any kind or the answering of any deposition or interrogatory or to secure testimony or any combination thereof.
>
> (b)  Upon application by the Senate or any authorized committee or subcommittee of the Senate, the district court shall issue an order to an entity or person refusing, or failing to comply with, or threatening to refuse or not to comply with, a subpena or order of the Senate or committee or subcommittee of the Senate requiring such entity or person to comply forthwith . . . Nothing in this section shall confer upon such court jurisdiction to affect by injunction or otherwise the issuance or effect of any subpena or order of the Senate or any committee or subcommittee of the Senate or to review, modify, suspend, terminate, or set aside any such subpena or order.

---

[2] With the exception of the first and last argument, the Subcommittee considered and rejected Mr. Ferrer's objections.

28 U.S.C. § 1365(a), (b). The statute strips this Court of its customary authority to modify or quash a subpoena. It allows the Court only to decide whether to enforce the subpoena brought before it.

Mr. Ferrer argues that because the Subcommittee is seeking enforcement of three of the eight requests in the October 1, 2015 subpoena, it is seeking relief outside the Court's jurisdiction. In essence, he contends that enforcement of a subpoena in part is not available under the statute so that the Court has no authority and the Application must be denied. *See* Opp'n at 45 ("Because the Subcommittee has sought enforcement of the Subpoena in a manner — following modification — which is expressly forbidden under § 1365, such enforcement is not warranted and should not be granted."). The Court disagrees. By its plain terms, the statute imposes no constraint on the Subcommittee's authority to seek partial enforcement of a subpoena or order. 28 U.S.C. § 1365(b).

Mr. Ferrer's argument also ignores the very purpose of the statute, which was to avoid judicial interference with Congress's exercise of its constitutional powers. *See* S. Rep. No. 95-170, at 94 (1977). The statute's legislative history makes clear that "the court's jurisdiction is limited to *the matter Congress brings before it*, that is whether or not to aid Congress is enforcing the subpoena or order." *Id.* (emphasis added). It is the Senate's constitutional prerogative to decide what to bring before the Court. *See Senate Select Committee on Ethics v. Packwood*, 845 F. Supp. 17 (D.D.C.), *stay denied*, 510 U.S. 1319 (1994) (Rehnquist, C.J., in chambers) (enforcing a narrower documentary subpoena under § 1365). As the Subcommittee correctly states, "By granting the Application, the Court would not be *modifying* the subpoena in any way, but merely enforcing the parts of the subpoena brought before it." Mot. at 23

(emphasis in original).  Accordingly, the Subcommittee's relief is permitted by the statute and the Court has subject matter jurisdiction.

### B.  The Subcommittee's Authority and the Subpoena's Legislative Purpose

"The power of the Congress to conduct investigations is inherent in the legislative process," *see Watkins v. United States*, 354 U.S. 178, 187 (1957), and the capacity to enforce said investigatory power "is an essential and appropriate auxiliary to the legislative function," *see McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).  "Absent such a power, a legislative body could not 'wisely or effectively' evaluate those conditions 'which the legislation is intended to affect or change.'"  *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 305 (D.D.C. 1976), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976) (quoting *McGrain*, 273 U.S. at 175).

Mr. Ferrer raises a plethora of arguments objecting to the Subcommittee's actions, none of which is persuasive.  Mr. Ferrer argues that the subpoena lacks a legislative purpose and does not seek information that is pertinent to an investigation within the Subcommittee's jurisdiction or power.  A cursory review of the Subcommittee's investigatory authority and actions in this instance demonstrate that these objections are just wrong.  The Subcommittee is authorized to study or investigate, *inter alia*:  (1) organized criminal activity in interstate or international commerce; (2) the adequacy and need to change Federal Laws targeting organized crime in interstate or international commerce to protect the public; (3) "all other aspects of crime and lawlessness within the United States which have an impact upon or affect the national health, welfare, and safety"; and (4) "the efficiency and economy of all branches and functions of Government with particular references to the operations and management of Federal regulatory policies and programs."  S. Res. 73, 114th Cong., § 12(e)(1) (2015), *reprinted in* S. Doc. No. 114-6, at 137 (2015).  Senate Resolution 73 also authorizes the Subcommittee "to require by

subpoena or otherwise the attendance of witnesses and production of correspondence, books, papers, and documents." *Id.* § 12(e)(3).

Undoubtedly, the use of the Internet for human and sex trafficking, as defined by statute, involves organized criminal activity in interstate or international commerce and can affect the national health, welfare, and safety. *See, e.g.*, 18 U.S.C. §§ 1581-1592 (recognizing different forms of human trafficking — *i.e.*, slavery, forced labor, involuntary servitude, and sex trafficking of minors — as federal crimes); 18 U.S.C. § 1961(1) (defining "racketeering activity" under the Racketeer Influenced and Corrupt Organizations Act to include "any act which is indictable under" 18 U.S.C. §§ 1581-1592). The Subcommittee is also authorized to evaluate the effectiveness of existing statutes, programs, and regulatory initiatives addressing the problem of sex trafficking. This can be done, in part, by examining the magnitude of sex trafficking on the Internet. Finally, the power to issue documentary subpoenas is inherent in the Subcommittee's investigatory authority. *See* S. Res. 73, § 12(e)(3).

Mr. Ferrer responds in conclusory terms that the subpoena "cannot be enforced based [on] an unlimited legislative mandate, simply because Congress is empowered to legislate about anything involving either organized crime or the Internet." Opp'n at 32. This generalized statement offers no basis to limit the Subcommittee's authority to issue the subpoena here. The Constitution authorizes Congress to investigate any issue or subject about which it can enact legislation to the extent that it "would be materially aided by the information which the investigation was calculated to elicit." *McGrain*, 273 U.S. at 177; *see also* U.S. Const. art. I, § 8. The Senate granted broad investigatory powers to the Subcommittee, which would include looking into Internet sex trafficking. *See Barenblatt v. United States*, 360 U.S. 109, 111 (1959) (stating that "the scope of [Congress's] power of inquiry . . . is as penetrating and far-reaching as

the potential power to enact and appropriate under the Constitution").[3]   It is noteworthy that 96 Senators voted to enforce the subpoena, indicating strong agreement with the Subcommittee's authority.

Further, Congress has already demonstrated its interest in this area. One example of such interest in Internet protections is found in the Communications Decency Act (CDA), 47 U.S.C. § 230, which provides a safe harbor for website owners or service providers to self-monitor.  Specifically, this safe harbor provision establishes "broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service."  *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (internal quotation marks and citations omitted).  Courts have held that section 230 of the CDA preempts state statutes prohibiting the use of online marketplaces for advertising the sexual abuse of minors.[4]

---

[3] The Subcommittee notes that it has conducted numerous investigations into the use of the Internet to engage in criminal activity, such as identity and securities fraud.  *See, e.g.*, *Phony Identification and Credentials Via the Internet: Hearing Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs*, S. Rep. No. 107-133, 107th Cong. (2002); *Securities Fraud on the Internet: Hearing Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs*, S. Hrg. No. 106-137, 106th Cong. (1999); *Fraud on the Internet: Scams Affecting Consumers: Hearing Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs*, S. Hrg. No. 105-453, 105th Cong. (1998).  Mr. Ferrer does not address the validity of these investigations pursuant to Senate Resolution 73.

[4] Backpage has invoked successfully this provision to avoid liability.  *See, e.g.*, *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd*, 817 F.3d 12 (1st Cir. Mar. 14, 2016); *Backpage.com, LLC v. Hoffman*, No. 13-cv-3952, 2013 WL 4502097 (D.N.J. Aug. 20, 2013), *appeal dismissed*, No. 13-3850 (3d Cir. May 1, 2014); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012).

The First Circuit recently agreed that "aided by the amici, the appellants have made a persuasive case" showing that "Backpage has tailored its website to make sex trafficking easier." *Doe v. Backpage.com, LLC*, 817 F.3d 12, 29 (1st Cir. 2016). The Circuit added that, since Congress "chose to grant broad protections to internet publishers" in the CDA, "the remedy" to the evils identified by appellants and amici "is through legislation, not through litigation." *Id.* Given the relevance of section 230 of the CDA and its focus on self-monitoring, the Subcommittee is legitimately interested in investigating the nature and extent of Backpage's moderation procedures, as well as evaluating the measures taken by other service providers to prevent their websites from becoming sex trafficking havens.

Mr. Ferrer retorts that the Subcommittee cannot rely on Section 230 because it was "mentioned nowhere in the Subcommittee's authorizing resolution, it is not addressed in the Subpoena or its cover letter, and was never broached in the voluminous correspondence between Backpage and the Subcommittee staff." Opp'n at 33. He argues that "the Subcommittee cannot retroactively articulate its purpose through lawyers' arguments made to this Court." *Id.* Of course, forced to sue, the Subcommittee can present proof of its own authority howsoever it chooses. The Supreme Court has stated that it is not necessary for a Senate resolution authorizing an investigative committee to "declare in advance what the [S]enate meditated doing when the investigation was concluded." *In re Chapman*, 166 U.S. 661, 670 (1897). Since Mr. Ferrer was always fully aware of the topic under inquiry, namely, the measures taken by Internet companies to monitor their sites for Internet sex trafficking, his objections must fail.

Moreover, the record belies his assertion. In its November 3, 2015 Ruling on Mr. Ferrer's objections, the Subcommittee stated that "this [subpoenaed] information will enable Congress to assess how effectively it has encouraged service providers to self-regulate *as*

16

*Congress intended in the CDA*."  Nov. 3, 2015 Ruling on Mr. Ferrer's Objections at 17

(emphasis added and quotation marks omitted); *see also id*. at 10 (explaining that the subpoenaed

information "will assist Congress in its consideration of potential legislation in a number of

legitimate areas of legislative interest, including interstate and international human trafficking

and the federal law enforcement policies and resources devoted to combatting it").  In addition,

the Subcommittee told Backpage's counsel in its August 26, 2015 and October 1, 2015 Letters

that documents in response to the subpoena were important to evaluate the effectiveness of

Backpage's moderation procedures and to consider the need for new legislation on Internet sex

trafficking.  For example, the August 26, 2015 Letter stated in part,

> [T]he Subcommittee is engaged in a carefully structured inquiry into
> a complex problem of *significant legislative interest* — the use of
> the Internet as a marketplace for interstate sex trafficking, including
> trafficking in children.  The purpose of this long-term investigation
> is to produce a Subcommittee report addressing the problem and
> reform options that have received considerable legislative and
> scholarly attention.  *The Subcommittee's fact-finding will inform the
> Senate regarding these issues and assist in its consideration of any
> potential legislation* relating to, *inter alia,* interstate and
> international human trafficking and sex trafficking; interstate
> cyberstalking; federal law enforcement policies and resources to
> combat trafficking; the federal anti-money laundering regime as it
> concerns illegal trafficking proceeds; and federal
> telecommunications policy.

Aug. 26, 2015 Letter to Backpage at 1 (emphasis added).  Similarly, on October 1, 2015, the

Subcommittee told Backpage that "gaining a complete understanding of Backpage's anti-

trafficking measures, including its screening and verification procedures for advertisements

posted in its 'adult' section, will aid Congress as it considers additional legislation . . . that

combats human trafficking."  Oct. 1, 2015 Letter and Subpoena at 2.  The Court concludes that

the Subcommittee expressed a valid legislative purpose.

Mr. Ferrer argues further that the Subcommittee's subpoena and investigation should not be legitimized because the "goal is more prosecutorial than legislative."  Opp'n at 37. Mr. Ferrer has consistently argued that the actual purpose and intent of the Subcommittee's inquiry is to condemn and punish Backpage.  He cites statements made by Members of Congress and State officials criticizing Backpage as evidence of a larger governmental effort to target the company.  Mr. Ferrer misperceives the Court's role, which is not to determine the validity of the legislative purpose by "testing the motives of committee members" based on public statements. *Watkins*, 354 U.S. at 200.  "Their motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served." *Id.*

Finally, Mr. Ferrer has failed to support his accusation that the subpoena seeks documents that are not pertinent to the Subcommittee's investigation and legislative purpose. The "pertinency" of the requested documents "was made to appear with indisputable clarity" to Backpage.  *Barenblatt*, 360 U.S. at 124 (internal quotation marks and citations omitted). Backpage acknowledged its understanding when it informed the Subcommittee that it "strove to include the documents most relevant to the Subcommittee's professed inquiry concerning potential legislation regarding human trafficking . . . or other illegal activities and the investigation of such activities," in the small group of documents it submitted in mid-November 2015.  *See* Nov. 16, 2015 Letter at 2.  "Professed" or not, further explanation is unnecessary.

In conclusion, the subpoena before the Court has a valid legislative purpose and seeks pertinent information that falls within the scope of the Subcommittee's authority.  *See Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968) (holding that "when the purpose asserted is supported by references to specific problems which in the past have been or which in

the future could be the subjects of appropriate legislation, then we cannot say that a committee of the Congress exceeds its broad power when it seeks information in such areas").

### C.  Mr. Ferrer's First Amendment Objections

A congressional investigation and its use of subpoenas are "subject to the command [of the First Amendment] that the Congress shall make no law abridging freedom of speech or press [or religion] or assembly."  *Watkins*, 354 U.S. at 197.  The underlying rationale of this precept is that "investigation is part of lawmaking" and the "First Amendment may be invoked against infringement of the protected freedoms by law or by lawmaking."  *Id.* (citations omitted).

Mr. Ferrer makes three arguments in this respect:  (1) the subpoena constitutes an abuse of the investigative process that encroaches on his First Amendment rights; (2) the subpoena is part of a concerted effort to target Backpage and punish protected speech; and (3) the subpoena is overly broad and unduly burdensome and produces a chilling effect on speech. The Subcommittee points out that Mr. Ferrer has failed to identify any "particular or class of documents the production of which would implicate, much less violate, his First Amendment rights."  Reply at 11.  The Subcommittee argues further that Mr. Ferrer's claims that "the First Amendment provides a blanket protection from having to produce *any* documents responsive to subpoena requests 1, 2, and 3" and from "having even to search for responsive documents and assert privileges on a document-by-document basis" lack merit because "the First Amendment offers no such categorical immunity from government inquiry."  *Id.* (emphasis in original).

**1. The Subpoena is not an abuse of the investigative process that violates the First Amendment.**

The question posed by Mr. Ferrer's argument is actually whether the Subcommittee subpoena, as presented to the Court, represents an effort to intimidate Backpage or shut it down "through 'actual or threatened imposition of government power or sanction' [in violation of] the First Amendment." *Dart*, 807 F.3d at 230 (quoting *American Family Ass'n, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)). This test is not directly addressed by Mr. Ferrer.

At the outset, the Court rejects Mr. Ferrer's argument that, as CEO of Backpage, he has a First Amendment right not to conduct a full and comprehensive search for responsive documents and not to file a privilege log. Backpage counsel told the Subcommittee that it had not conducted a "complete search" and that "to be required to conduct such a search and review in light of the significant overbreadth and First Amendment infirmities of the Subpoena would in itself be constitutionally inappropriate." Nov. 16, 2015 Letter at 2. There is simply no legal or factual support for the proposition that being required to search for responsive documents would abridge Mr. Ferrer's protected freedoms of speech or press. Mr. Ferrer does not possess an absolute right to be free from government investigation when there are valid justifications for the inquiry.

The First Amendment does not give Mr. Ferrer an "unlimited license to talk" or to publish any content he chooses. *Konigsberg v. State Bar of California*, 366 U.S. 36, 50 (1961). The Supreme Court has consistently rejected throughout its history "the view that freedom of speech and association . . . as protected by the First and Fourteenth Amendments, are 'absolutes,' not only in the undoubted sense that where the constitutional protection exists it

20

must prevail, but also in the sense that the scope of that protection must be gathered solely from a literal reading of the First Amendment." *Id.* at 49 (internal citation omitted).

In fact, not all speech is subject to the protection of the First Amendment. *See Chaplinsky v. State of New Hampshire*, 315 U.S. 568 (1942); *Schenck v. United States*, 249 U.S. 47 (1919). Restrictions or limitations on protected speech that are "not intended to control [its] content," but rather, "incidentally limit[] its unfettered exercise" or expression, do not violate the First Amendment, "when they have been found justified by subordinating valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved." *Konigsberg*, 366 U.S. at 50-51 (citations omitted). Under such circumstances, it is imperative to balance the nature of the intrusion against the asserted governmental interest — an exercise that Mr. Ferrer simply does not acknowledge, let alone discuss, in his briefs or letters. *See id.* at 51 ("Whenever, in such a context, these constitutional protections are asserted against the exercise of valid governmental powers a reconciliation must be effected, and *that perforce requires an appropriate weighing of the respective interests involved.*") (emphasis added).

Mr. Ferrer correctly told the Subcommittee in a letter that "[t]he Constitution tells us that ––– when freedom of speech hangs in the balance — the state may not use a butcher knife on a problem that requires a scalpel to fix." Aug. 6, 2015 Letter (quoting *Cooper*, 939 F. Supp. 2d at 813). The problem is that the Constitution also tells us that Mr. Ferrer cannot use the First Amendment as an omnipotent and unbreakable shield to prevent Congress from properly exercising its constitutional authority.

Mr. Ferrer argues that the subpoena violates the First Amendment because it intrudes into Backpage's editorial decision-making. Some of the documents that the

21

Subcommittee is requesting may contain information that is not subject to First Amendment protection due to its illegal nature, such as the selective editing of an advertisement for sexual relations with a minor.  Moreover, it would appear that Backpage has changed its moderation processes for the very purpose of avoiding inquiry, and it has been accused of deliberately structuring "its website to facilitate sex trafficking." *Doe*, 817 F.3d at 16.[5]  Having refused to maintain policies or procedures regarding its current moderation process, Backpage now states that the only way to determine its moderation efforts is to review hundreds of employee emails, which would be burdensome.  *See* October 23, 2015 Letter at 6-7.  So be it; Backpage has no recourse but to produce all employee emails concerning moderation activities that would otherwise remain hidden.  Backpage cannot proclaim its attention to moderation efforts to avoid ads for sex trafficking and refuse to respond with documentary evidence of how that attention works in practice.

The claim of protected "editorial policies" rings hollow.  First, of course, Backpage has produced only scarce documentation of its previous practices on moderation, some of which was publicly available and not entirely responsive to the Subcommittee's Subpoena. *See, e.g.*, *See* Letter to Chairman and Ranking Member of PSI from Steven R. Ross, Esq., Nov. 13, 2015 [Dkt. 8-10] at 1-2 (producing a "previously-used list of moderation guidelines,"

---

[5] For example, "even though the website does require that posters verify that they are 18 years of age or older to post in that section, entering an age below 18 on the first (or any successive) attempt does not block a poster from entering a different age on a subsequent attempt." *Doe*, 817 F.3d at 16 n.2.  Another example is that "Backpage also allows users to pay posting fees anonymously through prepaid credit cards or digital currencies." *Id.*

moderation process discussions in 2011, a sample moderation log, a list of banned terms, and

certain screenshots of the website); October 23, 2015 Letter at 6-7 (producing the website's

Terms of Use, Posting Rules, User Agreement, and Backpage's general counsel testimony in

2012); PSI Staff Report at 30-31 (S. Hrg. No. 114-179, at 85-86).  Backpage has not produced

evidence of emails exchanged between employees concerning its moderation efforts, even

though the Subcommittee is aware of their existence because some have been obtained from

third parties.  Second, Backpage has refused to perform a comprehensive search for responsive

documents, claiming that such a requirement itself violates the First Amendment.  The Court has

rejected this argument above because merely searching for responsive documents does not limit

or chill First Amendment rights.  Third, having failed to perform the customary duties associated

with a subpoena, Backpage has no basis in fact to assert that *all* employee emails are protected

First Amendment communications.  *United States v. Williams*, 553 U.S. 285, 297 (2008)

("Offers to engage in illegal transactions are categorically excluded from First Amendment

protection.") (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S.

376, 388 (1973)); *Flytenow, Inc. v. FAA*, 808 F.3d 882, 894 (D.C. Cir. 2015) (noting that "the

advertising of illegal activity has never been protected speech") (citing *Pittsburgh Press Co.*, 413

U.S. at 388-89).

   While Backpage may engage in protected activity in some instances, that does not

mean that all of its decisions and policies receive First Amendment protection.  "The First

Amendment does not protect speech that is itself criminal because it is too intertwined with

illegal activity."  *Conant v. McCaffrey*, 172 F.R.D. 681, 698 (N.D. Cal. 1997) (citing *Giboney v.*

*Empire Storage & Ice Co.,* 336 U.S. 490, 498 (1949)) (other citation omitted).  Just as

"[b]ookselling in an establishment used for prostitution does not confer First Amendment

coverage to defeat a valid statute aimed at penalizing and terminating illegal uses of premises," *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986), engaging in editorial decisions on a website used for sex trafficking does not immunize Backpage from its duty to comply with a subpoena aimed at investigating Backpage's moderation practices.  Mr. Ferrer has had ample time to perform the necessary duties of searching for, locating, identifying, and producing either responsive documents or a privilege log with an explanation for any withheld material.  Having done none of the above, he is hard put to plead a barren First Amendment claim without underlying facts.

Moreover, enforcement of the subpoena in the instant case does not impose a content-based restriction on any protected activity.  The subpoena seeks documents relevant to, *inter alia*, Backpage's moderation practices and policies.  *See* Oct. 1, 2015 Letter and Subpoena. This is a content-neutral request.  While Mr. Ferrer cites various cases where courts ruled in favor of Backpage on First Amendment grounds, these cases are inapposite because they involved content-based restrictions found to be both vague and overbroad.  *See, e.g.*, *Hoffman*, 2013 WL 4502097, at *7; *Cooper*, 939 F. Supp. 2d at 830-39; *McKenna*, 881 F. Supp. 2d at 1277-85.  In these cases, different states sought to criminalize certain sex-oriented advertisements, thus directly regulating speech despite federal law.  Mr. Ferrer merely cites these cases for the general proposition that the First Amendment has been applied to Backpage, but does not explain why the subpoena at issue imposes a similar content-based restriction as to each and every document that concerns Backpage's moderation activities.

One might contend that it is unclear whether the Subcommittee's subpoena, while "not intended to control the content of speech, incidentally limit[s] its unfettered exercise" and is "found [to be] justified by subordinating valid governmental interests, a prerequisite to

constitutionality which . . . necessarily involve[s] a weighing of the governmental interest involved." *Konigsberg*, 366 U.S. at 50-51 (citations omitted).  While not identifying the relevant legal balancing test, Mr. Ferrer relies on a series of decisions — particularly, *Bursey v. United States*, 466 F.2d 1059 (9th Cir. 1972) — to support his objections.  *Bursey* involved a grand jury investigation of *The Black Panther* newspaper after the paper published speeches and articles threatening to assassinate President Nixon, advocating the overthrow of the United States government, and providing instructions on how to use firearms and make Molotov cocktails.  466 F.2d at 1065-68.  The grand jury investigated, among other things, the internal management of the paper, the identity of persons who worked on the paper, and their roles in its publication.

Mr. Ferrer's reliance is misplaced because *Bursey* differs substantively from this case.  In *Bursey*, the "[i]nquiries about the identity of persons with whom the witnesses were associated on the newspaper and in the Black Panther Party . . . infringed the right of associational privacy" and had a chilling effect on the press.  *Id.* at 1085.  *Bursey* involved an inquiry implicating political speech, as well as the liberty to decide what to print, to distribute what is printed, and to protect the anonymity of disfavored speakers and political dissenters.  *Id.* at 1083-86.  These concerns do not apply in this case.  The Subcommittee does not seek any "personally identifying information of any Backpage user or account holder."  *See* Oct. 1, 2015 Letter and Subpoena.  Moreover, this case does not involve any editorial judgments concerning political speech, which generally receives heightened constitutional protection.  Mr. Ferrer has failed to demonstrate that requesting information on Backpage's efforts to screen out sex trafficking from commercial advertisements on its website (which would be illegal, even though Backpage would not be liable) would produce an impermissible chilling effect upon freedoms of the press, association, or speech.

Notably absent from Mr. Ferrer's briefs and letters is the required weighing of the alleged intrusion on his First Amendment rights against the asserted governmental interest in the subpoenaed information for its investigation on Internet sex trafficking.  Such a necessary weighing of competing interests is an exercise that is amply discussed in *Bursey* and other First Amendment cases cited by Mr. Ferrer.  *See, e.g.*, *Watkins*, 354 U.S. at 198; *United States v. Rumely*, 345 U.S. 41, 44 (1953); *Bursey*, 466 F.2d at 1083.[6]  In *Bursey*, the journalists did not refuse to appear before the grand jury and did not argue that being required to appear was unconstitutional.  Instead, they objected to specific questions on the record, thus allowing the court to weigh the First Amendment interests implicated by each question against the asserted governmental interest.  The Ninth Circuit concluded that the government's interests, while compelling, did not override the First Amendment interests at stake with respect to all questions.  *Bursey*, 466 F.2d at 1086 (citing *Watkins*, 354 U.S. at 198-99).  With respect to some of the questions, the Court found that their impact on "lawful associations and protected expression [was] so slight that governmental interests must prevail."  *Id.* at 1086 n.20.

Here, Mr. Ferrer not only refused to appear before the Subcommittee and failed to articulate specific objections in a privilege log, but also refused to conduct a full search for responsive documents.  Mr. Ferrer merely invokes the First Amendment in general terms and states that the Subcommittee's need for the information does not automatically override his

---

[6] Like *Bursey*, *Watkins* and *Rumely* also involved attempts to uncover the identity of disfavored speakers and political dissenters, efforts that directly implicated the freedoms of speech, press, and associational privacy.  *See Watkins*, 354 U.S. at 184-86 (involving a subpoena seeking witness testimony to identify Communist associates); *Rumely*, 345 U.S. at 42-43 (involving a subpoena seeking documents to identify purchasers of disfavored political books).

constitutional rights.  He engages in no legal analysis to weigh his rights against the

Subcommittee's asserted interest.

   The Subcommittee argues that, since Backpage is a publisher of commercial

advertisements, Mr. Ferrer is required to show that the subpoena intrudes on his right to engage

in commercial speech, a right to which the Constitution "affords a lesser protection" than "other

constitutionally guaranteed expression."  *United States v. Edge Broadcasting Co.*, 509 U.S. 418,

426 (1993); *see also Pittsburgh Press Co.*, 413 U.S. at 386-87.  Mr. Ferrer disagrees and argues

that the Subcommittee "tries to downplay Backpage's First Amendment interests by incorrectly

framing this as a commercial speech case," when in fact, "Backpage is not an advertiser, but

rather is an online intermediary for third-party speech, for whom First Amendment protections

are significant."  Opp'n at 28.  Whether or not the speech at issue is "commercial," merely

arguing that Backpage enjoys "significant" First Amendment protections proves nothing as a

matter of fact or law.  "It is not enough merely to mention a possible argument in the most

skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and

put flesh on its bones."  *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).  By not

attempting to balance the parties' competing interests and failing to identify the applicable level

of First Amendment scrutiny, Mr. Ferrer is essentially saying:  The Court should presume that

any responsive document that has not been produced contains constitutionally-protected

information that no governmental need could possibly overcome.  His position is untenable and

without legal support.

   As to some of the specifics, Mr. Ferrer has failed to explain the nature and scope

of the subpoena's alleged intrusion into his First Amendment rights.  He claims that requests for

information "relating to payment processing . . . *can* violate the First Amendment and chill

protected speech." Opp'n at 24 (emphasis added). Even if accurate that this effect "*can*" be true, Mr. Ferrer offers no facts or argument, beyond the conclusory statement, that it *is* true here. The point remains unsupported and unpersuasive.

The Subcommittee attempted to circumscribe the scope of its inquiry by allowing Backpage to redact any personally identifying information on subscribers and advertisers. Information about Backpage's efforts to avoid sex trafficking ads does not regulate content directly, except that which is concededly illegal. On this record, the Court finds that to the extent the Subpoena implicates Mr. Ferrer's protected freedoms, it is only in an incidental and minimal fashion. In comparison, the subpoenaed information is highly relevant to the Subcommittee's investigation and potential legislation on Internet sex trafficking. Understanding the magnitude of Internet sex trafficking and how to stop it substantially outweighs Mr. Ferrer's undefined interests. Even if Mr. Ferrer's activities did not involve commercial speech and were entitled to greater scrutiny, the record shows that the subpoena's impact on Mr. Ferrer's First Amendment freedoms is "so slight" that the Subcommittee's interests must prevail. *Bursey*, 466 F.2d at 1086 n.20.

### 2. The Subpoena does not seek to punish Backpage and is not so broad and burdensome that it would deter speech or abridge a protected freedom.

Mr. Ferrer makes two additional arguments as to why the subpoena violates the First Amendment: (1) it is part of a "sustained, coordinated, and targeted campaign" that seeks to punish Backpage, *see* Opp'n at 37; and (2) it is overly broad and unduly burdensome. With respect to the first argument, Mr. Ferrer has failed to show how the fact that "other governmental entities have taken actions adverse to Backpage has [any] bearing on the legitimacy of the Subcommittee's investigation" or the "Subcommittee's constitutional authority to investigate

Backpage or to obtain information from Mr. Ferrer."  Reply at 18.  The Court has found that the

subpoena serves a valid legislative purpose and seeks information that is pertinent to an

investigation within the Subcommittee's jurisdiction or power.  Thus, while some may have

expressed dismay at Backpage's adult ads and some States have attempted to legislate against it,

the CDA continues to protect Backpage from liability as an Internet intermediary.  In any event,

"[s]o long as Congress acts in pursuance of its constitutional power," as it has in the instant case,

"the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise

of that power."  *Barenblatt*, 360 U.S. at 132-33; *see also Watkins*, 354 U.S. at 200.

        With respect to the second argument, the Court notes that it is "to be expected"

that "some burden" would result from the production of responsive documents to a subpoena;

however, such burden "is necessary in furtherance of the [Subcommittee's] legitimate inquiry

and the public interest."  *FTC v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977).  "The burden

of showing that the request is unreasonable is on the subpoenaed party," and this "burden is not

easily met where, as here, the [Subcommittee's] inquiry is pursuant to a lawful purpose and the

requested documents are relevant to that purpose."  *Id.*  Mr. Ferrer simply states that the

subpoena requires "production of massive amounts of information, with no explanation of how it

relates to the purported topic of the investigation."  Opp'n at 31.  His statement is hard to credit,

as the topic of the investigation is clear and the "massive amounts of information" are required

only because of Backpage's seeming efforts to avoid inquiry.  As the Court has already

explained, the information is highly relevant to the stated legislative purpose.  In addition, the

Subcommittee's request is more narrow than Mr. Ferrer would admit.  The Subcommittee seeks

only those emails and communications that concern Backpage's screening practices against

Internet sex trafficking, not all "the email correspondence from and between all those employed

to provide moderation services for the past six years." Opp'n at 30.  There is nothing unusual, unreasonable, or overly broad about requiring a party to search for all responsive documents on a specific subject or topic.

Further, Mr. Ferrer's objections totally ignore the fact that Backpage searched for, identified, and intended to produce millions of documents responsive to request 4, yet failed to make an effort to quantify the number of materials responsive to requests 1, 2, and 3 that would allow consideration of the supposed burden of the subpoena.  Moreover, the Subcommittee expressed its willingness to "discuss ways of minimizing any burden . . . — such as [] agreeing upon electronic search terms or focusing on particular document custodians or employees." *Id.* at 22 n.20 (citing Aug. 26, 2015 Letter to Backpage).  Notwithstanding the Subcommittee's efforts to narrow its document requests and minimize the supposed burden on Backpage, Mr. Ferrer refused to consider such an approach.

Finally, the fact that the Subcommittee also requested similar information from other sources, particularly individuals and entities connected to Backpage, is irrelevant to the question of whether the Subcommittee's subpoena in this case is overly broad and unconstitutional.  Mr. Ferrer does not cite any legal authority to the contrary.

### D.  Mr. Ferrer's Due Process Objection

Mr. Ferrer argues that the Subcommittee violated his due process rights by: (1) "failing to define the scope of its inquiry and the relevance of its requests"; and (2) "depriving the company of the opportunity to consider and address the Subcommittee's ostensibly flexible and evolving objectives" of the investigation.  Opp'n at 41.  This Court has already found that the scope of the inquiry and the pertinence of the requests "was made to appear with indisputable clarity" to Backpage.  *Barenblatt*, 360 U.S. at 124 (internal quotation

marks and citations omitted).  In addition, the argument is undeveloped and devoid of legal support.

The Due Process Clause of the Fifth Amendment of the Constitution, which provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law," includes protections for both substantive and procedural due process.  U.S. Const. amend. V; *see Town of Castle Rock v. Gonzales*, 545 U.S. 748, 755-56 (2005).  It cannot be invoked to protect oneself from a congressional investigation merely because the investigation may be inconvenient or undesirable.  It is unclear from the record and from Mr. Ferrer's briefs whether he is asserting a procedural or substantive due process claim.  "Judges are not expected to be mindreaders.  Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace."  *Zannino*, 895 F.2d at 17 (internal quotation marks and citation omitted).  Even if the Court were to consider both claims, Mr. Ferrer has failed to support or establish a valid due process objection to the Subcommittee's subpoena.

Mr. Ferrer has not asserted a cognizable protected interest under either component of the Due Process Clause.  This fact alone is fatal to Mr. Ferrer's objection.  Even if there were a fundamental or cognizable interest at stake, Mr. Ferrer has not alleged, let alone shown, that the deprivation of said interest was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" — an essential element of any claim rooted in substantive due process.  *Gonzalez-Fuentes v. Molina,* 607 F.3d 864, 880 (1st Cir. 2010) (citation omitted); *see also United States v. Salerno,* 481 U.S. 739, 746 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' . . . or interferes with rights 'implicit in the concept of ordered liberty.'") (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952) and *Palko v. Connecticut,* 302 U.S. 319, 325-26 (1937)).  With respect to

procedural due process, Mr. Ferrer failed to assert that he was deprived of a liberty or property interest for which some process was owed. *See Board of Regents v. Roth*, 408 U.S. 564 (1972). He also does not explain why he was not afforded the appropriate amount of process despite the Subcommittee's numerous efforts to minimize the burden on Backpage and ensure compliance with the subpoena.

Finally, Mr. Ferrer cannot seriously argue that the Subcommittee's "shifting demands violate due process," Opp'n at 42, when the demands have shifted precisely to accommodate Mr. Ferrer's concerns and facilitate Backpage's compliance. The Subcommittee tried to minimize the burden on Backpage by issuing a new subpoena that reduced the number of categories from forty-one to eight, pursuing more narrow and targeted requests, offering to agree upon electronic search terms or focus on particular document custodians or employees, and choosing to enforce only three of eight categories. Backpage's counsel acknowledged that the categories in the October 1, 2015 subpoena were "more targeted requests." *See* Oct. 23, 2015 Letter at 1. Mr. Ferrer's due process argument lacks merit. Accordingly, the Court will reject it.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant the Subcommittee's Application to Enforce Subpoena *Duces Tecum*, Dkt. 1. Mr. Ferrer shall comply forthwith with the October 1, 2015 Subpoena of the Subcommittee and produce to the Subcommittee all documents responsive to requests 1, 2, and 3 of the subpoena no later than 10 days from the date of this Opinion.

A memorializing Order accompanies this Memorandum Opinion.

Date: August 5, 2016

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge
